DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@holdenlegal.com
Amanda E. Ulrich (ISB No. 7986)
aulrich@holdenlegal.com
HOLDEN KIDWELL HAHN & CRAPO, P.L.L.C.
P.O. Box 50130
1000 Riverwalk Drive, Suite 200
Idaho Falls, ID 83405
Telephone: (208) 523-0620
Facsimile: (208) 523-9518

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| LORI STEVENS,<br><br>     Plaintiff,<br><br>v.<br><br>BRIGHAM YOUNG UNIVERSITY-IDAHO d/b/a BYU-Idaho, a Utah corporation, and SUSAN STOKES, personal representative of the Estate of Stephen Stokes,<br><br>     Defendants. | Case No. 4:16-00530<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Filing Fee: $400.00 |

Plaintiff, Lori Stevens, by and through her counsel of record, Holden, Kidwell, Hahn & Crapo, P.L.L.C. and as a cause of action against Defendant Brigham Young University - Idaho d/b/a BYU-Idaho, and Susan Stokes, personal representative of the Estate of Stephen Stokes, alleges and complains as follows:

## JURISDICTION AND VENUE

1.   This is an action brought under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, the Americans with Disabilities Act, 42 U.S.C. § 12182, the Rehabilitation Act, 29 U.S.C. § 794(a), and Idaho Code § 15-3-804(b).

2.      Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331,  and 1343(4) and 1367; 20 U.S.C. § 681, *et seq*.; 42 U.S.C. § 12181 *et seq.*, and 29 U.S.C. § 790 *et seq.*

3.      This action properly lies in the District of Idaho, Eastern Division, pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

4.      Plaintiff realleges and incorporates by reference paragraphs 1 through 3 as though fully set forth herein.

5.      Plaintiff Lori Stevens ("Stevens or Plaintiff") is a female citizen and resident of the United States of America, who is, and at all times relevant hereto was, a resident of Madison County, Idaho.

6.      Brigham Young University-Idaho ("BYU-I"), is a Utah educational corporation doing business in Madison County, Idaho.

7.      Susan Stokes, as personal representative of the Estate of Stephen Stokes, is, and at all times relevant hereto was, a resident of Madison County, Idaho.

8.      At all times material to this Complaint, BYU-I was operating an educational program or activity receiving federal financial assistance, bringing it under the requirements of Title IX of the Education Amendments Act of 1972,  20 U.S.C. § 1681, the Americans with Disabilities Act, 42 U.S.C. § 12182, and the Rehabilitation Act, 29 U.S.C. § 794(a).

9.      At all times material to this Complaint, Susan Stokes has served as the personal representative of the Estate of Stephen Stokes.

## FACTS COMMON TO ALL COUNTS

10. Plaintiff realleges and incorporates by reference paragraphs 1 through 9 as though fully set forth herein.

11. Stevens began her education at BYU-I in April 2014. She is and was at all times relevant a disabled student.  Stevens suffered and continues to suffer from post-traumatic stress disorder, agoraphobia, severe anxiety, panic disorder, and anorexia.

12. Before enrolling in BYU-I Stevens obtained disability benefits on account of her multiple disabling diagnoses. At the beginning of her academic career at BYU-I, Stevens presented the Disability Services Office with the appropriate documentation from her health care providers regarding her disabilities, and was able to receive certain accommodations. Those accommodations included preferential seating, lenience from professors with regards to attendance, and being excused from group projects and presentations. Letters explaining her needed accommodation were sent to her professors.

13. During the first week of June 2014 Stevens was walking through the hallway in the Ricks Building when she met Professor Stephen Stokes ("Stokes"), faculty of the Sociology and Social Work Department, for the first time. Stokes stopped Stevens and said, "You aren't the typical student here. What's your story?"  Stokes asked her name, and then immediately told her he was an old friend of her deceased father's. Stokes invited her to his office after class to continue discussing her father and her academic future at the University.

14. After class, Stevens went to Stokes' office as invited. Stokes stated that he believed her deceased father inspired him to reach out and say hello to her in the hallway.  Stokes encouraged her to join the Social Work program and offered to be her advisor.  Stokes helped

her fill out the transfer application to the Social Work program.  Stokes repeatedly credited Stevens' deceased father as bringing her to him.

15.     Shortly after Stevens joined the Social Work program, Stokes began to take a heightened interest in her.  He told her he was aware of her disability accommodations through the letters he had received from the Disability Services Office and he asked her to tell him more about her diagnoses. She complied. She explained that she had numerous psychiatric problems including disabling anxiety, agoraphobia, panic attacks, etc.  Stevens explained how she struggled to manage basic functions of everyday life with these disabilities and care for her children as a single mother.

16.     Shortly thereafter Stokes arranged to have food delivered from the local food bank to Stevens' home.  He asked his colleague, Christopher Moore (LDS Philanthropies Director) ("Moore") to assist her family. Christopher Moore served a dual role as Stevens's Stake President.

17.     Stokes reported to Stevens that Moore had told him many derogatory things about Stevens and that she should not trust her bishop or stake president, but rely on him exclusively for assistance.  Apparently, Moore repeatedly warned Stokes that his relationship with Stevens was unhealthy and dangerous.

18.     In the beginning, Stokes did many kind things for Stevens.  He helped her get food from the food bank, he advocated for her at BYU-I, and was a very supportive friend to her.  Stevens saw him as fatherly figure in her life and appreciated his help.

19.     In the fall of 2014, Stokes asked Stevens if she would be his teaching assistant the following semester.  Stevens accepted and was very excited to have a helpful friend at school and a part-time job.

20.     In the fall of 2014, Stokes also began having Stevens listen to his conversations with his wife, telling her how difficult their relationship is.  Stokes told Stevens that the Lord brought the two of them together so they could help one another.  As a father figure, Stevens was grateful for his friendship and assistance and wanted to provide him help as a friend too.

21.     In or about September 2014, after a challenging day, Stevens left the BYU-I campus in tears. She was driving down the road when she received a call from Stokes, who was following her in his own car. Stokes instructed Stevens to pull over. Stevens complied. Stokes got into Stevens's car and sat net to her in the passenger seat as she continued to cry. At one point he brushed her hair away from her face. This caused Stevens to reflexively jump, prompting Stokes to further prod her about her past history of abuse. Stokes, while in her car, told her that Heavenly Father placed her in his life for a reason, and that he (Stokes) is supposed to show her what it feels like to be cared for.

22.     Stokes begins texting and calling Stevens more frequently.  Stokes would ask Stevens to come to his office every day.  Stokes frequently asked Stevens about her past and the abuse she had suffered.  Stevens trusted and respected him.  Stokes told her he was doing what her father would want him to do and it was an honor for him to help her.  Stokes told her he was the closest thing to a patriarch in Stevens' life and she should turn to him for blessings, help, and comfort.  Stokes told Stevens that God had revealed her goodness to him and that he had been given the sacred privilege to help her.

23.     Stokes advocated for Stevens at school and told other he was her advisor, counselor, and friend.  Stokes placed a picture of Stevens and her father on his desk, telling her he had done so because her father had brought her to him for help.

24.     Stokes started shutting the door when he would ask Stevens to come to his office.  He would give her hugs, telling her his heart-to-heart hugs would give her energy and strength. Considering their age difference of approximately 20 years, Stevens viewed him like a father.

25.     In October 2014 Stokes observed Stevens walking with a slight limp. He inquired and she responded that she had strained her back. Stokes asked her to come to his office and closed his office door behind her. He told her he was trained to perform "spinal touches."  Without Stevens' consent, he slid his hand up her shirt and touched the small of her back. Stevens became frightened and started shaking. Stokes said, "You poor thing, you have been so abused."  He then told her that the Lord sent her to him so he could help her overcome her fear.  He then put his hands inside the back of her pants and began to rub her lower back/upper buttocks. Stevens became extremely anxious, but he reassured her that it was "therapy" and that he was helping her to not be fearful of touch. As Stevens continued to stand there shaking and crying, Stokes told her that this kind of touching is not wrong if it is endorsed by God.  Stokes continued to describe Stevens as his dearest friend and a blessing in his life.

26.     Additionally, in or about October 2014, in his office at BYU-I, Stokes asked Stevens if she engaged in "self-gratification" as a way of managing her anxiety. This made Stevens extremely uncomfortable, but she responded that no, she does not because the Church forbids masturbation. Stokes informed her that it is only forbidden for youth but not older members, and encouraged her repeatedly to self-gratify as a means of managing her anxiety disorder.

27.     Stokes began texting, calling, and showing up at Stevens' house.  He would show up at her children's events, programs, and other events.  Stokes brought some of his clothing to

Stevens, telling her he wanted her wrapped up constantly in his energy and love so she felt safe and cared for.

28.    During the fall of 2014 Stevens was receiving mental health services from Upper Valley Resource and Counseling Center. She would receive therapy in their office and they would send a case worker to her home to work with her on various issues related to her disabilities including the setting of appropriate personal boundaries, which is difficult for her based on Stevens' disabilities.  On one of the occasions when the case worker arrived at her home, Stokes was at Stevens' home.  Stokes excused himself and left during the session but returned before the worker had left.  The worker, Tonya Hollist, spoke pointedly with Stevens, in Stokes' presence, that she (Hollist) found it strange that a professor would be in her home and that it was a "very serious boundary issue that needed to be addressed." Stevens still believed that Stokes was acting as a father figure and friend in her life.

29.    During another one of Stokes' "spinal touch" sessions in late fall 2014, in his office at the BYU-I campus he told Stevens that he wanted to show her how to self-gratify.  He placed his hands down her pants without her permission and began to rub her private area. Stevens struggled against his advances and tried to move away. She told him what he was doing was not okay. He would not stop and told her to "trust" him and have more faith in Heavenly Father.  He continued to do this to Stevens repeatedly, despite her discomfort, and told her it would help her anxiety.  Stokes' actions greatly increased Stevens' fear and anxiety.

30.    In late fall 2014, Stevens was looking for an apartment for her children.  Stokes told Stevens he could show her one and told her to meet him at an apartment complex across from the Rexburg Rapids.  Stokes told her his daughter and her husband had just moved out and he would show it to her because he still had the key.  Stevens met him to see the apartment.

When she walked in, only Stokes was there and a blanket had been laid out on the floor in the bedroom.  Stokes asked her to sit and talk with him.  He told her how grateful he was that the Lord had brought them together.  Stokes made Stevens lie on the floor where he layed down on top of her fully clothed and began moving as if he were having sex until he reached orgasm.

31.     Mid-November 2014, Stokes came to Steven's home uninvited.  He lifted up Stevens' dress and pulled down her underwear without her permission. When she resisted and moved away, Stokes told her that God had given him this sacred opportunity to look at her naked. He told her that there was a difference between violent sex and loving intimacy, and that the Lord wanted him to show her the difference.

32.     In January 2015, Stevens began working for BYU-I as a teaching assistant under the direct supervision of Stokes in all of his classes that semester.  She was employed by BYU-I and earned $8.25 per hour.

33.     During the semester she served as his teaching assistant, Stokes began to confide in Stevens more about the dysfunction in his own marriage. Stokes would take calls from his wife and place her on speaker phone so that Stevens could hear her yelling, swearing and berating him regarding various issues in their marriage.  He would frequently text Stevens derogatory comments about his wife, begging Stevens that he needed her in his life.

34.     Stokes spent a great deal of time with Stevens in his office discussing her past of traumatic physical and sexual abuse, and the disabilities that she suffered as a result of her trauma, taking on a role as a counselor.

35.     During her employment he continued to insist on providing "therapeutic" rubbing and touching to "assist" Stevens in managing her anxiety. To the contrary, her anxiety became

unmanageable at this time. Stevens sought treatment and received fluids and anxiety medication through an IV to deal with the anxiety that was being triggered and aggravated by Stokes' conduct. She was dismayed when he began to show up to these appointments without invitation.

36.     From approximately January 2015 until July 8, 2016 Stevens was seen at the medical center or the ER at Madison Memorial at least fourteen times for administration of IV fluids and anxiety medication to deal with the stress of her overwhelming anxiety, panic attacks, and the accompanying exacerbations caused by Stokes aggressive harassment, stalking and sexual assault and battery.

37.     On or about February 24, 2015, Stokes told Stevens that they were brought together by God, that she needed him in her life, and that he will never leave her. He told Stevens she was now his "wife," and that God has directed him to take Stevens as his wife.  Stokes claimed that God was finally blessing him for staying in an unhappy marriage for years.

38.     Sometime in approximately  mid-March 2015, after dropping his wife off at the temple for her regular Thursday session, Stokes located Stevens at school and told her to get into his wife's car.  Stokes drove Stevens to Walker's Siding, which is beyond her comfort zone as an agoraphobic and a major trigger for panic attacks. She cried and pleaded with him to take her back to campus. Stokes refused and insisted that this was good "therapy" for her. As he intended, Stokes drove far enough away from her comfort zone that Stevens broke down. Stevens was terrified. She could not think; she could not see; she could not hear. Once Stokes accomplished his mission of utterly paralyzing Stevens with fear, he grabbed her hand and forced it into his pants and onto his erect penis. He insisted that she "owed" it to him to take care of his needs. He told her this would take her mind off of her panic and help her relax.

Stevens begged to go back. Stokes refused to return her until she complied with his demands. He told her she had an important lesson to learn from the Lord about trust and she could not go back until she learned her lesson. Once Stokes ejaculated onto her hand he returned her to her campus.

39.    On or about April 21, 2015, Stokes performed oral sex on Stevens, and then simulated sex on her naked body until he ejaculated onto her. In the months following this incident Stokes initiated similar sexual activity with Stevens.  Stokes told Stevens that as long as he did not ejaculate inside her, they were not breaking any temple covenants.  Stokes also told Stevens his semen on her body would serve as medicine for her anxiety and health.  These acts took place in several of BYU Idaho's parking lots, class rooms, the green house area on campus south of the Ricks building, and the Hinckley building. This sexual contact occurred at least three (3) times per week from approximately April 21, 2015 until June 30, 2016.

40.    As Stokes' obsession and control increased, the sexual harassment and battery persisted. All the while, Stevens' anxiety and depression worsened. She began to skip school and avoided being on campus in an effort to stay away from Stokes. Her efforts to avoid him proved unsuccessful, however, as he would show up at her house between classes, after work, during church and virtually any free time he had. He would show up at her children's school performances and activities and remind her that they were "his" children too because she was his wife.

41.    Where Stevens had been maintaining very good grades before, her grades began to seriously suffer and as a direct and proximate result of the sexual harassment, intimidation, stalking and sexual battery she suffered daily from Stokes.

42.     At this point Stokes controlled virtually every aspect of Stevens' life, from her finances, to her family decisions, to her medical treatment. She had no autonomy. He warned her that because he loved her so much, he would call the police on her if she failed to respond to his texts or calls within five minutes. He proceeded to text her during all hours of the day and night.

43.     Stevens wanted to end this harmful relationship but felt trapped.  Stokes had been so kind to Stevens as a father figure when they first met, but she wanted nothing to do with his sexual advances and obsession with her as his "wife."  Stevens texted him that it was over, to which he responded "never," and proceeded to obsessively manage her life under the guise that he was her loving husband, sent by God.

44.     Stevens came to believe that if she ended the relationship, Stokes would retaliate against her and ensure that she could not complete her degree. Stevens was convinced that if she would submit to him and do whatever he wanted he would allow her to graduate. She had a family to provide for and she dreamed of becoming self sufficient.

45.     Other students, including Danielle Spencer ("Spencer"), began to notice the change in Stevens' demeanor and school attendance. Spencer, a peer of Stevens' and a student of Stokes', asked Stevens what was going on.  After some prodding, Stevens disclosed to Spencer that she felt trapped in a relationship with Stokes.  Spencer was aware of Stevens' disabilities and was aware that Stevens was vulnerable to abuse.  Spencer had personally observed Stokes kiss Stevens, tell her he loved her, and rub Stevens' arms and legs in a physically intimate manner.

46.     Spencer shared this information with Dan Barnes ("Barnes"), BYU-I's school counselor. Barnes told Spencer that if she did not report Stokes that he would.

47.   On or about June 6, 2016, Spencer confronted Stokes about his misconduct. Stokes responded that it was none of Spencer's business what he did with Stevens.  Further, Stokes told Spencer that the Lord had approved his relationship with Stevens, and that Spencer should not be judgmental.  Spencer stormed out of the room, telling Stokes he was wrong.

48.   On or about June 7, 2016, Stokes sent a text message to Stevens that if Spencer continued to meddle in their relationship that she (Spencer) would lose this "pushing match" and that with one phone call he would have Spencer's internship at the Juvenile Corrections Center terminated. He reminded Stevens that she could not trust anyone other than him, and that Spencer would only serve to "re-traumatize" her. Stevens was afraid for Spencer and what Stokes' and his colleagues might do to jeopardize Spencer's academic career.

49.   On or about June 7, 2016, Spencer went to Stevens' home and said that if Stevens would not report Stokes, then she [Spencer] would. Stevens became terrified that she herself was going to lose her degree.

50.   After Spencer left Stevens' home, Stokes called Stevens and she reported to him about her conversation with Spencer. Stokes instructed Stevens to go to Paul Roberts ("Roberts") (Head of the Social Work Program) first thing the next morning and "protect" him.  He specifically instructed her to make "NO REPORT" but to explain their relationship in a way that would not point to any misconduct on Stokes' part. Stokes articulated his plan. He intended to deliver Stevens into Roberts' office first thing in the morning and hopefully well before Spencer could get to Roberts herself.

51.   That next morning, on June 8, 2016, at approximately 8:00 a.m. Stokes personally escorted Stevens to Roberts' office. He reminded her that she was to make "NO REPORT."  He knocked on the door and directed her into the office.

52.     As Stevens' meeting with Roberts was just beginning, another professor, Richard Whiting ("Whiting") (faculty for the Social Work Program) knocked on the door and escorted Spencer into the room. Whiting stated that Spencer "needed" to be there.  He then patted Stevens on the back and told her that she was doing the "right thing."

53.     Stevens, Spencer and Roberts met in Robert's office for approximately four hours.  During this meeting Stevens disclosed that she and Stokes had a physical relationship that involved kissing and leg rubbing. She disclosed that Stokes frequently came to her home, that Stokes had told her he was "in love" with her and that he would "never" withdraw from his relationship with her.  Likewise, Spencer reported what she had observed.

54.     Roberts asked Stevens if she and Stokes "broke any covenants.  Stevens asked for clarification and definition of what he meant by 'covenant breaking.'"  Roberts defined "covenant breaking" as "ejaculation inside of her (Stevens') vagina."  Stevens answered honestly to the question as defined by Roberts and told Roberts that Stokes had not, in fact, ejaculated inside of her.

55.     Roberts seemed relieved that no "covenant breaking" occurred but agreed that the other things that were going on between the two were not "good."  At this point the discussion got redirected toward an inquiry into Steven' own history of victimization and trauma.  As the noon hour approached the three took a break.

56.     When they reconvened Roberts had included Nathan Meeker ("Meeker"), Chair of the Sociology and Social Work Department in the meeting. Stevens was subjected to another five hours of interrogation on the part of Meeker and Roberts. Among other things, Stevens continued to disclose that Stokes had "taken over her life" and that she had a physical relationship with Stokes. Stevens said she believed that Stokes was the victim of an abusive

marriage.  Meeker seemed moved by this sad fact and stated that due to Stokes' abusive home life, BYU-I should be more supportive of Stokes.

57.     The stress of the meeting triggered Stevens' anxiety and she began to have a panic attack. Both men stated that it was clear to them that Stevens was "vulnerable" and that Stokes was using his position of power to manipulate her. They appeared to agree that it was his (Stokes') responsibility to keep the relationship appropriate and professional.  Throughout the meeting Stokes was texting Stevens and encouraging her to follow his manipulative plan.

58.     The meeting concluded with the two Department Heads summarizing the plan of action as follows:

   a)     showing an increase of love and understanding and lenience to Stokes who was being victimized by his abusive wife;

   b)     not reporting to the Title IX office or the Dean's Office;

   c)     only reporting to Steven Dennis ("Dennis") (Chair of the Sociology and Social Work Department);

   d)     advising Stevens that she would be welcome to return to school if she were able to get an ecclesiastical endorsement from the Dean of Admissions (acting in his dual role, Bishop Robert Garrett.)

59.     Stevens and Spencer were dismissed.  Immediately thereafter Roberts and Meeker reconvened Stokes to discuss the allegations. After a matter of minutes Stokes exited the room smiling triumphantly and reported to Stevens, (who was huddled in the corner of his office crying), that everything was fine and thanked her for "saving him."

60.     The next day Stokes received an email from Department Chair, Dennis, informing him that he had been reported as having an inappropriate relationship with a student and that all

contact with her must stop to avoid further action being taken. There would be no investigation from the Title IX office, no report to the Dean, no action taken to protect Stevens other than one empty letter to her abuser. Stokes would suffer no consequences, receive no discipline and no remedial training. He would not need his Bishop's endorsement to keep his job, his retirement benefits and his reputation would remain intact.

61.   Immediately after receiving the email that day, Stokes went to Stevens' home, showed her the email, and reiterated that she was his wife and nobody would keep him away from her. Stokes, emboldened and validated by his colleagues, continued to harass, stalk, assault and sexually batter his victim, Stevens.

62.   Stokes sent a follow up text message that night reminding her that the email warning from Dennis would not serve its intended purpose of keeping him away from her.

63.   Even after the meeting and warning from Dennis, Stokes continued to regularly sexually assault and batter Stevens on the BYU-I school campus and in her home.

64.   Stokes died on July 1, 2016 due to complications of heart surgery.

65.   Stevens received no contact from the Title IX office, she received no follow up from the concerned department heads and department Chair.  Stevens was offered no additional assistance in accommodating the devastating effects that Stokes' conduct had on her grades. No one ever asked Stevens if the letter and the warning to Stokes was sufficient in deterring future contact.

66.   BYU-I's Sexual Misconduct Policy states that "the university prohibits sexual misconduct in all of its forms, including (but not limited to) sexual harassment, sexual violence, domestic violence, dating violence, stalking, sexual exploitation, or indecent exposure (collectively 'Sexual Misconduct') perpetrated by or against university students, university employees,

participants in university programs, or visitors to its campus, whether the behavior occurs on or off campus."

67.   BYU-I's Sexual Misconduct Policy specifically prohibits relationships between a professor and a student "while one individual has the power to either reward or penalize the other person."

68.   BYU-I's Sexual Misconduct Policy, requires the following regarding reporting: "University employees who become aware of or reasonably suspect any incidents of Sexual Misconduct must promptly report the information to the Title IX Coordinator."

69.   In spite of the numerous officials who had actual notice of Stokes' discriminatory and abusive conduct, no Title IX investigation was ever conducted.

70.   As instructed by Meeker and Roberts, Stevens met with her Bishop (Bishop Garrett is also the Dean of Admissions) on July 3, 2016. She was emotionally distraught. Using information that Bishop Garrett apparently acquired in his dual role as director of the admissions office, Bishop/Dean Garrett demanded to know the level of "sexual activity" that occurred between Stevens and Stokes.

71.   Stevens told him that they had "gone as far as possible without having full blown sex," meaning that Stokes had never ejaculated inside her. Bishop/Dean Garrett, abusing his authority through his ecclesiastical calling, was able to retaliate against Stevens on behalf of BYU-I by refusing to allow her to return to BYU-I on account of "her" conduct in being victimized and traumatized by an esteemed and "beloved" professor.

72.   The Bishop/Dean of Admissions told her he would not give her his endorsement and sent her a letter telling her he was presenting her for discipline at a Church Court. Stevens pleaded with Dean/Bishop Garrett to allow her to return to school. She needed to graduate to become

self-sufficient. He told her not to worry the Church would assist with food, which it has since refused to do.

73. Stevens was depressed and suicidal after her meeting with Garrett. She attended a counseling session with Barnes, because she knew that Spencer had already confided in him about her situation with Stokes. Barnes told her that he had reported Stokes to the Dean's office after Spencer reported to him and before Stokes died. Barnes was worried about Stevens' mental state and called for an ambulance to take her to Madison Memorial Hospital.

74. Two days later Barnes called Stevens and asked to meet with her. Barnes indicated that he would be willing to be an advocate for her with the school. Stevens signed a release for Barnes to speak with the BYU-I Administration. Barnes relayed to Stevens that he had met with the Administration and it was determined that she was not eligible to return to school, but they were considering allowing her to continue to receive counseling services there.

75. On July 27, 2016 Stevens was placed on academic suspension for poor grades, which were due entirely to her missing class in an effort to avoid Stokes, and attempt to manage her rampant anxiety and panic that became unmanageable during Stokes' life. Unfortunately for Ms. Stevens, she is only a handful of credits and an internship away from completing her degree.

76. Stevens arranged to meet with her stake president, Moore, with her counselor who has treated her for the last approximately 10 years. Stevens was very concerned about her temple recommend and the threat of a Church court. Moore confirmed that Stevens' temple recommend was still valid.

77.   Relieved, Stevens asked Moore to provide her an ecclesiastical endorsement so that she could again attend school. Moore refused, telling Stevens that he would not even discuss that with her until her potential lawsuit against BYU-I was dismissed.

78.   Based on information and belief, Stokes has engaged in similar behavior with other female students.

## COUNT ONE
### Teacher-on-Student Hostile Environment/Sexual Harassment under
### Title IX of the Education Amendments Act

79.   Stevens realleges and incorporates by reference paragraphs 1 through 78 as though fully set forth herein.

80.   Stokes had authority and power of Stevens as it related to her grades, disability accommodation in his classes, as a teaching assistant, and in his declared role as her counselor.

81.   BYU Idaho is an educational institution which receives federal funding and is therefore subject to the mandates of 20 U.S.C. § 1681 *et seq.* ("Title IX").

82.   Beginning in approximately September 2014 and continuing through July 2016, Stokes engaged in a serious of inappropriate, offensive, intimidating and discriminatory acts towards and/or against Stevens, based upon her sex, which altered the terms and conditions of her educational experience at BYU-I.

83.   Stokes discriminatory and abusive behavior was directly reported to Barnes, the Director of the Counseling Center at BYU-I, who is an official at BYU-I who had authority to address the discrimination and to institute corrective measures on Stevens' behalf.

84.     Stokes discriminatory and abuse conduct was also reported to Roberts, Head of the Social Work Program, who is an official at BYU-I who had authority to address the discrimination and to institute corrective measures on Stevens' behalf.

85.     Stokes discriminatory and abuse conduct was also reported to Whiting, faculty for the Social Work Program, who is an official at BYU-I who had authority to address the discrimination and to institute corrective measures on Stevens' behalf.

86.     Stokes discriminatory and abuse conduct was also reported to Meeker, Chair of the Sociology and Social Work Department, who is an official at BYU Idaho who had authority to address the discrimination and to institute corrective measures on Plaintiff's behalf.

87.     Professor Stokes discriminatory and abuse conduct was also reported to Steve Dennis, Dean of the Education & Human Development Department, who is an official at BYU-I who had authority to address the discrimination and to institute corrective measures on Stevens' behalf.

88.     All five of these officials at BYU-I who had actual knowledge of the discrimination and abuse suffered by Stevens' at the hands of Stokes also had substantial education and training in counseling, mental health, and protecting victims of abuse due to their advanced education in social issues.

89.     None of the discriminatory or abuse conduct was report by any of these BYU Idaho officials to the Title IX Coordinator, as required by BYU-I's Social Misconduct Policy.

90.     All five of these officials at BYU-I, in spite of their capacity and obligation to take corrective action to protect Stevens, failed to adequately respond and/or responded in a manner that was clearly unreasonable in light of the abuse circumstances and Stevens was being subjected to.

91. The discriminatory conduct was so severe and pervasive, and objectively offensive that it deprived Stevens of access to the educational opportunities or benefits provided by BYU-I.

92. BYU Idaho's failure to adequately address the discriminatory and abuse conduct demonstrated deliberate indifference to discrimination.

93. As a direct and proximate result of BYU-I's actions and/or failure to act, Steven has suffered and will continue to suffer emotional distress consisting of outrage, shock and humiliation, based upon the discrimination she experienced. Further, Stevens has suffered and will continue to suffer a loss of educational opportunities, earnings and other employment benefits and job opportunities. Stevens is thereby entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to him, including reinstatement.

94. BYU-I's conduct was malicious and oppressive, and done with reckless disregard for Stevens' federally protected rights, for which he is entitled to punitive damages.

## COUNT TWO
### Teacher-on-Student Quid Pro Quo Sexual Harassment

95. Stevens realleges and incorporates by reference paragraphs 1 through 94 as though fully set forth herein.

96. Stevens was subjected to quid pro quo sexual harassment in that Stokes had power to affect and harm Stevens' ability to complete her education.

97. BYU-I officials with authority to take corrective action had actual notice of Stokes' sexual misconduct.

98. BYU-I acted with deliberate indifference to the abuse and discrimination directed at Stevens.

99. As a direct and proximate result of BYU-I's actions and/or failure to act, Steven has suffered and will continue to suffer emotional distress consisting of outrage, shock and humiliation,

based upon the discrimination he experienced. Further, Stevens has suffered and will continue to suffer a loss of educational opportunities, earnings and other employment benefits and job opportunities. Stevens is thereby entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to him, including reinstatement.

100. BYU-I's conduct was malicious and oppressive, and done with reckless disregard for Stevens' federally protected rights, for which he is entitled to punitive damages.

**COUNT THREE**
**Intentional Infliction of Emotional Distress**
**(As against Stokes)**

101. Stevens realleges and incorporates by reference paragraphs 1 through 100 as though fully set forth herein.

102. Stokes intentionally and/or recklessly acted in an extreme and outrageous fashion in his treatment of Stevens.

103. As a direct and/or proximate result of Stokes' actions, Stevens suffered, and still suffers, severe emotional distress, causing damage to Stevens, all in amounts to be proven at trial.

**COUNT FOUR**
**Negligent Infliction of Emotional Distress**
**(As against Stokes)**

104. Stevens realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

105. At all times relevant to this Complaint, Stokes had a duty recognized by law requiring him to conform to a certain standard of conduct in his treatment of Stevens.

106. Stokes breached his duty owed to Stevens.

107.   Stokes' breach of duty to Stevens caused Stevens to suffer from severe emotional distress and incur damages, all in amounts to be proven at trial.

## COUNT FIVE
### Assault and Battery
### (As against Stokes)

108.   Stevens realleges and incorporates by reference paragraphs 1 through 107 as though fully set forth herein.

109.   Stokes knew that Stevens had numerous disabilities that made her especially vulnerable to abusive conduct.

110.   Stokes took advantage of Stevens' vulnerability into forcing her into a sexual relationship with Stokes.

111.   Stokes on numerous occasions touched Stevens physically, and in a sexually abusive manner.

112.   Stokes' physical contact Stevens' person was harmful and without consent.  In fact, Stevens informed Stokes on numerous occasions that she did not want to participate in the sexual conduct initiated and pursued.

113.   Stokes' physical contact with Stevens' person was unlawful, harmful, and offensive.

114.   Stokes' physical contact with Stevens' person occurred while Stevens was a student at BYU-I.

115.   Stevens suffered severe emotional and physical harm Stokes' physical and sexual abuse.

116.   Defendant Susan Stokes as personal representative of Stokes' estate is liable to Stevens for the assaults and batteries committed against Stevens.

117.   As a direct and proximate result of Stokes' actions and/or failure to act, Stevens has suffered and will continue to suffer physical injury, medical expenses and costs, as well as emotional distress consisting of outrage, shock and humiliation, reasonably occurring and likely to

occur based upon the assault and battery she experienced.  Stevens is thereby entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to her.

## COUNT SIX
### Violation of the Rehabilitation Act and Americans with Disabilities Act
### (Hostile Learning Environment)

118.    Stevens realleges and incorporates by reference paragraphs 1 through 117 above, as though fully incorporated herein.

119.    Stevens has, and at all times pertinent hereto, had, disabilities within the meaning of the Rehabilitation Act and the Americans with Disabilities Act.

120.    Stevens' disabilities include post-traumatic stress disorder, agoraphobia, severe anxiety, panic disorder, and anorexia, which substantially limit Stevens' major life activities, such as the ability to care for her children, venture into public and attend class.

121.    BYU-I recognized Stevens' disabilities and provided her professors with an accommodation letter explaining what accommodations Stevens should be provided in connection with her attendance at BYU-I.

122.    Stokes was aware of Stevens' disabilities both by virtue of the accommodation letter and conversations in which he asked Stevens multiple details about her disabilities when they first met.

123.     Based upon Stevens' disabilities, Stokes targeted Stevens as a vulnerable person whom he could groom for a sexual relationship.

124.    Stokes used his knowledge of Stevens' disabilities to coerce Stevens into an unwelcome, unwanted sexual relationship.

125.    Stokes' use of Stevens' disabilities to coerce Stevens was abusive to Stevens and unwelcome

and unwanted by Stevens.

126.   Stokes' targeting of Stevens based upon her disabilities constitutes harassment and a hostile educational environment.

127.    Stokes' targeting of Stevens based upon her disabilities was so severe that it altered the conditions of Stevens's education and created an abusive, hostile learning environment.

128.   BYU-I had actual knowledge of Stokes' actions toward Stevens and was deliberately indifferent regarding Stokes' actions toward Stevens.

129.   BYU-I violated the Rehabilitation Act and the ADA by subjecting Stevens to a hostile learning environment.

130.   As a direct and proximate cause of BYU-I's actions and/or failure to act, Stevens has suffered and will continue to suffer emotional distress consisting of outrage, shock and humiliation due to the hostile learning environment she experienced.  Further, Stevens has suffered and will continue to suffer loss of educational opportunities and associated opportunities, including employment subsequent to obtaining a degree.  Stevens is thereby entitled to general and compensatory damages, such amount to be determined at trial, as well as any other equitable remedies available to her.  Additionally, Stevens is entitled to injunctive relief to allow her to return to school and complete her degree.

131.   BYU-I's conduct was malicious and/or done with reckless disregard for Stevens' federally protected rights, for which Stevens is entitled to punitive damages.

**ATTORNEY'S FEES**

132.    As a further and direct result of Defendants' actions and/or failures to act, Stevens has been compelled to retain the services of counsel, and thereby incurred, and will continue to incur, costs, expert witness fees, and attorney fees which should be required to be paid by Defendant pursuant to Idaho Code §§ 12-120 and 12-121; 20 U.S.C. § 1681, *et seq*.; 42 U.S.C. § 1988;  and 29 U.S.C. § 794(a).

### DEMAND FOR JURY TRIAL

Stevens demands trial by jury as to all issues triable to a jury in this action.

### PRAYER FOR RELIEF

Wherefore, Stevens seeks judgment against Defendants BYU-I and Susan Stokes as follows:

1.    For compensatory and general damages in an amount as shall be proven at trial, and any available equitable remedies;

2.    For punitive damages in an amount as shall be proven at trial;

3.    For attorney's fees pursuant to statute and costs of suit;

4.    For prejudgment interest on all amounts claimed; and

5.    For such other and further relief as the Court deems just and proper.

Dated this 9th day December, 2016.

                              /s/
                              DeAnne Casperson, Esq.
                              Holden, Kidwell, Hahn & Crapo, P.L.L.C.

G:\WPDATA\DC\19335 Stevens\Pleadings\Complaint.wpd