UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LORI STEVENS,<br><br>                    Plaintiff,<br><br>v.<br><br>BRIGHAM YOUNG UNIVERSITY-<br>IDAHO d/b/a/ BYU-Idaho, a Utah<br>corporation,<br><br>                    Defendant. | Case No.: 4:16-cv-00530-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

# I. OVERVIEW

This matter comes before the Court on ten Motions centered on different claims of privilege the parties to this case, and one third-party, have asserted.[1] In the order filed, those Motions are:

1. Brigham Young University-Idaho's ("BYU-I") Motion Regarding Plaintiff's Waiver of the Priest-Penitent Privilege (Dkt. 46);

2. BYU-I's Motion to Seal its Motion Regarding Plaintiff's Waiver of the Priest-Penitent Privilege (Dkt. 45);

3. BYU-I's Motion to Compel Plaintiff's Compliance with Her Discovery Obligations (Dkt. 47);

---

[1] Dockets 51 and 52 were not filed as motions, but the parties briefed them as motions and the Court finds it appropriate to treat them as motions.

4. The Church of Jesus Christ of Latter-day Saints' (the "LDS Church") Motion to Intervene (Dkt. 49);

5. The LDS Church's Motion Regarding the Common Interest Privilege (Dkt. 51);

6. BYU-I's Motion Regarding Privilege Claims (Dkt. 52);

7. Plaintiff Lori Stevens' Motion for Protective Order (Dkt. 55);

8. BYU-I's Motion to Seal Exhibit 19 to the Declaration of Wade L. Woodard filed in support of the Motion to Compel Plaintiff's Compliance with Her Discovery Obligations (Dkt. 66);

9. BYU-I's Motion to Seal its Reply Brief and Supporting Declarations and Exhibits filed in Support of its Privilege Claims (Dkt. 69); and

10. Stevens' Motion to Strike Reply Declarations and References to Prior Settlement Discussions (Dkt. 76).

The Court finds good cause to GRANT the Motions to Seal (Dkts. 45, 66, 69) and will not discuss those Motions further. As for the remainder of the Motions, the Court addresses each of them in turn.

## II. BACKGROUND

Stevens filed this case against BYU-I and Susan Stokes, as personal representative of the Estate of Stephen Stokes,[2] on December 9, 2016. Dkt. 1. Prior to any answer or appearance by Defendants in this matter, Stevens filed her Amended Complaint on March 3, 2017. Dkt. 4. In her Amended Complaint, Stevens, a former BYU-I student,

---

[2] The Court will refer to Defendant Susan Stokes as "Susan Stokes" and Stephen Stokes as "Stokes."

alleges generally that Stokes, a former BYU-I professor, initiated an unwanted relationship with her while she was a student and Stokes was a professor at BYU-I. Stevens alleges that this relationship ultimately became sexually and emotionally abusive. Stevens further asserts that she, along with another student, reported Stokes' inappropriate and abusive behavior to several BYU-I professors and officials, who failed to take any action. The relationship ended when Stokes died on July 1, 2016, from complications during heart surgery.

On January 26, 2018, the Court conducted an informal discovery dispute conference with the parties in this case. The parties indicated that both sides were claiming privileges to which the other side objected. After input from all parties, the Court directed the parties to formally brief the claims. While the parties were briefing the claims, the LDS Church also moved to intervene to assert its own privileges.

On February 9, 2018, Susan Stokes, as Personal Representative of the Estate of Stephen Stokes, notified the Court that she and Lori Stevens had reached a settlement agreement. Dkt. 43. Thus, the Estate is no longer involved in this lawsuit.

Shortly thereafter, the Court denied Stevens' Motion to Amend her Complaint to assert a negligence per se claim and a negligent supervision claim. Dkt. 54. This left the following claims pending against BYU-I: (1) teacher-on-student hostile environment/sexual harassment actionable under Title IX of the Education Amendments Act; (2) teacher-on-student quid pro quo sexual harassment; (3) hostile learning environment in violation of the Rehabilitation Act and the Americans with Disabilities Act; and (4) violation of the Idaho Human Rights Act.

## V. STEVENS' MOTION FOR PROTECTIVE ORDER (Dkt. 55)

In this Motion, Stevens seeks a protective order regarding communications she had with Laurie Gaffney, her former attorney, and an individual named Hollie Anderson.

### A. Background

Laurie Gaffney of Gaffney Law Office originally represented Stevens in this dispute. On October 22, 2016, Stevens fired Gaffney via a notarized Termination of Services letter that she and her friend, Hollie Anderson, drafted. The letter states, among other things, that Gaffney "sought remedies and methods to file a complaint against [Stevens'] wishes"; misrepresented who she is and what she stands for; "mistreated her, and "coerced and manipulated" her when she "was sick, on medication, and under extreme duress." Dkt. 61-2.

Stevens provided a copy of this letter to a third party, Roland Blaser. *See* Dkt. 61-3. In addition, Stevens' current counsel voluntarily produced this letter to BYU-I's counsel at Blaser's deposition, allowed BYU-I to mark it as an exhibit, and allowed BYU-I's counsel to question Blaser about the letter. At the deposition, Blaser revealed information that Stevens had told him about her communications with Gaffney. Stevens told Blaser Gaffney was planning to sue BYU-I for a million dollars and that Gaffney had said "no one in the church was supposed to talk with [Stevens] except through Gaffney." *Id.* at 11, 17. Stevens did not want either of these things. *Id.* Stevens also told Blaser she wanted to be compensated "for the year she was out of school." *Id.* at 20. Stevens told Blaser about an incident in which someone, presumably from Gaffney's law firm, came

to her home and forced her to sign a legal document when she was "throwing up" in her bathroom. *Id.* at 23.

Stevens also disclosed the letter and additional information about her communications with Gaffney to Jon and Evona Beesley, who, in turn, and with Stevens' permission, shared that information with other third parties, including Brad Bowen, Randy Austin, Wilford Anderson, Nick Rammell, and Nate Reese (the parties describe these individuals as upper-level religious leaders). Based on these facts, BYU-I ask the Court to find:

> That Stevens has waived the attorney-client privilege as to all communications she had with Gaffney relating to (a) her termination of Gaffney and the reasons for that termination; (b) the "facts" of the case as relayed by Stevens to Gaffney versus how Gaffney outlined them in the complaint; (c) Stevens' purpose for filing this lawsuit and what she hopes to gain from it, including the amount of any monetary award she seeks and what she authorized Gaffney to request; and (4) any agreement between Stevens and Gaffney for the payment of attorney's fees and costs.

Dkt. 61, at 21.

While Gaffney was representing Stevens, she had Hollie Anderson enter into a contract entitled "CONFIDENTIALITY AGREEMENT RE: LORI STEVENS" ("Confidentiality Agreement"). This contract provided that "[d]ue to [Stevens'] disabling anxiety, a confidant [(Anderson)] is being trusted to assist the client in communications with the firm." Dkt. 61-16. Stevens listed Anderson as a witness in her Initial Disclosures. As such, on January 2, 2018, BYU-I served a subpoena upon Anderson, in which it sought documents, including text messages, social media posts, emails, notes and journal entries, relevant to the matters at issue. In response, Stevens' counsel

produced a few documents and stated that Stevens was claiming a privilege as to Stevens'

communications with Anderson pursuant to the Confidentiality Agreement. Later, after

BYU-I made multiple additional requests, Stevens' counsel produced 49 pages of

partially redacted text messages and a privilege log. BYU-I now asks the Court to hold:

> That Stevens' communications with Anderson are not protected by the
> attorney-client privilege and, as such, Anderson must produce all documents
> responsive to BYUI's subpoena without redactions. In the alternative, should
> this Court find that some of Stevens' communications with Anderson are
> potentially privileged, BYUI respectfully asks that this Court order Stevens
> to produce competent evidence sufficient to prove that the documents she has
> withheld are, in fact, protected by the attorney-client privilege.

Dkt. 61, at 21.

## B. Applicable Law

Pursuant to Federal Rule of Evidence 501, "federal law governs the availability

and scope of the attorney-client privilege in nondiversity actions." *Admiral Ins. Co. v.*

*U.S. Dist. Court for Dist. of Ariz.*, 881 F.2d 1486, 1492 (9th Cir. 1989). "Ordinarily, the

party asserting attorney-client privilege has the burden of establishing all of the elements

of the privilege." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1099 (9th Cir. 2007). The

essential elements of the attorney-client privilege are:

> (1) . . . legal advice of any kind is sought
>
> (2) from a professional legal adviser in his capacity as such,
>
> (3) the communications relating to that purpose,
>
> (4) made in confidence
>
> (5) by the client,
>
> (6) are at this instance permanently protected

(7) from disclosure by himself or by the legal adviser,

(8) unless the protection be waived.

*Admiral Ins.*, 881 F.2d at 1492 (citation omitted). "The privilege may be waived by the client either implicitly, by placing privileged matters in controversy, or explicitly, by turning over privileged documents [to a third party]. Inadvertent disclosure can also result in a waiver of the privilege." *Gomez v. Vernon*, 255 F.3d 1118, 1131 (9th Cir. 2001). In addition, "[t]he attorney-client privilege is [usually] waived when the communication between the attorney and client is made in the presence of a third party." *In re Mortg. & Realty Tr.*, 212 B.R. 649, 652 (Bankr. C.D. Cal. 1997) (citing *United States v. Landof*, 591 F.2d 36 (9th Cir. 1978)). Moreover, "it has been widely held that voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject." *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981). Such a waiver is often referred to as a "subject matter waiver." Significantly, "the Ninth Circuit [has] (1) limited the breadth of subject matter privilege to the matters actually disclosed (rather than general questions) and (2) found a waiver of subject matter only when attorney client communications were used as both a sword and a shield." *Truckstop.Net, L.L.C. v. Sprint Commc'ns Co., L.P.*, No. CV-04-561-S-NRS, 2007 WL 2480001, at *5 (D. Idaho Aug. 29, 2007).

*C. Analysis*

1. Communications with Anderson

Stevens argues her communications with Anderson and her communications with Gaffney during which Anderson was present are protected by the attorney-client privilege. In support of this assertion, Stevens first points to Rule 1.14 of the Idaho Rules of Professional Conduct.[3] This Rule provides that when a "lawyer reasonably believes that the client has diminished capacity, . . . and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client . . . ." I.R.P.C. 1.14(b). Comment 3 to this Rule further provides that "[t]he client may wish to have family members or other persons participate in discussions with the lawyer. When necessary to assist in the representation, the presence of such persons generally does not affect the applicability of the attorney-client evidentiary privilege." I.R.P.C. 1.14 cmt. 3.

Some other authorities have acknowledged such an exception to the general rule that the presence of a third-party destroys the attorney-client privilege. For such an exception to apply, the Court examines "whether the client reasonably understood the conference to be confidential" despite the presence of the third party and "whether the presence of the relative or friend was reasonably necessary for the protection of the client's interests in the particular circumstances." 1 McCormick On Evid. § 91 (7th ed.);

---

[3] Stevens also points to Idaho Rule of Evidence 502. While the Court may draw on the Idaho Rules of Evidence, they are not binding on the Court as federal law governs the claims of privilege in this case. *See* Fed. R. Evid. 501.

*see also People v. Doss*, 161 Ill. App. 3d 258, 261–62, 514 N.E.2d 502, 505 (1987) (finding presence of third party, who was present to provide "moral support" caused waiver of attorney-client privilege where, despite evidence of client's "possibly low intelligence level," the third party testified that the client "needed no help in getting across what was important to their attorney").

BYU-I argues that the presence of Anderson was not reasonably necessary for the protection of Stevens' interest. In particular, BYU-I points to Stevens' letter terminating Gaffney, in which she stated she was "of sound mind," and Stevens graduation from BYU-in December of 2017 with a bachelor of science in social work with a 3.043 grade point average. Stevens argues these facts are not evidence that she did not need Anderson's assistance in communicating with legal counsel. She asserts that she needed Anderson's assistance in drafting the termination letter, BYU-I gave her many accommodations due to her multiple disabilities, and she needed the assistance of friends and family to interact with BYU-I as she completed her degree, primarily from home.

With little precedence to bind the Court, the Court finds the best course of action is to rely on the "reasonably believes" standard from Rule 1.14 of the Idaho Rule of Professional Conduct. Based on the Confidentiality Agreement Anderson signed and the evidence of Stevens' disabilities and need for accommodation, Gaffney could reasonably believe Anderson's presence was necessary because Stevens' could not adequately act in her own interest.

That being said, Rule 1.14 does not protect all of Stevens' communications with Anderson. Rule 1.14 only protects Stevens' communications with Gaffney while

Anderson was present. The commentary to Rule 1.14 only states that the assistant's "participat[ion] in discussions with the lawyer . . . generally does not affect the applicability of the attorney-client evidentiary privilege." The commentary does not say all communications with the assistant are then cloaked with the protections of the attorney-client relationship. To hold otherwise would violate the clearly established policy of "strictly constru[ing]" the attorney-client privilege in order to facilitate the "full and free discovery of the truth." *Weil*, 647 F.2d at 24. Therefore, the Court finds Stevens' communications with Anderson outside of the presence of her attorney are not privileged.

## 2. Waiver of Privilege Through Disclosure to Third-Parties

BYU-I next argues that the letter terminating Gaffney is not privileged and that Stevens' disclosure of the letter to third parties constituted a subject matter waiver of all subjects discussed therein. Stevens does not claim that the letter is privileged, but argues that her waiver of the attorney-client privilege ends with the letter.[4]

As to Stevens disclosures to Blaser, Stevens waived her attorney-client privilege with regard to the topics she directly discussed with Blaser. These topics include: (1) that Gaffney was suing for and/or demanded $1 million from BYU-I to help Stevens become financially stable but that Stevens did not want to sue BYU-I for that amount; (2) that Gaffney told the LDS Church that nobody was to speak with Stevens except through Gaffney herself; and (3) that Gaffney mistreated Stevens by physically forcing her to sign

---

[4] The Court addresses whether Stevens' disclosure of information about her communications with Gaffney to the Beesleys constituted a waiver of her attorney-client below, when it addresses the priest-penitent privilege.

papers while she was sick. Blaser directly stated in his deposition that Stevens discussed these topics with him.

Whether these discussions or Stevens' disclosure of the termination letter lead to a "subject matter waiver" is a more complicated question. BYU-I argues a subject matter waiver has occurred because Stevens is trying to use her privileged communications with Gaffney as both a sword and a shield. *See Truckstop.Net*, 2007 WL 2480001, at *5 (citing *Chevron v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992). *Chevron* is instructive here. In *Chevron*, the Ninth Circuit found Pennzoil was using its privileged communications as a sword when it asserted, as part of its defense, that it complied with certain disclosure requirements imposed by federal securities law and that it had relied on its tax attorney's declaration that its tax position in these disclosures was reasonable. 974 F.2d at 1162. Pennzoil was also using those communications as a shield when it contended that the communications with its tax attorney regarding these disclosures were "privileged and thus not subject to disclosure." *Id.*

BYU-I asserts Stevens is trying to use her privileged communications as a sword by using them to "(1) to pressure BYUI into settling; (2) to rehabilitate her image by painting herself as a reasonable and good person; and (3) to counteract the evidence that contradicts her allegations and supports a finding that she fabricated her claims and manipulated the situation and Stokes to secure a huge payday." BYU-I explains, Stevens first "does this by using those portions of the privileged communications she has elected to disclose to claim that Gaffney disregarded and misrepresented her wishes and factual account by filing a complaint with fabricated facts to make the situation look worse than

it actually was and demanding an exorbitant settlement that is contrary to her wishes." BYU-I further explains that she "does this by sharing the privileged communications with people she knows will pass it on, *and to whom she gave permission to pass it on*, to others within the LDS Church in an attempt to force BYUI to settle because Stevens is allegedly suffering anxiety at the thought that the litigation 'would be damaging to the LDS Church and BYUI.'"

These allegations are a far cry from what occurred in *Chevron*, where Pennzoil used privileged communications as a direct part of its defense. In contrast, here, Stevens does not try to use her privileged communications with Gaffney to support an element of her claims. Rather, BYU-I asserts a story of manipulation that, at this point, the Court finds very little support for in the record. The Court is more troubled by BYU-I's lack of case precedence to support a finding that a party's use of privileged communications outside of direct litigation (for example, to pressure the other party to settle) is considered use "as a sword" for the purposes of the subject matter waiver. Thus, without the necessary factual or legal support, the Court find Stevens has not waived her attorney-client privilege as to all communications regarding subjects discussed in the termination letter or discussed with Blaser. Stevens only waived her privilege regarding the narrow set of topics she discussed with Blaser that Blaser specifically identified in his deposition.

## VI. MOTION TO COMPEL COMPLIANCE
## WITH DISCOVERY OBLIGATIONS (Dkt. 47)

In this Motion, BYU-I asks the Court to compel Stevens to comply with her discovery obligations under Rule 26. Specifically, BYU-I seeks additional medical

records and information on Stevens' history of abuses and trauma. At oral argument, Stevens' counsel indicated that they were in the process of providing additional material to BYU-I that would meet this request. Accordingly, the Court will not address this Motion to Compel at this time. However, if any of the parties find it necessary, they may bring this issue before the Court again. Before renewing this Motion, or otherwise re-raising this issue, the parties should contact the Court so that it may set an appropriate briefing schedule, if one is necessary.

## V. BYU-I'S MOTION RE: PRIEST-PENITENT PRIVILEGE (Dkt. 46)

Stevens claims a privilege in her communications with several members of the LDS Church, namely: (1) her prior Bishop and Stake President, Christopher Moore ("President Moore"); (2) current Bishop, Robert Garrett ("Bishop Garrett"); (3) prior Bishop Lovell ("Bishop Lovell")[5]; and (4) Jon and Evona Beesley (the "Beesleys"). BYU-I objects to this claim of privilege.

### A. The Applicable Law

Federal Rule of Evidence 501 provides as follows:

The common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless any of the following provides otherwise:

• the United States Constitution;

• a federal statute; or

• rules prescribed by the Supreme Court.

---

[5] The parties have not provided Bishop Lovell's first name.

But in a civil case, *state law governs privilege regarding a claim or defense for which state law supplies the rule of decision*.

Fed. R. Evid. 501 (emphasis added). Based on this last sentence, Stevens asserts that in this case Idaho state law governs the issue of privilege. The Court does not agree. Stevens asserts three federal claims against BYU-I. State law does not supply the rule of decision on these claims. Moreover, Stevens clearly states in her Amended Complaint that this Court has federal question jurisdiction over this case. Thus, because state law does not supply the rule of decision on the federal claims, state law does not govern this issue of privilege with regard to the federal claims. Rather, federal common law governs the issue (unless any of the three enumerated sources of federal law provided otherwise). *See id.*

The Court acknowledges that Stevens has filed one state claim against BYU-I. Few courts have addressed the question of which law, state or federal common law, governs a privilege issue when the plaintiff has asserted both state and federal claims. The Southern District of California has fully evaluated this question and concluded as follows:

> In the absence of Ninth Circuit case law, the court follows the well-reasoned decisions of the Second, Third, Fourth and Eleventh Circuits and holds that where state law provides the rule of decision with respect to a state law claim but federal law provides the rule of decision with respect to a claim over which the court has federal subject matter jurisdiction, federal privilege law is to be applied with respect to both claims.

*Crowe v. Cty. of San Diego*, 242 F. Supp. 2d 740, 749–50 (S.D. Cal. 2003). It appears that the Ninth Circuit still has not addressed this issue. The Court adopts the *Crowe* court's approach and finds federal common law applies to this claim of privilege.

Federal courts have recognized the "priest-penitent privilege" before, but there are very few cases that have closely analyzed or fully explained the privilege. The Supreme Court has only recognized the privilege in dicta. *See Trammel v. United States*, 445 U.S. 40, 51 (1980) ("The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return."); *Totten v. United States*, 92 U.S. 105, 107 (1875) ("[S]uits cannot be maintained which would require a disclosure of the confidences of the confessional, or those between husband and wife."). The Ninth Circuit has broadly described the privilege as "embracing any 'confession by a penitent to a minister in his capacity as such to obtain such spiritual aid as was sought and held out in this instance.'" *Mockaitis v. Harcleroad*, 104 F.3d 1522, 1532 (9th Cir. 1997) (quoting *Mullen v. United States*, 263 F.2d 275, 277 (D.C. Cir. 1958) (applying privilege to reverse a criminal conviction where a Lutheran communicant had confessed her crime to a minister as a condition for receiving communion and his testimony had been used to convict her), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997).

However, "[t]he Third Circuit has provided the most detailed guidance in applying the privilege." *United States v. Burgess*, No. 1:14-CR-2022-TOR, 2015 WL 13674174, at *2 (E.D. Wash. Mar. 4, 2015) (citing *In re Grand Jury Investigation*, 918 F.2d 374 (3d Cir. 1990)). According to the Third Circuit, "[t]he privilege applies to protect communications made (1) to a clergyperson, (2) in his or her spiritual professional capacity (3) with a reasonable expectation of confidentiality." *Fabricant v. United States*,

No. CR 03-01257-RSWL-1, 2015 WL 5923481, at *12 (C.D. Cal. Oct. 8, 2015). *See United States v. Webb*, 615 F.2d 828 (9th Cir. 1980) (holding that communications between prisoner and clergyman were not confidential, and therefore would not be protected). The Third Circuit, in recognizing the privilege, drew on the 1973 Proposed Federal Rules of Evidence. These proposed rules set forth the following definitions and tenets:

> (a) *Definitions.* As used in this rule:
>
>> (1) A "clergyman" is a minister, priest, rabbi, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.
>>
>> (2) A communication is "confidential" if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.
>
> (b) *General rule of privilege.* A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual adviser.
>
> (c) *Who may claim the privilege.* The privilege may be claimed by the person, by his guardian or conservator, or by his personal representative if he is deceased. The clergyman may claim the privilege on behalf of the person. His authority so to do is presumed in the absence of evidence to the contrary.

*In re Grand Jury Investigation*, 918 F.2d at 380 (quoting Proposed Fed. R. Evid. 506, 56 F.R.D. at 247). These definitions and tenets, while not binding, help guide the Court's application of the privilege in these circumstances.

Like with other privileges, a claimant can waive the priest-penitent privilege. The parties dispute under what circumstances a claimant can waive the priest-penitent privilege. BYU-I argues Stevens waived the privilege by (1) disclosing her

communications to third parties and (2) putting the communications at issue in this suit. Stevens argues that the second of these methods of waiver—known as the "implied waiver" doctrine or the "at issue" doctrine—does not apply to the priest-penitent privilege. However, she does not cite any legal authority for this argument. Rather, she simply points out that the only case BYU-I cites on the topic applied the waiver in the context of the attorney-client privilege.

The Court agrees with BYU-I on this point. The Ninth Circuit has described the "doctrine of implied waiver" in generic terms such that it could apply to any claim of privilege. *See Bittaker v. Woodford*, 331 F.3d 715, 720 (9th Cir. 2003). It appears BYU-I has not cited a case applying the doctrine to the priest-penitent privilege simply because there is a dearth of case law discussing the priest-penitent privilege.

Under the doctrine of implied waiver, a claimant waives a privilege by "put[ting] privileged information at issue," if "allowing the privilege would deny the opposing party access to information vital to its defense." *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995); *see also Chevron,* 974 F.2d at 1162 ("Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived."). "The court imposing the waiver does not order disclosure of the materials categorically; rather, the court directs the party holding the privilege to produce the privileged materials if it wishes to go forward with its claims implicating them." *Bittaker*, 331 F.3d at 720.

In other words, "[t]he court . . . gives the holder of the privilege a choice: If you want to litigate this claim, then you must waive your privilege to the extent necessary to give your opponent a fair opportunity to defend against it." *Id.*

## B. Application

### 1. Communications with Church Leaders

The parties first dispute whether Stevens' communications with her Church leaders—President Moore, Bishop Garrett, and Bishop Lovell—are protected. BYU-I first asserts Stevens has put at issue (and thus waived her privilege) subjects she discussed with Bishop Garrett and President Moore. Second, BYU-I asserts Stevens waived her privilege by disclosing her communications with these three Church Leaders to third parties. Accordingly, BYU-I seeks a declaration that "Stevens has waived the privilege as to all communications she had with these ecclesiastical leaders on any subject relevant to her lawsuit, including specifically the following subject matters: (1) Stokes' treatment of Stevens and any relationship the two shared; (2) Stevens' and her daughter's ecclesiastical endorsements; (3) potential ecclesiastical discipline against Stevens; (4) Stevens' temple recommend; and (5) Stevens' financial situation, her need for help and these individuals' or the Church's alleged failure to provide assistance." Dkt. 46-1, at 12.

### a. Communications with Bishop Garrett

Stevens alleges that she met with Nathan Meeker, the Chair of the Sociology and Social Work Department at BYU-I, and Paul Roberts, the Head of the Social Work Program at BYU-I, in June 2016. Dkt. 4, at 15. Stevens alleges that during this meeting

Meeker and Roberts interrogated her for hours about her relationship with Stokes. At the end of the meeting, they "advis[ed] Stevens that she would be welcome to return to school if she were able to get an ecclesiastical[6] endorsement from the Dean of Admissions (acting in his dual role, Bishop Robert Garrett.)." *Id.* She then alleges the following regarding her communications with Bishop Garrett:

> 70.   As instructed by Meeker and Roberts, Stevens met with [Bishop Garrett the Dean of Admissions] on July 3, 2016. . . . Using information that Bishop/Dean Garrett apparently acquired in his dual role as director of the admissions office, Bishop/Dean Garrett told Stevens he needed to know the level of "sexual activity" that occurred between Stevens and Stokes.

> 71.   Stevens told him that they had "gone as far as possible without having full blown sex[.]" . . . Bishop/Dean Garrett told this information to Stake President Moore, who worked in the BYU-I philanthropies office. President Moore pressed for a church court to be held, but Bishop/Dean Garrett did not feel right about it. He met with Plaintiff further and decided not to proceed with a church court.

> 72.   Although Bishop/Dean Garrett did not want to proceed with a church court under the circumstances, President Moore would not allow Stevens to have an ecclesiastical endorsement until the lawsuit was dismissed.

Dkt. 4, at 17. Stevens also alleged the following in her "Charge of Discrimination" filed with the Idaho Human Rights Commission and the Equal Employment Opportunity Commission:

---

[6] "The Board of Trustees of BYU-Idaho requires every student attending the university to have an annual ecclesiastical endorsement from the bishop of the ward in which he or she resides." BRIGHAM YOUNG UNIVERSITY-IDAHO, *Ecclesiastical Endorsement*, http://www.byui.edu/student-honor-office/ces-honor-code/ecclesiastical-endorsement (last visited May 10, 2018). In order to obtain an ecclesiastical endorsement, the bishop must verify that the student "lives a chaste and virtuous life, including avoidance of pornography, abstinence from sexual relations outside of marriage, and abstinence from homosexual behavior"; "lives the Word of Wisdom by abstaining from alcoholic beverages, tobacco, coffee, tea, and other harmful substances"; "demonstrates appropriate and consistent church activity'" and "is honest." *Id.* In addition, the student must verify "he or she is striving to live the Honor Code." *Id.*

On July 3, 2016, I met with my bishop, Robert Garrett, who is also Dean of Admissions at BYU-I to discuss renewing my ecclesiastical endorsement. Garrett was aware of my involvement with Stokes due to his position at the University. Garrett determined that because I was so disable, that I would not have to be held accountable for my actions in church court. Despite this however, he did refuse to give me my ecclesiastical endorsement because my actions were in violation of the Honor Code. I cannot return to school without an ecclesiastical endorsement.

Dkt. 46-4, at 8.

BYU-I alleges that by making these allegations Stevens has put these discussions with Bishop Garrett about her ecclesiastical endorsement "at issue" and has waived any privilege she had in the communications. Based on Stevens' Amended Complaint, it is not entirely clear to the Court how she is using these allegations about her ecclesiastical endorsement. At oral argument, Stevens' counsel clarified that Stevens is not claiming BYU-I, or any of its employees, discriminated against her or retaliated against her by denying her an ecclesiastical endorsement. In addition, Stevens is not using this conversation with Bishop Garrett to prove BYU-I knew about Stokes' behavior and failed to take action to stop or prevent it. In other words, counsel clarified that these allegations about Stevens' conversation with Garrett are mere factual background.

If these allegations truly are factual background, and Stevens does not try to use them to support her claims, then Stevens has not put the subject matter of the conversation "at issue." Accordingly, the Court finds Stevens has not waived her privilege in the conversation with Bishop Garrett. However, Stevens should know she will not be permitted to change her tune at trial. To do so would deny BYU-I a fair opportunity to defend itself.

*b. Communications with President Moore*

Stevens alleges the following regarding her communications with President

Moore:

76.     [Sometime after Stokes' death] Stevens arranged to meet with her stake president, Moore, and with her counselor who has treated her for the last approximately 10 years. Stevens was very concerned about her temple recommend[7] and the threat of a Church Court. Moore confirmed that Stevens' temple recommend was still valid.

77.     Relieved, Stevens asked Moore to provide her an ecclesiastical endorsement so that she could again attend school. Moore refused, telling Stevens that he would not even discuss that with her until her potential lawsuit against BYU-I was dismissed.

78.     Stevens was subsequently informed she needed to apply for an ecclesiastical waiver. However, when she attempted to pursue that process, she was told she would have to go back to her current Bishop and Stake President to again seek an ecclesiastical endorsement. Stevens was informed that she could seek a waiver if she is again denied an ecclesiastical endorsement. Stevens is still in the process of trying to obtain an ecclesiastical endorsement.

Dkt. 4, at 18. Like with Bishop Garrett, Stevens' conversation with President Moore

centered on her ecclesiastical endorsement. The Court, therefore, reaches the same

decision it reached with regard to communications with Bishop Garrett: so long as

Stevens is not claiming that BYU-I, or its employees, discriminated against her or

retaliated against her by denying her an ecclesiastical endorsement (or a temple

---

[7] In order to enter a Mormon Temple, an individual "must possess a current recommend." *Preparing to Enter the Holy Temple*, PREPARING TO ENTER THE HOLY TEMPLE, 1–37 (2002) *available at* <https://www.lds.org/manual/ preparing-to-enter-the-holy-temple/preparing-to-enter-the-holy-temple?lang=eng>. "This recommend must be signed by the bishop of [the individual's] ward and the president of [the individual's] stake." *Id.*

recommend, or considering sending her to Church Court), those topics are not at issue.

Accordingly, Stevens has not waived her privilege in the conversations she had with

President Moore.

*c. Disclosure of Communications to Roland Blaser*

BYU-I next argues Stevens waived any privilege regarding her discussions of her

ecclesiastical endorsement with Church Leaders by disclosing those communications to

Roland Blaser. In fact, all Stevens told Blaser was that in order to be readmitted to BYU-I

she would have to get a recommendation from her bishop or stake president and that her

bishop or stake president had indicated "they would need to think about [it]." Dkt. 46-6,

at 4–5. Stevens' brief mention of her ecclesiastical endorsement to a third party does not

amount to a waiver of privilege.

*d. Disclosure of Communications to Regarding Need for Food Assistance*

BYU-I next argues Stevens waived her privilege in discussions with Bishop

Lovell about her need for food assistance by disclosing those communications to Danielle

Spencer and Stokes. Specifically, she told both of these individuals that she "reached out

to her bishop for food [assistance]," "that he would not fill food orders," and that he "told

her that she was in such a financial situation, that she could—that maybe she should sell

her house or send her kids off to live with somebody else." Dkt. 46-7, at 5–7. This

appears to be a clear disclosure of her communications with Bishop Lovell to a third

party, which constitutes waiver of any privilege.

The Court questions the relevance of this information. Nevertheless, the scope of

permissible discovery under the Federal Rules is quite expansive, *see* Fed. R. Civ. P.

26(b)(1), and Stevens has not objected to this evidence on relevancy grounds. Therefore, the Court finds this information about her need for food assistance is not privileged and thus discoverable.

### e. Disclosure of Communications Regarding Stevens' Daughter's Ecclesiastical Endorsement

BYU-I next argues Stevens waived her privilege by disclosing to a third-party, Delores Birch, communications Stevens had with Bishop Lovell about Stevens' Daughter's Ecclesiastical Endorsement. In fact, it appears that Stevens told Birch that Bishop Lovell "pulled [Stevens' daughter's] endorsement a week before school started, causing her to be dismissed from school." Dkt. 46-8, at 7. There is no evidence that Stevens actually communicated with Bishop Lovell about her daughter's ecclesiastical endorsement or that, if she did, she specifically disclosed those communications to Birch. The Court, therefore, finds Stevens has not waived her priest-penitent privilege in this regard.

### 2. Communications with the Beesleys

BYU-I next argues that Stevens' communications with the Beesleys are not protected in the first place and, even if they are, Stevens waived her privilege with regard to these communications.

Jon Beesley is a member of the High Priest group in his ward and Evona Beesley is one of Stevens' visiting teachers. It appears that Stevens communicated at length with the Beesleys regarding many aspects of her case. The Beesleys, in turn, sent several

emails to different individuals, including Brad Bowen[8] and Randy Austin,[9] "summarizing

what [they] have learned concerning the situation with Lori Stevens and the law suit

against BYU-I." Dkt. 46-9. On the bottom of one of the emails, Evona Beesley notes that

Stevens had "reviewed this letter for accuracy and gives her consent for us to share it

with you." *Id.* at 9. The emails cover many topics including Stevens' acquisition and

disagreements with her first attorney, what Stevens wants out of the lawsuit, Stevens'

dismissal from BYU-I, Stevens' multiple former marriages and history of abuse, Stevens'

fragile emotional and physical state, and BYU-I's "intimidation" tactics.

BYU-I first argues that the Beesleys are not "clergymen" as used in the context of

the priest-penitent privilege. BYU-I points out that every adult woman in the LDS

Church is designated as a "visiting teacher." Such individuals have no ecclesiastical

authority and do not perform any clerical functions. "High priests" similarly lack

ecclesiastical authority, unlike bishops or stake presidents. Stevens argues in response

that she believed the Beesleys were her clergymen in this situation because her bishop

and stake president (Bishop Garrett and President Moore) had conflicts of interest that

prevented them from providing religious guidance to her regarding the lawsuit.

It is a close call whether the Beesley's qualify as "clergymen" under the priest-

penitent privilege. Not only is there no case law on this issue, there are factual disputes

regarding whether Stevens actually believed the Beesleys were acting as her clergy—i.e.

---

[8] Elder Bradford C. Bowen is an Area Seventy for the LDS Church, based in Idaho Falls, Idaho. His role is to supervise the LDS Church's affairs in the surrounding area.

[9] Randy Austin is an attorney for the LDS Church.

providing the spiritual guidance and counseling normally provided by Bishop Garrett and President Moore—and whether that belief was reasonable. Nevertheless, the Court need not answer this question. Even if the Beesleys qualified as "clergymen," Stevens waived her privilege in the conversations she had with them by allowing them to disclose her communications to Bowen and Austin.

Stevens attempts to defend her disclosures by pointing to an exception found in the definition of "Confidential Communication" found in Idaho Rule of Evidence 505. It reads: "A communication is 'confidential' if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication." Stevens argues her consent to have the Beesleys disclose her communications with them fall under this exception because the "disclosure was in furtherance of the purpose of the communication between Stevens and the Beesleys—i.e., it sought the religious administrative guidance of a leader in the LDS Church who is higher in precedence than any of the local Church Leaders with whom Stevens had been dealing." Dkt. 58, at 10. This argument is fallacious for several reasons. First, it does not account for the disclosure to Austin, an attorney. Second, neither Bowen nor Austin were "present" during Stevens' communications to the Beesleys, as the exception appears to require. Finally, the letters do not appear to be seeking religious guidance. Rather, they seek to "resolve this case swiftly" and avoid having the case become public in order to prevent further deterioration of Stevens' fragile emotional and physical state. Thus, the letters themselves were not written "in furtherance of" Stevens' need for spiritual

guidance. The Court finds Stevens' waived any privilege she had in her disclosures to the

Beesleys when she permitted them to share that information with others.

## VI. THE LDS CHURCH'S MOTION TO INTERVENE

The LDS Church moves to intervene for the limited purpose of asserting

evidentiary privileges (specifically the attorney-client privilege and the community of

interest privilege) to protect its documents and other information from improper

disclosure in this matter. The LDS Church seeks both to intervene as of right and

permissively.

### A. Applicable Law: Intervention as of Right

Federal Rule of Civil Procedure 24(a) provides:

> Upon timely application anyone shall be permitted to intervene in an action:
> . . . (2) when the applicant claims an interest relating to the property or
> transaction which is the subject of the action and the applicant is so situated
> that the disposition of the action may as a practical matter impair or impede
> the applicant's ability to protect that interest, unless the applicant's interest
> is adequately represented by existing parties.

The Ninth Circuit applies a four-part test to determine whether to permit a party to

intervene under Rule 24(a):

> (1) the application for intervention must be timely; (2) the applicant must
> have a "significantly protectable" interest relating to the property or
> transaction that is the subject of the action; (3) the applicant must be so
> situated that the disposition of the action may, as a practical matter, impair
> or impede the applicant's ability to protect that interest; and (4) the
> applicant's interest must not be adequately represented by the existing parties
> in the lawsuit.

*Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir. 2001). However,

courts should construe Rule 24(a) "liberally in favor of potential intervenors" and "should

be guided primarily by practical considerations, not technical distinctions." *Id.* (internal quotation marks and citations omitted). In other words, "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Id.* (quoting Fed. R. Civ. P. 24 advisory committee's notes).

*B. Analysis*

1. Whether the Motion to Intervene is Timely

The Ninth Circuit "considers three criteria in determining whether a motion to intervene is timely: (1) the stage of the proceedings; (2) whether the parties would be prejudiced; and (3) the reason for any delay in moving to intervene." *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996), *as amended on denial of reh'g* (May 30, 1996). The LDS Church moved to intervene on February 23, 2018—part-way through discovery and about thirteen and a half months after Stevens originally filed this case. The LDS Church asserts that it did not move to intervene until February 2018 because "the parties are still disputing the issue of the community of interest privilege." In other words, the LDS Church did not move to intervene until it found it necessary to assert its claims of privilege before the Court—when Stevens specifically requested production of documents the Church considered privileged. Although the LDS Church could have intervened earlier, the Court finds the Church's reasons for delay reasonable. Accordingly, the Court concludes the LDS Church's Motion to Intervene was timely.

## 2. Whether the LDS Church Has a Significantly Protectable Interest

To show a significantly protectable interest, "[i]t is generally enough that the interest [asserted] is protectable under some law, and that there is a relationship between the legally protected interest and the claims at issue." *Berg*, 268 F.3d at 818. A claim of privilege can be a sufficient interest to justify intervention. *Cf. Sierra Club v. United States EPA*, 995 F.2d 1478, 1482 (9th Cir. 1993); *United States v. Zolin*, 809 F.2d 1411, 1413 (9th Cir. 1987). Specifically, the Church claims an attorney-client privilege and a common interest privilege in an email between Joshua Figueira, former counsel for the LDS Church, and President Moore. President Moore, as a stake president, is a member of the LDS Church's lay clergy and, accordingly, the LDS Church represents him in his capacity as a member of that lay clergy. BYU-I is in possession of this email and Stevens asked BYU-I to produce the email during discovery. The Church turned the email over to BYU-I in preparation for a "joint defense." The Church asserts it began to prepare this joint defense after it received a letter from Stevens' first attorney, Gaffney, which made it believe Stevens might bring claims against both BYU-I and the LDS Church.

The Court will fully address whether BYU-I and the LDS Church can claim the common interest privilege below. But, for the purposes of this element of the four-part test, the Court finds the LDS Church has articulated that the common interest privilege is a protectable interest and there is a relationship between the interest and the claims at issue. Accordingly, the LDS Church has asserted a significantly protectable interest.

### 3. Whether the Disposition of the Action May, as a Practical Matter, Impair or Impede the Applicant's Ability to Protect That Interest

The Court finds this element satisfied, because if this Court orders the disclosure of the Figueira email, then "as a practical matter" the Church's ability to protect its privilege in the email will be impaired. Of course, the Court can issue a protective order, but the LDS Church will lose some protection of the document.

### 4. Whether BYU-I Can Adequately Represent the Claim of Privilege

Stevens argues that the LDS Church need not intervene because BYU-I can assert the joint interest privilege on the LDS Church's behalf. The LDS Church maintains that it holds different privileges that BYU-I cannot assert. For example, only the LDS Church represents the Church's lay clergy in their capacity as clergy and, thus, only the LDS Church may assert the priest-penitent privilege to protect disclosure of certain types of information. In contrast, BYU-I only represents the interests of the lay clergy in their capacity as employees of BYU-I.

The Court must consider these arguments in the context of the privilege the LDS Church is currently asserting. *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980) ("Adequacy of representation must be assessed in relation to the specific purpose that intervention will serve."). The LDS Church is not currently trying to assert the priest-penitent privilege. It is only trying to assert the attorney-client privilege and the common interest privilege. It appears BYU-I can—and has—asserted this same privilege on the Church's behalf. Nevertheless, the Court is cognizant of the rampant privilege issues in this case and aware that additional issues of privilege may arise in this case in

the future. As discussed at oral argument, the Court fears the LDS Church may be before

it again in a few short weeks asserting another privilege on behalf of its lay clergy that

BYU-I cannot adequately protect. Accordingly, the Court, out of caution, finds the

Church may intervene in this case under Rule 24(a), but only for the limited purpose of

protecting its claims of privilege.[10]

## C. Applicable Law: Permissive Intervention

The Federal Rule of Civil Procedure also allows intervention in an action "when

an applicant's claim or defense and the main action have a question of law or fact in

common." Fed. R. Civ. P. 24(b)(1)(B). However, permissive intervention generally

requires three things: "(1) an independent ground for jurisdiction; (2) a timely motion;

and (3) a common question of law and fact between the movant's claim or defense and

the main action." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir.

1992). "However, an independent jurisdictional basis is not required" where, as here, the

"intervenors do not seek to litigate a claim on the merits." *Id.* In addition, "[i]n exercising

its discretion" to permit or deny permissive intervention, "the court must consider

whether the intervention will unduly delay or prejudice the adjudication of the original

parties' rights." Fed. R. Civ. P. 24(b)(3).

---

[10] "Once a district court concludes that a party has a right to intervene, the inquiry is not necessarily at an end. Even where intervention is a matter of right, district courts may impose appropriate conditions or restrictions upon the intervenor's participation in the action." *Wildearth Guardians, Defenders of Wildlife v. Salazar*, 272 F.R.D. 4 (D.D.C.2010). "The court may limit the scope of intervention, granting intervention only for the limited purpose of protecting the movant's interest that might be injured by the litigation." *In re Urethane Antitrust Litig.*, 04–MD–1616–JWL, 2010 WL 4226214 (D.Kan. Oct. 21, 2010).

As explained in the previous section, the Church's Motion to Intervene was timely; therefore, the second element of permissive intervention has been satisfied.

With regard to the third element, the Ninth Circuit has clarified that a party need not assert a literal "claim or defense" that requires a pleading in order to permissively intervene in a case. *Beckman*, 966 F.2d at 473. Rather, some other "nexus" may satisfy "the commonality requirement of 24(b)," such as a request to modify a protective order. *Id.* at 474. Other courts have found an intervenor's assertion of a privilege "implicates a common question of law or fact" required by Rule 24(b). *See, e.g.*, *S.E.C. v. Goldstone*, No. CIV 12-0257 JB/LFG, 2013 WL 6920854, at *30 (D.N.M. Dec. 13, 2013). Similar to this case, in *Goldstone*, the defendants sought disclosure of certain materials from the plaintiff in a motion to compel. A third party moved to intervene to claim a privilege in those materials. The intervenor's claim of privilege and the motion to compel involved the same question of law or fact, thus satisfying the third element of permissive intervention. Here, Stevens seeks documents that both BYU-I and the LDS Church claim are privileged. The application of the privilege is the common question of law or fact. *See also State Comp. Ins. Fund v. Drobot*, No. SACV130956AGCWX, 2016 WL 3546583, at *3 (C.D. Cal. Feb. 29, 2016) (granting government's motion for permissive intervention "for the limited purpose of modifying certain discovery requests and restricting the scope of discovery to protect its investigatory and prosecutorial interests").

Finally, it appears the intervention will not cause "undue delay or prejudice" to Stevens. Fed. R. Civ. P. 24(b)(2). Particularly if the Court limits the LDS Church's intervention to asserting its privileges. Because BYU-I has also asserted the common

interest privilege, the Court already has that issue before it. The only prejudice Stevens has asserted is the potential need to respond to both BYU-I's and the LDS Church's arguments in future briefing. The Court finds the risk of this hardship to be minimal; however, if it becomes an issue in the future, the Court will work with the parties to fashion an appropriate remedy, such as limiting the length of future briefs.

Because all of the necessary elements have been satisfied, the Court also grants the LDS Church's Motion to Intervene under Rule 24(b). However, as noted previously, the Court will limit the scope of this intervention.

## VII. BYU-I's PRIVILEGE CLAIMS (Dkt. 52)

In this motion, BYU-I claims that several relevant documents that Stevens seeks to obtain are privileged. In particular, BYU-I asserts three types of privileges over these documents: attorney-client privilege, common-interest privilege, and attorney work-product privilege. Dkt. 52. The Court will separately address the common-interest privilege in its discussion of the LDS Church's claim of this same privilege. The Court addresses the remaining claims below. The Court notes that it reviewed, in camera, all of the at-issue documents.

### A. Applicable Law

The Court previously set forth the applicable law on attorney-client privilege. *See* Part V.B. The Court incorporates that law here as if set forth in full.

Under Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure, "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). "Such

documents may only be ordered produced upon an adverse party's demonstration of 'substantial need [for] the materials' and 'undue hardship [in obtaining] the substantial equivalent of the materials by other means.'" *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 906 (9th Cir. 2004) (quoting Fed. R. Civ. P. 26(b)(3)). The work-product doctrine is "intensely practical," "grounded in the realities of litigation in our adversary system." *United States v. Nobles*, 422 U.S. 225, 239 (1975). "One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself." *Id.* at 238–39.

The Ninth Circuit has explained that, "to qualify for protection against discovery under [Rule 26(b)(3)], documents must have two characteristics: (1) they must be prepared in anticipation of litigation or for trial, and (2) they must be prepared by or for another party or by or for that other party's representative." 357 F.3d at 907 (internal quotation marks and citations omitted).

Dual purpose documents, meaning documents "not prepared exclusively for litigation," can also be protected by the work product doctrine. *United States v. Richey*, 632 F.3d 559, 567–568 (9th Cir. 2011). The Ninth Circuit uses the "because of" test in determining whether a dual purpose document is protected by the work product doctrine. *Id.* Under this test, a dual purpose document is prepared in anticipation of litigation if, "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of

litigation." 357 F.3d at 907. This test does not consider whether the prospect of litigation was the primary or secondary purpose for creating the document. *Id.* The "because of" standard considers the totality of the circumstances and whether the "document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation." *Id.*

## *B. Analysis*

### 1. Emails between Nick Rammell and Travis Yost

BYU-I first claims a privilege in several internal BYU-I email communications between Nick Rammell (Associate Dean of Students; Deputy Title IX Coordinator) and Travis Yost (Systems Manager, Online Degrees and Services) regarding potential resolution of Plaintiff's claims, which Rammell later forwarded to Kip Harris (Dean of Students at BYU-I). These communications took place in February 2017, about two months after Stevens initiated this suit. In the emails, Rammell states that he is gathering information for an upcoming discussion with BYU-I's attorneys concerning the lawsuit.

Stevens argues there is no evidence that the emails were prompted by an attorney or that they were ever provided to counsel. BYU-I provided a declaration from its in-house counsel, Stephen Craig, that he directed Rammell "to gather additional information for the purpose of providing legal advice regarding Plaintiff's claims." Dkt. 52-4, at 2. BYU-I states that the emails between Rammell and Yost are the result of that direction. It is also clear from the emails themselves that Rammell was gathering information from Yost to share with BYU-I's counsel. Based on the timing, the declaration, and the emails themselves, the Court finds the emails and their attachments were "prepared in

anticipation of litigation" and prepared by an "investigator" or "agent" of BYU-I's counsel. Accordingly, the emails are privileged.

## 2. Emails between Mckinzie Cole and Paul Roberts

BYU-I next claims a privilege in communications between Mckinzie Cole (BYU-I's Employee Relations Coordinator and an attorney), Paul Roberts (Head of Social Work Program), and Kevin Price (Human Resources Director for BYU-I) regarding Cole's information gathering process concerning a report of a relationship between Plaintiff and Stokes at the direction of Craig. On July 26, 2016, Cole contacted Craig to inform him "of a situation involving Plaintiff and Stephen Stokes." Dkt. 52-4, at 2. Craig then directed Cole "to gather information for [him] so [he] could provide BYUI with legal advice regarding the situation." *Id.* As part of the information gathering process, on July 28, 2016, Cole asked Roberts for a timeline of events relating to Plaintiff's allegations that Roberts had been preparing. Roberts attached this timeline to the email correspondence with Cole, which also included Price.

Stevens argues these emails and attachments were not prepared in anticipation of litigation because Stevens' former attorney (Gaffney) did not send BYU-I a litigation hold letter until August 5, 2016. The Court is not persuaded by this argument. Given the situation, Craig reasonably could have believed that Stevens would assert claims against the school in the future and, accordingly, directed Cole to gather information in anticipation of that future litigation.

Stevens also argues that the email correspondence and attachments were never forwarded to Craig; instead, Roberts emailed the timeline directly to Craig a few weeks

later. BYU-I has provided an additional email showing Cole did forward Roberts' timeline to Craig. However, Cole received the timeline from Roberts on August 1, 2016, and did not forward it to Craig until August 9, 2016. This delay tends to indicate Cole did not originally seek out the timeline at Craig's direction. In addition, in the email requesting the timeline from Roberts, Cole specifically indicates Price had asked her to get in touch with Robert regarding the timeline. This fact indicates Cole may have been gathering the timeline and other relevant documents for "BYU-I's own internal HR information gathering purposes," as Stevens argues. Because BYU-I carries the burden on this point, the Court finds the emails are not privileged.

### 3. September 2016 Emails

BYU-I next claims a privilege in email communications between Kelly Burgener (Associate Academic Vice President) and Rammell in which Burgener gives his account of a conversation he had with Susan Stokes on September 20, 2016. It appears Burgener first drafted an account of the conversation and sent it to the generic "Academic Office" email address on September 20, 2016. Then on September 22, 2016, Burgener revised the account slightly and sent it to Rammell. Rammell then asked if Burgener had sent the account to Craig. Burgener indicated he did not have Craig's email address and asked Rammell to forward it for him. BYU-I did not initially, but later provided the email in which Rammell forwarded the account to Craig.

The Court is not convinced these emails are privileged. First, there is no indication that Craig (or Rammell at the direction of Craig) asked Burgener to speak with Susan Stokes and then draft an account of his conversation with her in anticipation of litigation.

It is just as likely that Burgener happened to have a conversation with Susan and thought it necessary to report it to Rammell. This conclusion is supported by the fact that Burgener took contemporaneous notes about the conversation and sent it to the Academic Office alone at first. Only later did Burgener send the account to Rammell and it is not clear what prompted Burgener to do so. BYU-I has not provided a declaration from Burgener to clarify the circumstances surrounding the email. The Court, therefore, finds BYU-I has not carried its burden and concludes these emails are not privileged.

### 4. October 2016 Emails

BYU-I next claims a privilege in October 2016 email correspondence between various BYU-I employees with the subject line: "Legal Counsel." The emails discuss a planned visit by BYU-I's in-house counsel to campus to investigate Stevens' claims. They also contain a brief account of a conversation between Rammell and Craig regarding Stevens' lawsuit. The emails are between Burgener, Mary Taylor (Executive Secretary in BYU-I's Executive Office), Rammell, and Price, none of whom are attorneys.

The Court has reviewed these emails and finds they are not privileged. Although litigation was ongoing at the time they were sent, the emails do not involve an attorney and are not the type of information gathering communication that is often protected by the work product doctrine even though the communication was not prepared by an attorney.

<u>5. August 2017 Emails</u>

BYU-I next claims a privilege in emails between Jeremiah Cochran[11] of BYU-I and other BYU-I employees in August of 2017 regarding the gathering of information at the direction of BYU-I's trial counsel in order to respond to Stevens' discovery requests in this litigation.

The Cochran email is privileged as it was prepared in anticipation of litigation at the direction of BYU-I attorneys. However, it is not as clear whether the response from Burgener is privilege. Burgener attached some notes he made in 2016, apparently after he received notice in September of 2016 of the demand letter BYU-I received from Stevens' first attorney. BYU-I has not provided a declaration from Burgener that he prepared them in anticipation of litigation or at the direction of an attorney. Burgener may have simply prepared them on his own, without direction from an attorney, and then produced them later when Cochran requested them. BYU-I cannot elevate non-privileged notes to privileged status simply by attaching them to a privileged document. For these reasons, the Court finds BYU-I has not established that Burgener's notes are privileged.

<u>6. Interrogatory No. 12</u>

Stevens' Interrogatory No. 12 asked BYU-I to "identify all information provided by Danielle Spencer to any employee or representative of [BYU-I] concerning Stokes' relationship with Plaintiff." Spencer was one of Stevens' peers at BYU-I and one of Stokes' students. Dkt. 4, at 12. Stevens alleges she disclosed her relationship with Stokes

---

[11] The parties have not specifically indicated Cochran's job title, but he appears to work in BYU-I's human resources department.

to Spencer and that Spencer then shared this information with certain BYU-I faculty and staff members in early June 2016. *Id.* at 12-13. BYU-I objects to Stevens' Interrogatory No. 12 "to the extent it improperly seeks disclosure of the mental impressions, conclusions, opinions, and/or legal theories of BYU-I's counsel or BYU-I employees who were gathering information at the direction of, and for the benefit of, counsel." BYU-I points out that Stevens already had the opportunity to depose Spencer and asked questions regarding her communications with BYU-I's counsel. BYU-I indicates it would be impossible for it to disclose Spencer's communications to its counsel without also disclosing privileged material, for example, the questions asked or topics explored, which would reveal counsel's mental impressions and theories regarding the case.

Any documents or electronically stored information Spencer provided directly to a BYU-I employee or representative are not covered by the attorney-client privilege. Therefore, if Spencer provided any documents or electronically stored information to BYU-I, BYU-I must provide them in bulk to Stevens, redacting or omitting any information that might indicate privileged information, such as how BYU-I categorized the information. To the extent Spencer gave information to any BYU-I employee or representative in the form of a conversation or interview, any notes regarding this information could be privileged. If such notes or documentation exists, BYU-I must submit these to the Court for in camera review.

### 7. Request for Production 33

Stevens' Request for Production No. 33 seeks production of "any and all documents and communications (whether electronic or otherwise) relating to any

interviews, meetings, or similar gatherings involving or regarding Plaintiff." At first

BYU-I did not produce any documents in response to this request, objecting that it sought

"information related to BYUI's inquiry into Plaintiff's allegations, conducted for the

purpose of obtaining legal advice from counsel and/or at the direction of counsel."

Recently, BYU-I supplemented its production to provide communications and documents

created prior to July 26, 2016, relating to Stevens. It maintains that all documents created

after this date were made in anticipation of litigation.

The Court agrees, generally, that any documents or communications regarding

interview or meetings about Stevens BYU-I created after July 26, 2016, were likely

drafted in anticipation of litigation. Accordingly, the Court finds BYU-I's production to

date satisfies its discovery obligations with regard to Request for Production 33.

### VIII. STEVENS' MOTION TO STRIKE (Dkt. 76)

Before taking up the common interest privilege, the Court takes up Stevens'

Motion to Strike as it may affect the Court's decision. Stevens moves to strike the

declarations and references BYU-I filed with its reply brief regarding the common

interest privilege. BYU-I submitted additional declarations from Stephen Craig and Wade

Woodard with its reply brief. Dkts. 70-1–70-7. Stevens argues the declarations (A)

improperly submit new information on reply and (B) improperly include information

regarding prior compromise negotiations.

*A. Whether BYU-I Improperly Submitted Evidence on Reply*

## 1. Applicable Law

Rule 6(c)(2) of the Federal Rules of Civil Procedure provides that "[a]ny affidavit supporting a motion must be served with the motion." In addition, the District of Idaho Local Rules provide that "[t]he moving party shall serve and file with the motion affidavits required or permitted . . . and other supporting materials on which the moving party intends to rely." Dist. Idaho Loc. Civ. R. 7.1(b)(2). Neither the Federal Rules nor the Local Rules specifically provide for submitting affidavits with a reply brief. Nevertheless, this Court has previously held that "[a]lthough the rules do not specifically allow for submission of evidence on reply, where it relates to an argument made in reply to an opposition, the Court often considers the information." *Creative Co-Op, Inc. v. Elizabeth Lucas Co.*, LLC, No. CV 11-116-REB, 2012 WL 761732, at *6 (D. Idaho Mar. 7, 2012). In other words, "precedent establishes that, in the face of new evidence, the court should permit" reply affidavits, "so long as no element of surprise or prejudice is created by doing so." *Doolittle v. Structured Investments Co., LLC*, No. CV07-356-S-EJL-CWD, 2008 WL 5121591, at *3 (D. Idaho Dec. 4, 2008) (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477 (6th Cir. 2002)). In determining whether to consider a reply affidavit, the Court must evaluate whether the evidence rebuts arguments raised for the first time in the non-moving party's opposition, *see Mintun v. Peterson*, No. CV06-447-S-BLW, 2010 WL 1338148, at *27 (D. Idaho Mar. 30, 2010), and whether it "should have been presented with the opening brief," *Advanced Media Networks LLC v. Row 44*

*Inc.*, No. CV 12-11018 GAF JCGX, 2014 WL 5760545, at *1 (C.D. Cal. Nov. 4, 2014) (citation omitted).

<u>2. Analysis</u>

In its initial brief, BYU-I asserted a common interest privilege with the LDS Church in several emails. It asserted the common interest privilege applied to the emails because they were shared for the purpose of developing and pursuing a common legal strategy with the LDS Church. Among other things, BYU-I explained how both it and the LDS Church feared Stevens might assert claims against both entities, that Stevens' Complaint made allegations about individuals who worked for both the school and the LDS Church, and how the two entities are closely affiliated.

With its reply brief, BYU-I submitted a "Second Declaration of Stephen M. Craig" with five exhibits and a "Declaration of Wade L. Woodard." Dkt. 70-1–70-7. Stevens maintains that both these declarations and the exhibits are improper new evidence. BYU-I argues the Second Declaration of Stephen M. Craig and the accompanying exhibits were intended to address Stevens' contention that BYU-I and/or the Church fabricated the allegations being asserted against the Church. For example, BYU-I more thoroughly described the relationship between BYU-I and the LDS Church and the allegations Stevens has made in this lawsuit, going back to her demand letter, that made them believe Stevens would assert claims against both entities. Dkt. 78, at 5. This evidence simply bolsters the arguments BYU-I made in its opening brief; it does not merely rebut arguments raised for the first time in Stevens' opposition. BYU-I had this evidence when it filed its original brief and it should have presented it at that time. The Court will,

therefore, strike the Second Declaration of Stephen M. Craig and the accompanying exhibits.

BYU-I next argues the Declaration of Wade L. Woodard was necessary to combat Stevens' allegations that BYU-I and the LDS Church are attempting to use the common interest privilege to conspire against her to share information protected under the priest-penitent privilege. The Court agrees that Stevens' conspiracy arguments were raised for the first time in the opposition brief and BYU-I could not have anticipated them. The Court finds it appropriate to permit BYU-I to submit evidence with its reply brief to combat these new arguments. Accordingly, the Court will not strike the Declaration of Wade L. Woodard.

*B. Whether BYU-I Improperly Included Information*
*Regarding Prior Compromise Negotiations*

1. Applicable Law

Federal Rule of Evidence 408 provides, in full:

(a) Prohibited Uses. Evidence of the following is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

(1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or a statement made during compromise negotiations about the claim--except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

(b) Exceptions. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408. The Ninth Circuit has clarified that "Rule 408 is designed to ensure that parties may make offers during settlement negotiations without fear that those same offers will be used to establish liability should settlement efforts fail." *Rhoades v. Avon Prod., Inc.*, 504 F.3d 1151, 1161–62 (9th Cir. 2007). Thus, "[w]hen statements made during settlement are introduced for a purpose unrelated to liability, the policy underlying the Rule is not injured." *Id.*

## 2. Analysis

Stevens asserts BYU-I has used prior compromise negotiations improperly in three ways. First, in responding in support of its assertion of the common interest privilege, BYU-I attached a letter Gaffney sent to Craig on August 31, 2016, requesting $950,000 jointly from the school and the Estate to settle Stevens' claims (Dkt. 70-5), and referenced that letter in its reply brief (Dkt. 70, at 4). Second, Stevens asserts BYU-I has attempted to use this demand letter to impeach her and her family members during depositions. Finally, in its Memorandum in Opposition to Stevens' Motion for Protective Order, BYU-I referenced that Gaffney was looking for a "one-million-dollar cash settlement." Dkt. 61, at 4, 13, 14.

In response to Stevens' first complaint, BYU-I argues it did not use Gaffney's demand letter "to prove or disprove the validity or amount of any claim in this lawsuit" or "to impeach Stevens." Instead, BYU-I asserts it used the letter "to support [its] position that it and the Church share a joint interest privilege in this case." The Court agrees that, in citing the letter in its reply brief, BYU-I did not use the letter for any of the purposes

explicitly prohibited by Rule 408. The Court, therefore, will not strike that reference to the demand letter.

As to Stevens' allegation that BYU-I has used the demand letter to try to impeach witnesses during depositions, Stevens has not cited any evidence to support this claim. The Court also questions whether the current Motion to Strike is the proper vehicle for objecting to such a tactic. In any event, the Court declines to strike anything from the record on such grounds.

Finally, BYU-I argues it referenced Gaffney's settlement request in its Opposition to Stevens' Motion for Protective Order because Stevens had disclosed that fact to third parties, and in doing so had waived any privilege in the communication. This, again, is not a prohibited use of "prior negotiations" under Rule 408, and the Court will not strike the references from the brief.[12]

## IX. COMMON INTEREST PRIVILEGE (Dkts. 51, 52)

Finally, the Court turns to the common interest privilege, which both BYU-I and the LDS Church assert.

### A. Applicable Law

"[T]he 'common interest' or 'joint defense' rule is an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012). At its heart, the common interest privilege is "an extension of the attorney-client

---

[12] The fact that the Court allows this letter for purposes of the current motions does not make the letter admissible for trial. That issue will be decided later if necessary.

privilege." *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012). "The privilege applies if (1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived." *Perez v. Clearwater Paper Corp.*, No. 3:13-CV-00461-BLW, 2015 WL 685331, at *2 (D. Idaho Feb. 17, 2015) (citation omitted). "[T]he common interest . . . may be either legal, factual, or strategic in character." Restatement (Third) of the Law Governing Lawyers § 76 (2000). However, "a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception." *Pac. Pictures Corp.*, 679 F.3d at 1129. "Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten." *Id.*; *see also In re Fresh & Process Potatoes Antitrust Litig.*, No. 4:10-MD-02186-BLW, 2014 WL 2435581, at *7 (D. Idaho May 30, 2014). Significantly, an entity or individual need not be a named party in a suit to claim the common interest privilege. *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir. 1987), ("Even where the non-party who is privy to the attorney-client communications has never been sued on the matter of common interest and faces no immediate liability, it can still be found to have a common interest with the party seeking to protect the communications.").

### B. Analysis

BYU-I and the LDS Church assert that they feared Stevens would sue both entities in the late summer and early fall of 2016. In particular, they point to a letter Gaffney sent to President Moore in August of 2017. Gaffney begins the letter by stating, "This email is

addressed to you in your capacity as her stake president." Dkt. 51-2, at 2. The email went

on to admonish President Moore for allegedly attempting to contact Stevens and discuss

legal matters with her. Finally, Gaffney stated, "All contacts with my client from both

your church and school are to be run through me." *Id.*

Based on this email, the LDS Church ceased communications with Stevens and

engaged the law firm of Kirton McConkie to represent it. The LDS Church maintains it

also determined it should form a joint defense strategy with BYU-I. Pursuant to this joint

strategy, BYU-I and the LDS Church shared information with each other, including

emails from the Church's legal counsel. They now claim the common interest privilege

protects those shared communications. In particular, they claim an email from Josh

Figueira, former counsel for the LDS Church, and President Moore, which was later

forwarded to Kip Harris at BYU-I, is privileged.

The Court finds the parties do have a common interest. Not only are the two

entities closely affiliated,[13] but Stevens has made allegation about individuals (for

example, President Moore and Bishop Garrett) who hold local leadership offices with the

LDS Church. These individuals, at times, appear to fluidly shift between their different

capacities within BYU-I and the LDS Church. The lines of these roles are often blurred.

For example, President Moore is employed by LDS Philanthropies (another LDS Church

affiliate) and is also a member of the LDS clergy. Thus, he is not a BYU-I employee, but

---

[13] The LDS Church founded BYU-I, it continues to support and guide the school, and identifies itself as the school's "sponsoring institution." See Dkt. 51, at 8. In addition, to attend BYU-I, a student has to obtain an ecclesiastical endorsement from a member of the LDS Church's clergy.

BYU-I issued him a BYU-I email address, which he often uses to communicate in his clerical capacity as Stake President. In addition, the outcome of this litigation is likely to affect these individuals in their different capacities, and, in turn, the entities for which they work. Thus, although Stevens did not assert claims against the LDS Church, the LDS Church still shares common interests with BYU-I.

The Court also finds, under the circumstances, it was not unreasonable for the LDS Church to believe Stevens may file suit against it and for it to prepare accordingly. The Court acknowledges that the initial letter to preserve evidence, the charges of discrimination, the Complaint, and the Amended Complaint only included BYU-I and the Estate of Stephen Stokes. However, there is a multitude of reasons Stevens may have chosen not to include the Church as a defendant besides its alleged lack of legal interest. Moreover, the charges of discrimination and the Complaints included specific allegations about Stevens' ecclesiastical endorsement and temple recommend, commendations she can only obtain from members of the LDS Church's clergy. In fact, until recently, it was not entirely clear whether Stevens would ultimately make any claims of discrimination based on the denial of an ecclesiastical endorsement. Such a claim necessarily would have implicated the LDS Church.

The Court has some concerns about whether BYU-I and the LDS Church in fact agreed to form a joint defense. Counsel for the LDS Church have submitted affidavits stating they intended to form a joint defense. *See* Dkt. 51-2, at 2 ("[M]y client and I began to work with [BYU-I] and its counsel as part of a joint defense strategy."). A similar affidavit from BYU-I's counsel was missing from its opening brief. However, on

reply, BYU-I submitted an affidavit from Craig stating he "shared with Church Risk Management and Church attorneys privileged information regarding possible claims, defenses, and litigation strategies that might result in the wake of [Gaffney's] Demand Letter." Dkt. 70-1, at 4. As previously discussed, the Court struck this affidavit from the docket, as it should have been included with the opening brief. *See supra* Part VIII. In addition, this affidavit does not specify that BYU-I and the LDS Church ever decided to form a joint defense. Rather, the affidavit only states that it was part of BYU-I's regular business practice to share such information with Church Risk Management and Church attorneys. Dkt. 70-1, at 4. Thus, the Court only has the LDS Church's affidavit to rely on, which has its own flaws. The affidavit from the LDS Church's attorney fails to identify when exactly the entities began working together, how they first started communicating, or any other details about the joint defense. Thus, BYU-I and the LDS Church have failed to "demonstrate cooperation in formulating a common legal strategy." *In re Fresh & Process Potatoes Antitrust Litig.*, 2014 WL 2435581, at *7.

The Court has additional concerns about whether the common interest privilege actually protects the specific emails that the LDS Church claims are privileged. Most important to this issue, the LDS Church must show it shared the email with BYU-I in furtherance of their common defense. The original email between Figueira and Moore clearly falls under the attorney-client privilege as it contains legal advice from an attorney to a client. **(It contains a letter stating why Moore cannot issue Stevens an ecclesiastical endorsement. It also states she should contact Kip Harris to seek a waiver.)** However, Moore then forwarded that email to Kip Harris, BYU-I's Dean of

Students. **(Moore sent the letter to Harris to let Harris know he had told Stevens to contact him.)** Harris then forwarded the email to Craig. **(Harris stated in this email he might need legal advice if Stevens were to contact him for an endorsement exception.)** While this email was eventually sent to Craig, Moore (the client) sent the email to Harris (another client). This chain of communication tends to show the emails were not intended to share evidence amongst attorneys for the purpose of building a common defense. Several legal authorities have acknowledged this reality. *See* Restatement (Third) of the Law Governing Lawyers § 76 (2000) ("Under the privilege, any member of a client set—a client, the client's agent for communication, the client's lawyer, and the lawyer's agent (see § 70)—can exchange communications with members of a similar client set. However, a communication directly among the clients is not privileged . . . ."); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 364 (3d Cir. 2007), *as amended* (Oct. 12, 2007) ("First, to be eligible for continued protection, the communication must be shared with the attorney of the member of the community of interest. . . . Sharing the communication directly with a member of the community may destroy the privilege."). The claim of privilege would be much more persuasive had Figueira directly emailed the letter to Craig. Moreover, the actual text of the emails offers/asks for advice in the present and going forward. In other words, the emails do not discuss a joint defense against the claims Stevens has already asserted. Thus, the Court cannot plainly conclude that the emails were sent in furtherance of BYU-I's and the LDS Church's common defense.

The Court has one additional issue it must address before reaching a decision on this claim of privilege: Stevens' concern that the entities will use the common interest privilege, in general, to share her communications with members of the LDS clergy that are protected by the priest-penitent privilege. Stevens believes BYU-I is improperly obtaining information from the LDS Church under this claim of privilege. Stevens has not presented evidence to support this claim while BYU-I has specifically provided declarations that such a breach of privilege has not occurred. BYU-I and the LDS Church are undoubtedly on notice of Stevens' claims of privilege in her communications with members of the LDS clergy. The Court cannot conclude that an improper breach of privilege is more likely in this case than in any other and it has no reason to doubt the declarations of counsel in this case. Those attorneys are bound by the Rules of Professional Conduct. The Court must trust that they will abide by those Rule and the other obligations imposed by relevant local and federal rules. Accordingly, the Court does not deny the common interest privilege protection on this ground. However, as outlined above, BYU-I and the LDS Church have not met the requirements to establish the Figueira email is protected by the common interest privilege.

## X. ORDER

THE COURT HEREBY ORDERS:

1. BYU-I's Motion Regarding Plaintiff's Waiver of the Priest-Penitent Privilege

   (Dkt. 46) is GRANTED IN PART and DENIED IN PART as follows:

   a. Stevens has not waived her priest-penitent privilege in her communications

      with Bishop Garrett or President Moore;

    b. Stevens has waived her priest-penitent privilege in her communications
        with Bishop Lovell regarding her need for food assistance;

    c. Stevens has not waived her priest-penitent privilege in any communications
        she may have had with Bishop Lovell regarding her daughter's
        ecclesiastical endorsement;

    d. Stevens has waived any privilege she had in her communications to the
        Beesleys that the Beesleys then disclosed to Bowen and Austin over email.

2. BYU-I's Motion to Seal its Motion Regarding Plaintiff's Waiver of the Priest-
   Penitent Privilege (Dkt. 45) is GRANTED.

3. BYU-I's Motion to Compel Plaintiff's Compliance with Her Discovery
   Obligations (Dkt. 47) IS DENIED AS MOOT.

4. The LDS Church's Motion to Intervene (Dkt. 49) is GRANTED. The LDS Church
   may intervene in this case, under Rule 24(a) and 24(b), but only for the purpose of
   asserting a privilege in discovery materials;

5. The LDS Church's Motion Regarding the Common Interest Privilege (Dkt. 51 is
   DENIED;

6. BYU-I's Motion Regarding Privilege Claims (Dkt. 52) is GRANTED IN PART
   and DENIED IN PART as follows:

    a. The emails between Rammell and Yost are PRIVILEGED;

    b. The emails between Cole and Roberts are NOT PRIVILEGED;

    c. The September 2016 emails are NOT PRIVILEGED;

    d. The October 2016 emails are NOT PRIVILEGED;

e.   Cochran's August 2016 email and Burgener's reply email are
     PRIVILEGED; the attachment to Burgener's email is NOT PRIVILEGED;

f.   BYU-I must produce any documents or electronically stored information it
     received from Spencer; BYU-I must submit to the Court for in camera
     review any documentation of interviews or conversations BYU-I
     employees or representatives had with Spencer;

g.   BYU-I has satisfied its discovery obligations as to Request for Production
     33.

7.   Plaintiff Lori Stevens' Motion for Protective Order (Dkt. 55) is GRANTED IN
     PART and DENIED IN PART as follows:

     a.   Stevens' communications with Anderson are only protected to the extent
          that Anderson participated in discussions with Stevens and Gaffney that are
          otherwise protected by the attorney-client privilege. All communications
          Stevens had with Anderson outside of this narrow category are not
          protected by the attorney-client privilege.

     b.   Stevens waived her attorney-client privilege with regard to the termination
          letter and the subjects she discussed with Blaser. However, no subject
          matter waiver has occurred with regard to these communications.

8.   BYU-I's Motion to Seal Exhibit 19 to the Declaration of Wade L. Woodard filed
     in support of the Motion to Compel Plaintiff's Compliance with Her Discovery
     Obligations (Dkt. 66) is GRANTED;

9. BYU-I's Motion to Seal its Reply Brief and Supporting Declarations and Exhibits filed in Support of its Privilege Claims (Dkt. 69) is GRANTED; and

10. Stevens' Motion to Strike Reply Declarations and References to Prior Settlement Discussions (Dkt. 76) is GRANTED IN PART and DENIED IN PART.

    a. The Court STRIKES from the record the Second Declaration of Stephen M. Craig (Dkt. 70-1) and the accompanying exhibits (Dkts. 70-2–70-6);

    b. The Court declines to strike any other evidence from the record.

DATED: June 11, 2018

David C. Nye
U.S. District Court Judge