UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LORI STEVENS,<br><br>    Plaintiff,<br><br>    v.<br><br>BRIGHAM YOUNG UNIVERSITY-IDAHO d/b/a BYU-Idaho, a Utah Corporation,<br><br>    Defendant,<br><br><br>THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,<br><br>    Intervener. | Case No. 4:16-cv-00530-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

Three ripe motions are presently before the Court: Brigham Young University of Idaho's ("BYUI") Brief in Support of the Common Interest Privilege (Dkt. 119); BYUI's Motion for Independent Examination of Plaintiff, for an Award of Monetary Sanctions, and for an Extension of the Deadlines (Dkt. 129); and BYUI's Renewed Motion Regarding Plaintiff's Waiver of the Priest-Penitent Privilege (Dkt. 139). Additionally, the Parties have fully briefed a dispute regarding the applicability of the attorney work product doctrine to a set of notes created by BYUI employee Mckinzie Cole.

# ANALYSIS

## 1. The Work Product Doctrine Shields Ms. Cole's Notes from Discovery

Plaintiff Lori Stevens seeks access to notes taken by Mckinzie Cole during Ms. Cole's interview of Stevens' friend, Danielle Spencer (hereinafter, the "Cole Notes"). Stevens' request is denied.[1]

### A. *Background*

#### (a) *Factual Background*

In June of 2016, Stevens, along with her friend Ms. Spencer, reported to members of BYUI's faculty that Stevens had an inappropriate non-academic relationship with BYUI Faculty Member Robert Stokes. After Stevens' relationship with Mr. Stokes came to light, Ms. Cole, an attorney who was employed as the Employee Relations Coordinator in BYUI's Human Resources Department, began gathering facts regarding Stevens' relationship with Mr. Stokes. Then, on August 5, 2016, Stevens' counsel sent BYUI a letter putting BYUI on notice of Stevens' intent to file a lawsuit. Thereafter, on August 15, 2016, Ms. Cole, along with BYUI in-house counsel Stephen Craig and BYUI

---

[1] The Court notes that its clerk informed the Parties that their briefing on this dispute was limited to no more than four pages. As Defendants point out, Stevens' brief is substantially longer than four pages. Relatedly, Defendants ask the Court to impose fees on Stevens' counsel for making an argument Defendants label as frivolous considering Judge Nye's prior ruling. The Court declines to impose fees given that both Parties are asking for, in essence, reconsideration of prior decisions issued by Judge Nye. Nevertheless, the Court will take this opportunity to remind the Parties of the importance of Rule 1 of the Federal Rules of Civil Procedure. Furthermore, the Court will not accept overlength briefs filed by the Parties.

trial counsel Wade Woodard, interviewed Ms. Spencer. The Cole Notes are the product of that interview.

(b) *Procedural Background*

The dispute between the Parties over the Cole Notes was previously considered by Judge Nye. On June 11, 2018, Judge Nye ordered BYUI to turn over for *in camera* review documents containing information Ms. Spencer gave to BYUI employees either via conversations or interviews. Dkt. 89 at 39. Mr. Woodard subsequently emailed, among other things, the Cole Notes to Judge Nye's law clerk on June 20, 2018. After performing an *in camera* review of the documents, Judge Nye found that the Cole Notes were covered by the work product doctrine. Dkt. 91.

B. *Legal Standard*

As the party seeking to protect documents under the work product doctrine, BYUI bears the burden of showing that the documents are, in fact, work product. *See In re Excel Innovations, Inc.*, 502 F.3d 1086 (9th Cir. 2007). The work product doctrine, codified in Rule 26(b)(3), protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *In re Grand Jury Subpoena*, 357 F.3d 900, 906 (9th Cir. 2004).

If a document falls within the doctrine, the adverse party must then show a "substantial need [for] the materials" and "undue hardship [in obtaining] the substantial equivalent of the materials by other means." *See* Rule 26(b)(3). But the standard is higher when opinion work product is sought. There, the adverse party must make "a

showing beyond the substantial need/undue hardship test." *See Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992). That higher test requires that the attorney's mental impressions be at issue in the case, and further that the need for the material is compelling. *Id.* at 577. Notes taken by an attorney from a witness interview are generally opinion work product because, in choosing what to write down and what to omit, the attorney necessarily reveals his or her mental processes. *See In re Grand Jury Proceedings*, 492 F.3d 976, 981-82 (8th Cir. 2007).

C. *Analysis*

Having reviewed the Cole Notes, the Court concludes that they are attorney work product. Ms. Cole is an attorney, and at the time the interview took place, BYUI was on notice that Stevens intended to bring a lawsuit against it. Thus, the notes were prepared in anticipation of litigation. In light of this determination, two questions remain: (1) whether the Cole Notes are fact work product or opinion work product and (2) whether, depending on the category that applies, Stevens has demonstrated a sufficient level of need.

With respect to the first inquiry, the Court notes that the United States Court of Appeals for the Eighth Circuit has held that notes taken by an attorney during a witness interview are generally opinion work product because, in choosing what to write down and what to omit, the attorney necessarily reveals his or her mental processes. *See In re Grand Jury Proceedings*, 492 F.3d at 981-82. Looking at the Cole Notes, the Court agrees with the Eighth Circuit's holding. Although the Cole Notes contain some direct

quotations, they are not a verbatim transcript of Ms. Cole's interview with Ms. Spencer. Rather, the Cole Notes include, in an organized fashion, Ms. Spencer's version of the events giving rise to this litigation. By choosing what details to record and what details to omit, Ms. Cole implanted her mental impressions in her notes, thereby making them opinion work product.

Because the Cole Notes are opinion work product, Stevens is required to show something beyond "substantial need for the materials and undue hardship." *See Holmgren*, 976 F.2d 573 at 577. Stevens has not come close to making the required showing. Instead, Stevens suggests that Spencer has changed her story after extensive time spent with BYUI's counsel. According to Stevens, she needs the Cole Notes to compare Spencer's current story to her prior story. To the extent it is true that Ms. Spencer has changed her story, the proper tool for probing this issue is rigorous questioning during Ms. Spencer's upcoming deposition and at trial. Given that both tools are still available to Stevens, there is no substantial need or undue burden associated with Defendants' refusal to produce the Cole Notes.[2]

**2.  The Court Will Review *In Camera* Documents that Defendants Maintain Are Subject to a Common Interest Privilege with the LDS Church**

---

[2] Although the Court is convinced that the Cole Notes are opinion work product, even if they were construed as fact work product, the Court would not order their production under the lesser fact work product standard for the reasons cited above.

Next, the Court turns to the dispute between the Parties regarding whether a common-interest privilege exists between the LDS Church and BYUI. Defendant's Motion (Dkt. 119) is denied to the extent it seeks a "global privilege assertion." Dkt. 119 at 2 n.1.

Like the dispute over the Cole Notes, the Parties' dispute over the common-interest privilege is also an attempt, this time by Defendant, to seek reconsideration of a prior ruling from Judge Nye. Specifically, on June 11, 2018, Judge Nye concluded that BYUI failed to present sufficient evidence to "demonstrate cooperation [with the LDS Church] in formulating a common legal strategy." Judge Nye's ruling referenced one particular email between LDS Church counsel and Stevens' ecclesiastical leader, Christopher Moore (referred to by the Parties as the "Figueira email"), but was not limited to that email alone; rather, it was a global decision about the relationship between BYUI and the Church. *See* Dkt. 89 at 52 ("The LDS Church's Motion Regarding the Common Interest Privilege (Dkt. 51) is DENIED.").

BYUI now attempts to present sufficient evidence to remedy the shortcomings identified by Judge Nye. Judge Nye ruled on this issue and the Court declines to alter Judge Nye's prior decision based on this newly presented evidence. However, this conclusion does not suggest that all communications between BYUI and the Church are discoverable. Therefore, BYUI is again directed to submit any disputed documents to the Court no later than April 19, 2019. Prior to doing so, however, counsel for both Parties are to contact the Court's clerk for a meet and confer regarding this dispute. Specifically,

the Parties should be prepared to discuss ways to limit the number of documents that need to be reviewed *in camera*.

3.      **Stevens Must Undergo an Independent Medical Examination**

The Court next addresses Defendant's Motion to Compel. Stevens brought this action under Title IX of the Education Amendments Act of 1972, the Americans with Disabilities Act, the Rehabilitation Act, Idaho Code § 15-3-804(b), and the Idaho Human Rights Act. *See* Dkt. 1. Stevens alleges that she (1) "suffered and will continue to suffer emotional distress consisting of outrage, shock and humiliation," Dkt. 4, ¶¶ 94, 100, 114, 123; (2) suffers from "severe emotional distress," *id.* ¶¶ 127, 132; and (3) "has suffered and will continue to suffer physical injury, medical expenses and costs, as well as emotional distress consisting of outrage, shock and humiliation," *id.* ¶ 142. Based on these allegations, BYUI requested that Stevens submit to an independent medical examination ("IME") pursuant to Federal Rule of Civil Procedure 35. After the Parties were unable to agree upon the terms and location of the IME, BYUI moved for an order to compel Stevens to attend an IME. For the reasons stated below, the Court grants BYUI's motion to compel the IME.

   A.    *Background*

Stevens does not dispute that she has placed her mental condition at issue. Initially, the Parties agreed after an informal discovery conference to certain terms and conditions of the IME by Dr. Beaver. On the eve of the IME, Stevens' counsel was informed that the chosen location of the IME, the Family Crisis Center ("Center"), would

not allow the IME to proceed as agreed upon. Specifically, the Center required another person to be in the room or that the examination be recorded. This change in terms precluded the IME from going forward.

   B.   *Legal Standard*

Under the Federal Rules of Civil Procedure, a court "may order a party whose mental or physical condition ... is in controversy to submit to a physical or mental examination by suitably licensed examiner" upon a showing of good cause. Fed. R. Civ. P. 35(a). Courts have broad discretion to "structure the time and manner of medical examinations." *Nicholas v. Wyndham Intern.*, 218 F.R.D. 122 (D.V.I. 2003). Like other rules of discovery, Rule 35 should be construed liberally in favor of an examination, but the Court must "balance the right of the party to be examined to avoid personal invasion against the moving party's right to a fair trial." *Franco v. Boston Scientific Corp.*, 2006 WL 3065580 (N.D. Cal. Oct. 27, 2006).

   C.   *Analysis*

      (a)   Stevens' Mental Condition Is "In Controversy"

"A mental condition is 'in controversy' when it is itself the subject of the litigation." *Gavin v. Hilton Worldwide, Inc.*, 291 F.R.D. 161, 164 (N.D. Cal. 2013). An IME will be ordered for emotional distress claims when "(1) the complaint includes a claim for intentional or negligent infliction of emotional distress; (2) the plaintiff alleges a specific mental or psychiatric injury or disorder; (3) the plaintiff claims unusually severe emotional distress; (4) plaintiff offers expert testimony to support the claim of

emotional distress; or (5) the plaintiff concedes that her mental condition is 'in controversy' for purposes of Rule 35." *Id.* At least four of the above factors are met. First, Stevens alleged both intentional and negligent infliction of emotional distress. Second, Stevens alleged she has, and will continue to have, severe emotional distress. Third, Stevens retained experts who may testify at trial regarding her mental condition. Lastly, as noted above, Stevens does not contest that her mental condition is in controversy. Based on the foregoing, Stevens has placed her mental condition in controversy.

        (b)    *Good Cause Exists to Order the IME*

"To establish 'good cause' exists for an IME, the moving party generally must offer specific facts justifying the discovery." *Id.* at 165. In conducting the "good cause" inquiry, Courts are to consider the following factors: "the possibility of obtaining desired information by other means, whether plaintiff plans to prove her claim through testimony of expert witnesses, whether the desired materials are relevant, and whether plaintiff is claiming ongoing emotional distress." *Id.* (citation omitted). Here, the desired materials are relevant to this case, and Stevens plans on proving her claim of emotional distress through either her treating providers or expert witnesses. Further, Stevens' complaint alleges ongoing claims of emotional distress. It also appears from the declaration of Dr. Beaver and Dr. LaCroix that it is not possible to obtain the desired information through reviewing Stevens' prior medical records. Because the foregoing factors are met, good cause exists for granting the IME.

(c) *Scope and Limitations of Stevens' IME*

Stevens argues that special circumstances exist to place limitations on the IME. Specifically, Stevens requests the following limitations:

i. The examination by Dr. Beaver will be limited to a single day and will include only those tests identified;

ii. The examination by Dr. LaCroix will be limited to a single day and will include only those tests identified;

iii. Both examinations will take place in Rexburg at the Family Crisis Center or another location within Plaintiff's safe zone as agreed by the Parties;

iv. Stevens will be allowed a support person of her choosing in the room during the examinations. The support person will not interfere with or speak during the examination except for requesting a break. The support person will sit either behind Stevens or at least five (5) feet to the side of Stevens, but with Stevens and the examiner in full view of the support person.

v. In the alternative, the examinations will be tape recorded with copies of the recordings kept in the sole and exclusive custody and control of Margie Harris or another designated third party unless the Court orders otherwise. At the close of litigation, all copies of the recording will be destroyed.

vi. Stevens will receive a paper copy or print out of each test as it is completed on the day of testing but it cannot be disclosed or used in any way outside of this litigation;

vii. Dr. Beaver will simultaneously provide to Plaintiff's counsel copies of all information provided to Dr. LaCroix.

Dkt. 133 at 10-11.

Pursuant to Rule 35, the Court may specify the scope and length of the examination. *See* Fed. R. Civ. P. 35. BYUI has represented that the examinations of

both Dr. Beaver and Dr. LaCroix will not exceed a single day and will be limited to the identified tests. Therefore, these two issues are not in dispute, and the Court will limit the length of the IME accordingly.

In its discretion, the Court will not allow a support person of Stevens choosing in the room nor will it allow any audio or video recording during the examinations. The Court will allow a support person to be available in the building; however, he or she cannot be in full sight of Stevens or in the room during the examination. Stevens may interact with her support person during the breaks of her examination. Stevens has not presented any significant evidence to establish the need for a third-party to be present or for the examination to be recorded. Although this Court is mindful of special circumstances raised by Stevens, "the approach adopted by Rule 35 is a considered an attempt to fairly place the parties on a somewhat equal footing." *Tomlin v. Holecek*, 150 F.R.D. 628, 632 (D. Minn. 1993). Dr. Beaver and Dr. LaCroix have offered their professional opinion that, based on their experience, limiting the IMEs in the manner urged by Stevens would preclude them from properly assessing Stevens. Although Marge Harris and Dr. Zollinger voice concerns about the possible effects of the IMEs on Stevens, the Court notes that neither Dr. Zollinger nor Marge Harris is trained in psychology. Conversely, Dr. LaCroix explained that "in [her] experience as a forensic psychiatrist and based upon my education, training and the academic literature, a combined psychological and psychiatric examination spread over a period of several days does not cause harm to an examinee, and it does not worsen any emotional pain and

suffering, mental anguish or psychological condition if done properly and using the appropriate venue, technique and the timing . . . ." Dkt. 129-23, ¶ 13. Dr. Zollinger and Marge Harris failed to present "exceptional circumstances," which are required to have a third-party be present (including indirect third-parties through a recording devise). *See Holland v. United States*, 182 F.R.D. 493, 495 (D.S.C. 1998) ("[T]he majority of federal courts have rejected the notion that a third party should be allowed, even indirectly through a recording device, to observe a Rule 35 examination."). Further, nothing in the record calls into question the validity of either the examinations proposed by Dr. Beaver or Dr. LaCroix or the concerns of Dr. Beaver or Dr. LaCroix in having direct or indirect third-party observers during the examinations. *See* Dkt. 129-21, ¶ 10 (Beaver Decl.); Dkt. 129-23, ¶¶ 15-21 (LaCroix Decl.). This Court assumes, as the court in *Tomlin v. Holecek* observed, that "both sets of health care professions are bound by the methodologies of their discipline and by the same formal or informal principles of professional integrity." 150 F.R.D. at 633. Therefore, given the risk of invalidating the results of Dr. Beaver's and Dr. LaCroix's IME, the Court declines to alter the IMEs as requested by Stevens. *See id.* at 631.

Because neither direct nor indirect third-party observation will be allowed, the IMEs cannot be conducted at the Family Medical Center. Marge Harris's declaration makes clear that the Center's regulations prevent examinations of the type contemplated here at the Center without direct or indirect observation. Dkt. 134-1. Furthermore, Dr. Beaver and Dr. LaCroix have identified other environmental concerns with the Center

that could potentially invalidate the testing. See 129-21, ¶ 10; 129-23, ¶ 21. Nevertheless, the Court will require that the IMEs be conducted within Stevens' "safe zone." Although Stevens' counsel objects to use of the Spring Hill Suites, Stevens has not presented any specific evidence establishing the parameters of her safe zone. *But see* Dkt.134-2, ¶ 18 (Zollinger Decl.) (suggesting Stevens' "safe zone" is "close in proximity to Ms. Stevens' home"). That said, Stevens has not suggested that BYUI was outside of her safe zone. Further, Stevens' treating physician, Dr. Zollinger, has outlined several additional locations (besides the Center), which are located within her safe zone. Dkt. 134-2, ¶ 18; *see also* Dkt. 133-1 (Casperson Decl.). Therefore, the IME shall be scheduled in one of the areas outlined above within Stevens' safe zone, excluding the Family Crisis Center. Finally, the Court will not require that Stevens' receive a paper copy or print out of each test as it is completed on the day of testing. However, counsel for BYUI shall provide to Stevens' counsel copies of all documents provided to Dr. LaCroix from Dr. Beaver. *See* Fed. R. Civ. P. 35(b).

      viii.      *Costs and Attorney's Fees*

BYUI requests the Court award all fees and costs it incurred in addressing the IME issues. Dkt. 129. Although Stevens has not refused to submit to an IME, Stevens cancelled the scheduled IME with Dr. Beaver on the eve of the examination. The Court finds that Stevens' response in cancelling the IME was not substantially justified, even though the Center's regulations played a role in the cancellation. Fed. R. Civ. P. 37(a)(5); *see also T.B. ex rel. G.B. v. Chico Unified Sch. Dist.*, No. CIV S-07-0926-

GEBCMK, 2009 WL 837468, at *4 (E.D. Cal. Mar. 26, 2009). However, the Court does not believe that a sanction for costs and fees incurred in addressing all the IME issues is appropriate. Therefore, the Court limits the award of expenses, including reasonable attorney's fees, to those incurred with filing BYUI's motion to compel.

        ix.       *Extension of Deadlines*

Because the IME was not conducted within the previously prescribed time-lines, good cause exists to extend the deadlines for expert disclosures. The Court therefore grants the requested extension of deadlines.

**4.**    **The Court Will Bar Stevens From Putting the Contents of Her Discussions with LDS Church Leaders at Issue**

Finally, the Court turns to BYUI's Renewed Motion Regarding Plaintiff's Waiver of the Priest-Penitent Privilege. Dkt. 139. BYUI argues that after Judge Nye issued his original decision on this issue, Stevens' experts put her communications with her religious leaders at issue, thereby waiving her privilege. The Court disagrees, subject to the same reservation adopted by Judge Nye: Stevens and her experts may not use statements made by Stevens to her religious leaders in support of her case.

    A.    *Background*

Judge Nye's decision thoroughly reviewed the background of this dispute. The Court therefore provides only a quick summary. Previously, BYU-I argued that Stevens waived privilege with respect to her communications with (1) her prior Bishop and Stake President, Christopher Moore ("President Moore"); (2) current Bishop, Robert Garrett ("Bishop Garrett"); (3) prior Bishop Lovell ("Bishop Lovell"); and (4) Jon and Evona

Beesley (the "Beesleys"). Importantly, Bishop Garrett was, at the time of the incidents giving rise to this suit, BYUI's Dean of Admissions. Dkt. 89 at 19. Similarly, President Moore was an employee of BYUI in the philanthropies office. *Id.* Judge Nye held that Stevens had waived the privilege with respect to her communications with Bishop Lovell and the Beesleys, but had not done so with respect to her communications with President Moore and Bishop Garrett. *Id.* at 53-54. Stevens' communications with President Moore and Bishop Garrett were primarily related to her request for an ecclesiastical endorsement to return as a student to BYUI. *Id.* at 21.

Judge Nye, in his analysis regarding the priest-penitent privilege, stated:

> Stevens' counsel['s] clarif[ication] that Stevens is not claiming BYU-I, or any of its employees, discriminated against her or retaliated against her by denying her an ecclesiastical endorsement. In addition, Stevens is not using this conversation with Bishop Garrett to prove BYU-I knew about Stokes' behavior and failed to take action to stop or prevent it. In other words, counsel clarified that these allegations about Stevens' conversation with Garrett are mere factual background.

*Id.* at 20. Judge Nye reached the "same decision" regarding Stevens' communications with President Moore. *Id.* at 21.

### B. *Analysis*

Although the Parties have spent considerable time and energy arguing about whether Stevens' expert reports waive the priest-penitent privilege, the Court will attempt to simplify the issue. BYUI represents that its interests are sufficiently protected by an order from the Court "precluding Stevens, her counsel and her witnesses, including her expert witnesses, from presenting any evidence or argument on the claims that implicate those communications." Dkt. 150 at 11. Stevens contends throughout her motions that

she "has no intention of testifying about the substance of her communications with her bishop or stake president." Dkt. 149 at 3.

In short, the Parties agree about the appropriate outcome: Stevens and her experts may not testify at trial regarding the contents of her discussions with President Moore and Bishop Garrett that took place in the context of Stevens seeking to obtain from President Moore and Bishop Garrett an ecclesiastical endorsement. Stevens and her experts *may* testify that BYUI's alleged failure to make an exception to BYUI's endorsement requirement was unlawful under Title IX. By proceeding in this fashion, the Court strikes a balance. The Parties may argue over the central factual issue–BYUI's refusal to issue a waiver–while at the same time respecting Stevens' right to seek confidential counsel and support from her spiritual leaders.

## ORDER

**IT IS ORDERED:**

1. Defendant has properly shielded the Cole Notes from production pursuant to the attorney work product doctrine.

2. Defendant's Motion in Support of the Common Interest Privilege (Dkt. 119) is **DENIED**.

3. Defendant's Motion for Independent Examination of Plaintiff, for an Award of Monetary Sanctions, and for an Extension of the Deadlines (Dkt. 129) is **GRANTED**, to the extent set forth in this decision.

4. Defendant's Renewed Motion Regarding Plaintiff's Waiver of the Priest-Penitent Privilege (Dkt. 139) is **DENIED**.

DATED: April 4, 2019

B. Lynn Winmill
U.S. District Court Judge