IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LORI STEVENS<br><br>    Plaintiff,<br><br>  v.<br><br>BRIGHAM YOUNG UNIVERSITY – IDAHO dba BYU-Idaho, a Utah corporation and SUSAN STOKES, personal representative of the Estate of Stephan Stokes,<br><br>    Defendants. | Case No. 4:16-CV-530-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion for sanctions, a motion to compel a response to discovery, a motion regarding a Rule 30(b)(6) deposition request, and a motion to exclude the expert testimony of Ryan Cragun. The Court held oral argument on the motions and took them under advisement. For the reasons expressed below, the Court will (1) schedule an evidentiary hearing on the motion for sanctions; (2) grant in part and deny in part the motion to compel, (3) grant in part and deny in part the Rule 30(b)(6) request, and (4) grant in part and deny in part the motion to exclude the testimony of Ryan Cragun.

**Memorandum Decision & Order – page 1**

## LITIGATION BACKGROUND

Plaintiff Stevens, a former BYU-I student, alleges that Robert Stokes, a former BYU-I professor, initiated an unwanted relationship with her while she was a student and Stokes was a professor at BYU-I. Stevens alleges that this relationship ultimately became sexually and emotionally abusive. She further asserts that she, along with another student, Danielle Spencer, reported Stokes' inappropriate and abusive behavior to several BYU-I professors and officials, who failed to take any action. The relationship ended when Stokes died on July 1, 2016, from complications during heart surgery.

Stevens originally sued BYU-I and the Stokes estate. She later settled her claims against the Stokes estate. The LDS Church intervened for "the limited purpose of protecting its claims of privilege. . . ." *See Order (Dkt. No. 89).*

There are now four claims in this case against BYU-I:

1. Teacher-on-student hostile environment/sexual harassment actionable under Title IX of the Education Amendments Act;
2. Teacher-on-student quid pro quo sexual harassment;
3. Hostile learning environment in violation of the Rehabilitation Act and the Americans with Disabilities Act; and
4. Violation of the Idaho Human Rights Act.

## Motion to Compel

Stevens seeks to compel the LDS Church to answer certain discovery requests concerning (1) the LDS Church's appointment and payment of counsel for Danielle Spencer; (2) information related to Christopher Moore's employment and his discussion with third parties; and (3) tithing contributions funding BYU-I.

With regard to Moore, Stevens wants to question him about (1) whether he was an employee of BYU-I and the scope of that employment, and (2) his communications with third parties while investigating Steven's request for an ecclesiastical recommend to continue attending BYU-I.

The LDS Church argues that as a limited intervenor it cannot be compelled to answer any discovery. It cites no authority so holding and the Court can find none. Certainly, the Court can put limitations on an intervenor's discovery obligations but there is no blanket rule absolving them from discovery. *See Southern v. Plumb Tools,* 696 F.2d 1321, 1323 (11th Cir. 1983) ("imposing certain conditions on either type of intervention [by right or permissive] poses no problem in the federal court").

The LDS Church argues next that Moore – an ecclesiastical leader within the LDS Church known as a Stake President – was acting in his ecclesiastical capacity when he questioned the third parties and therefore is entitled to the clergy/communicant privilege. In an earlier decision, the Court relied on the non-binding but helpful Rule of Evidence 506 (proposed) to govern the clergy/communicant issues in this case. *See* 2018 WL 2974388 (D.Id. June 11, 2018) at *7. In defining the scope of that privilege, Rule 506(c) states that "[t]he privilege may be claimed by the [communicant] . . . . The clergyman may claim the privilege on behalf of the [communicant]." This language, according to the Advisory Committee Notes, "makes clear that the privilege belongs to the communicating person." During the debate over the Rule, a faction within the Committee proposed giving the cleric more control – either making the cleric the sole holder of the privilege or making the cleric and penitent joint holders of the privilege,

**Memorandum Decision & Order – page 3**

noting that some states had adopted this approach.  *See 26 Wright and Graham, <u>Federal Practice & Procedure</u>, § 5624* at pp. 212-214.  But the Committee ultimately rejected that approach and made the communicant the sole holder of the privilege.  *Id.* at p. 214.

Making the communicant to be the sole holder of the privilege is the better approach here where Stevens seeks to question Moore about his conversations with third parties in investigating Stevens' request for an ecclesiastical recommend.  The third parties had no ecclesiastical relationship to Moore and his discussions with them were prompted by a request from Stevens.  Under those circumstances, the Court finds that Rule 506(c)'s approach – granting the privilege to the communicant but not the cleric – should govern the outcome of this issue.  The Court expresses no opinion on whether if faced with a different factual situation, the Court might deviate from Rule 506(c)'s approach.

Thus, Stevens holds the privilege, and Moore's right to claim the privilege is entirely derivative of Stevens' rights.  Here, Stevens is not asserting any privilege in Moore's communications with third parties – indeed Stevens wants Moore to divulge those communications.  Moore has no independent privilege and thus must answer the questions posed by Stevens regarding his communications with third parties listed above.

There is apparently also a dispute over whether Moore was an employee of BYU-I as Stevens has offered some evidence that he was Executive Director of Development for BYU-I and a Director for LDS Philanthropies, both positions dealing with charitable gifts.  BYU-I denies that he was an employee, and the LDS Church has refused to respond to a request by Stevens to take a Rule 30(b)(6) deposition of an LDS Church

**Memorandum Decision & Order – page 4**

official to discuss (1) any job titles Moore had with BYU-I; (2) the source of funds used to pay his salary; (3) the e-mail addresses given to LDS Philanthropies employees; and (4) payroll information regarding Moore's employment at BYU-I.

Moore is an important witness in this case and thus any connection he would have to BYU-I is relevant to evaluate his credibility and is therefore discoverable. The Court will compel the LDS Church to provide a Rule 30(b)(6) deponent to answer the four categories of questions listed above.

The LDS Church requests that if the motion to compel is granted as to Moore, that the Court set out boundaries for his deposition and also determine whether counsel for BYU-I is allowed to similarly ask Moore questions. With regard to boundaries, the Court is compelling discovery of Moore as to (1) whether he was an employee of BYU-I and the scope of that employment, and (2) his communications with third parties while investigating Stevens' request for an ecclesiastical recommend to continue attending BYU-I. The Court will allow BYU-I to ask questions of Moore in any deposition in line with these boundaries.

Stevens next seeks information from the LDS Church on the details of how tithing money collected by the LDS Church is used to fund BYU-I. More specifically, Stevens seeks a Rule 30(b)(6) representative from the LDS Church to answer questions regarding (1) "member tithing contributions provided to BYU-I for its operating cost from 2014 to date" and (2) any "notice to members as to member tithing contributions being provided to BYU-I for operating funds from 2014 to date." In interrogatories, Stevens asks the LDS Church to "identify the amount of funds the Church provides to BYU-I annually"

**Memorandum Decision & Order – page 5**

and to "identify he percentage of the funds the Church provides to BYU-I annually which originate from Church member tithing dollars." *See Exhibit A (Dkt. 158-3)*. To justify these discovery requests, Stevens argues that "the tithing contributions from the LDS Church to BYU-I are necessary for purposes of the financial relationship between the two and potential juror influence." *See Brief (Dkt. No. 158)* at p. 5.

Certainly, the financial ties between BYU-I and the LDS Church are relevant to this litigation and are discoverable generally. The LDS Church itself notes that "everyone within a hundred miles of Rexburg knows the Church funds BYU-I" and further agrees that the LDS Church will pay any liability incurred by BYU-I in this lawsuit. *See LDS Church Brief (Dkt. No. 162)* at p. 7. Given those stipulations, it is not apparent why Stevens needs to know the precise dollar amount the LDS Church provides to BYU-I and the percentage coming from tithing. In the absence of a more detailed explanation from Stevens, the Court will deny the request for these two items. *See Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.,* 981 F.2d 429, 438-39 (9th Cir. 1992) (affirming denial of motion to compel when movant "fail[ed] to make a specific showing . . . that the requested documents would lead to relevant evidence").

Stevens also seeks any notice given to members "as to member tithing contributions being provided to BYU-I for operating funds from 2014 to date." Stevens explains that she needs this information for jury selection. She argues that the jury pool will likely contain LDS Church members who understand that their tithing money might go to pay any judgment against BYU-I and, for that reason, be reluctant to award any money to Stevens. She will be asking to strike those prospective jurors for cause.

**Memorandum Decision & Order – page 6**

If such notices were provided to LDS Church members, Stevens could ask prospective jurors who are LDS Church members whether they received such notices and what that means to them. Without expressing any opinion on whether such questioning will be allowed of the jury pool, the requested discovery has at least some relevance to Stevens' legitimate argument for selecting a fair and impartial jury. Thus, the Court will compel an answer to this discovery request.

The final subject of Stevens' motion to compel is her request for discovery concerning the LDS Church's appointment and payment of counsel for Danielle Spencer. Spencer was a friend and confidant to Stevens during the time Stevens was involved with Stokes. From the record, it now appears that she will contradict Stevens' testimony and likely be a witness for BYU-I. Stevens offers some evidence that she alleges shows that BYU-I offered benefits to Spencer that may have influenced her testimony. BYU-I vigorously disputes Stevens' allegations. Nevertheless, Stevens is seeking discovery from the LDS Church as to whether it is paying Spencer's legal fees, an inquiry relevant to impeachment and not privileged. *See Ralls v. U.S.,* 52 F.3d 223, 225 (9th Cir. 1995). The Court will order the LDS Church to answer Stevens' discovery request as to whether the LDS Church is paying for Spencer's legal fees in this case.

**Motion to Exclude Expert**

BYU-I has filed a motion to exclude the testimony of Steven's expert witness, Ryan Cragun. Cragun has a PhD in Sociology, is an Assistant Professor Sociology at the University of Tampa and has studied and written about the Mormon faith. Stevens offers his testimony to explain "the LDS Church['s] . . . power structure, its belief system, and

**Memorandum Decision & Order – page 7**

how that system could be used to groom and exploit Stevens." *See Brief (Dkt. No. 171)* at p. 8. Stevens will be using Cragun's testimony along with her own to show that she was manipulated by Stokes, and that their sexual relationship was not consensual.

To properly evaluate Cragun's testimony, the Court must first review Steven's testimony. In her deposition testimony, Stevens stated that she was a member of the LDS Church and believed its teaching on chastity – that is, the prohibition against any sexual relations outside of marriage. Nevertheless, she engaged in sexual relations with Stokes, a married man. She explains the conflict between her beliefs and her conduct as follows:

> MS. STEVENS: I told him [Stokes]: I'm not your wife. You can't do those things to me. That's your wife. I'm not your wife. That's your wife. That's not okay with the church. Masturbation is not okay with the church. Cheating is not okay with the church. These things are not okay with the church. And you know what his response was? The Lord also says: Do not kill. The Lord also says; Do not do this. But yet he told Nephi to chop off Laban's head. So yeah, the Lord does make exceptions.
> MR. ANDERSEN [Counsel for LDS Church]: Okay.
> MS. STEVENS: And this man is a temple worker. This man has all kinds of authority. The university was full of people telling me that this man was the closest man to Christ of anyone they ever knew. So why would the Lord not give him revelation? He gave it to Nephi.
> BY MR. ANDERSEN: . . . So the argument he gave to you is that I, Stephen Stokes, have received special revelation that says the law of chastity as you have been taught it your entire life and that you believe in does not apply to us?
> MS. CASPERSON: Objection. Misstates the prior testimony.
> MS. STEVENS: That's exactly what he said.
> BY MR. ANDERSON: That's exactly what he told you?
> MS. STEVENS: Yes.

To explain the influence a man like Stokes might have with those in the LDS faith, Stevens will call Cragun to testify about "the LDS Church['s] . . . power structure, its belief system, and how that system could be used to groom and exploit Stevens." *See*

*Brief (Dkt. No. 171)* at p. 8. Cragun begins by describing the hierarchical organization of the Church:

> The LDS Church utilizes a hierarchical, top-down polity that is unique to the LDS Church. Policy decisions are made at the highest levels of leadership. The highest level is the current living Prophet along with his two counselors, who, collectively, make up the First Presidency. Next in the hierarchy is a group of twelve men referred to as the Quorum of the Twelve Apostles. . . . Below the general authorities are more regional and local authorities. A stake president is a man who oversees several congregations, which are called "wards" in Mormon vernacular. . . . There are two additional components to this hierarchical structure that must be noted. First, only men are allowed to hold all of the positions just noted. Second, the reason only men are allowed to hold these positions is because only men are allowed to have the priesthood in the LDS Church. LDS Church leaders teach that priesthood is the power and authority of God given to men to act in God's name. . . . [W]omen are not allowed to hold the priesthood, serve in the above noted leadership positions, or perform most ordinances in the LDS Church. . . .As should be clear form above, the leadership and structure of the LDS Church is male-dominated and hierarchical. Given the role of LDS Church general authorities in appointing the President of BYU-I and serving on the Board of Trustees, as well as the role for the LDS Church in setting policies and standards for BYU-I faculty and students, and the role of LDS bishops in providing ecclesiastical endorsements for students at BYU-I, it is clear that, by design, the LDS Church has a prominent role at BYU-I.

*See Cragun Report (Dkt. No. 159-3)* at pp. 6-7. Cragun then discusses in general terms – without relating it directly to this case – how inequality, especially gender inequality, may lead to abuse:

> Whenever there is inequality in power or authority in a relationship, there is a possibility for abuse. The existence of inequality is not a sufficient condition for abuse to occur, but it does increase the odds of abuse occurring. . . . At the heart of religious abuse lies inequality, particularly gender inequality. The hierarchical structure of the LDS Church is susceptible to general ecclesiastical abuse, similar to what has occurred in the Roman Catholic Church. As noted above, there is a clear power structure in the LDS Church. Given that power structure, it is very difficult for members of the LDS Church to challenge those in authority above them.

**Memorandum Decision & Order – page 9**

> . . . While contrary to Church teachings and official policy, an adult male member of the LDS Church could attempt to use the apparent authority he has through his position, through the priesthood, and/or through his maleness, to manipulate, control, or abuse anyone in a subordinate position by emphasizing the expectations of subordinates to obey and to respect the hierarchy in the religion. . . . Revelation in Mormonism refers to the various forms of communication from God. Revelation can take many shapes, from knowledge revealed in one's mind to visitations of angelic individuals to dreams or hearing the voice of God.

*Id.* at pp. 8-9. Cragun goes on to discuss the doctrines of revelation and the power of discernment in greater detail. The Court finds that the testimony to this point has been within Cragun's area of expertise. Moreover, it is relevant to show how gender inequality in the LDS Church can lead to manipulation generally and more specifically to confirm Stevens's testimony that she felt Professor Stokes' standing in the LDS Church – and his role as a Temple worker – allowed him to manipulate her and to rationalize conduct that was directly contrary to LDS Church teachings. The probative value of Cragun's testimony to this point is not substantially outweighed by any prejudicial effect under Rule 403.

While Cragun's discussion to this point has focused on generalities, he then turns to applying those general precepts to the particular facts of this case:

> Such an abuse of power and authority could also apply in the context of a Mormon male professor at a Church-owned school, particularly an older professor with the priesthood, a stake-level calling on the high council who also works at the local temple, taking advantage of a disabled female student. Should that Mormon male college professor emphasize his position and activities in the Church and his ability to receive revelation for those subordinate to him, particularly for women, and to emphasize the importance of obedience in Mormon doctrine and teachings, it is possible that such a professor could engage in an abusive relationship with a student, particularly a female student.

**Memorandum Decision & Order – page 10**

*Id.* at p. 11. Here Cragun strays from the solid ground of his expertise. His studies have given him expertise in the general structure, teachings and culture of the LDS Church, but he has not demonstrated any expertise in applying those general precepts to a specific case. This testimony just quoted therefore violates Rule 702 and must be stricken.

Cragun finishes his expert report by discussing (1) individual cases of men in leadership positions in the LDS Church that were reported by various media outlets to have committed sexual harassment; (2) the LDS Church's history of polygamy and particularly the revelations given to Joseph Smith and his practices regarding polygamy; and (3) specific examples in the Book of Mormon of "individuals engaging in behavior that appears to be contrary to [the LDS Church's] teaching but is justified as being in keeping with God's will." *Id.* at p. 16. Even if accurate, this testimony's probative value is slight at best – especially given what the Court has already allowed – and is substantially outweighed by the danger of delay and unfair prejudice under Rule 403. It will be excluded for that reason.

BYU-I raises a First Amendment objection to Cragun's testimony, arguing that his testimony constitutes an improper challenge to the reasonableness or truth of the LDS religious faith. The First Amendment defense arises if the jury is required "to evaluate religious doctrine or the 'reasonableness' of the religious practices followed within the [religious institution]." *Elvig v. Calvin Presbyterian Church,* 375 F.3d 951, 958 (9th Cir. 2004) (*quoting Bollard v. Calif. Province of the Society of Jesus,* 196 F.3d 940, 950 (9th Cir.1999).

Based on the Court's rulings above, the Court has already excluded (1) Cragun's attacks on the beliefs of the LDS Church and (2) his attempt to apply those beliefs to the specific circumstances of this case to conclude that a "Mormon male college professor" "could engage in an abusive relationship with a student, particularly a female student." BYU-I wants to go further, however, and exclude all of Cragun's testimony based on the First Amendment. To resolve that argument, it is necessary to understand the full context of what remains of Cragun's testimony.

To describe that context, the Court will begin with the simple and undisputed observation that Stevens' testimony detailing the circumstances of her harassment does not implicate any of the concerns of *Elvig*. However, BYU-I argues that Stevens has the burden of showing that the sex was unwelcome and will be required in her case-in-chief to explain her religious beliefs to show how she was allegedly manipulated by Stokes and did not consent. But even if "unwelcomeness" is a required element of a Title IX case-in-chief – a point on which the Court expresses no opinion – that element requires no more than her testimony that it was unwelcome; an explanation is not required. The explanation only becomes necessary because the LDS Church will respond with evidence that the sex was consensual. It is this defense that prompts Stevens to offer a full explanation of how she was manipulated by Stokes due to her understanding of LDS doctrine and culture and his justifications. The LDS Church is not attempting to exclude Stevens' explanation, at least not at this point, and indeed it would be unjust for the LDS Church to be able to raise the defense of consent and then use the First Amendment to block any rebuttal by Stevens. Instead, the LDS Church is trying to block what amounts

**Memorandum Decision & Order – page 12**

to confirming testimony by Cragun – that is, his testimony regarding the LDS hierarchical structure and male-dominated culture. Given that Cragun's allowable testimony has been narrowed down to only this confirming testimony, the jury will not be evaluating the reasonableness of religious doctrine. Instead, the jury will be evaluating Stevens' testimony explaining her understanding of the doctrine and how Stokes manipulated her into having sex with him by using his authority in the LDS Church to overcome her objections. At no point will the jury be required to evaluate the reasonableness or truth of LDS Church doctrine but will instead determine whether Stevens' explanation is credible. That is well-within the traditional function of the jury and does not raise First Amendment concerns. For these reasons, the Court will deny the motion to exclude to the extent it seeks to strike the testimony just discussed.

**Rule 30(b)(6) Deposition**

Stevens has asked BYU-I to provide a Rule 30(b)(6) deponent to discuss the following two subjects:

1. **Topic No. 6**: Information and knowledge regarding BYU-I's expectation of its faculty discussing principles and beliefs of [the LDS Church], including but not limited to holding prayer, incorporating LDS Church beliefs into class topics, and following and complying with the Honor Code.
2. **Topic No. 7**: Information and knowledge regarding BYU-I's teachings in its religion classes regarding the LDS Church's beliefs related to the practice of polygamy, including but not limited to, the LDS Church's past polygamy practice, the LDS Church's beliefs regarding the practice of polygamy after death, and the LDS Church's beliefs regarding the sealing of multiple women to one man.

The Court has already discussed its exclusion of testimony on polygamy and so will grant BYU-I's request to preclude discovery into Topic No. 7 listed above. Topic No. 6, however, is different. As discussed, BYU-I has raised the defense that Stevens' sex with

Memorandum Decision & Order – page 13

Stokes was consensual, and this defense entitles Stevens to explain how her understanding of her LDS faith led her to be manipulated by Stokes' justifications. Moreover, Stevens is entitled to present certain expert testimony from Cragun concerning the hierarchical structure of the church and its male-dominated culture. To set a context for this rebuttal of the defense of consent, Stevens wants to show how large a role the LDS Church plays at BYU-I in the classroom setting where she was a student. It has some relevance to her explanation that the sex was not consensual and that she, a student, was manipulated by Stokes, a professor. Thus, the Court will deny BYU-I's attempt to bar the discovery requested in Topic No. 6.

**<u>Motion for Sanctions</u>**

Stevens seeks sanctions against BYU-I for (1) suborning perjury, and (2) making frivolous privilege claims. Stevens alleges that attorneys for BYU-I met for hours with a critical witness – Darnelle Spencer, a friend and confidant of Stevens – to coach and influence her, educate her on privilege, and limit and shape her testimony. She further alleges that once BYU-I elicited Spencer's rehearsed testimony, the LDS Church stepped in to pay for legal counsel it selected to represent Spencer, and that this attorney then met with BYU-I's counsel to ensure that Spencer's testimony would be favorable to BYU-I. Opposing counsel reject all of these allegations and ask for an evidentiary hearing to rebut these charges.

The Court finds that it cannot resolve this dispute by relying entirely on the briefs and supporting materials. Instead, an evidentiary hearing is necessary. Accordingly, the Court will set an evidentiary hearing for November 12, 2019. Because that date is

**Memorandum Decision & Order – page 14**

distant, and the pending motion for sanctions will simply sit on the docket unresolved, the Court will deny the motion at this point, not based on the merits but rather based on the Court's finding that it cannot grant the motion on the basis of the briefs only and on the need to have the Court's docket be current. The Court will allow the motion to be revived at the evidentiary hearing along with all the supporting material.

## ORDER

In accordance with the Memorandum Decision above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motions for sanctions (docket no. 170) is DENIED as explained above. An evidentiary hearing on the motion shall be set for November 12, 2019, at 9:00 a.m. in the Federal Courthouse in Pocatello Idaho.

IT IS FURTHER ORDERED, that the motion to compel (docket no. 158) is GRANTED IN PART AND DENIED IN PART as set forth above.

IT IS FURTHER ORDERED, that the motion to exclude (docket no. 159) is GRANTED IN PART AND DENIED IN PART as set forth above.

IT IS FURTHER ORDERED, that the supplemental motion (docket no. 161) is GRANTED IN PART AND DENIED IN PART. The motion is granted to the extent it seeks to reject any discovery into Topic No. 7 listed thereon. The motion is denied to the extent it seeks to reject any discovery into Topic No. 6 listed thereon.



DATED: September 24, 2019

_____
B. Lynn Winmill
U.S. District Court Judge

**Memorandum Decision & Order – page 16**