IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| LORI STEVENS | |
|---|---|
| Plaintiff, | Case No. 4:16-CV-530-BLW |
| v. | **MEMORANDUM DECISION AND ORDER** |
| BRIGHAM YOUNG UNIVERSITY – IDAHO dba BYU-Idaho, a Utah corporation and SUSAN STOKES, personal representative of the Estate of Stephan Stokes, | |
| Defendants. | |

**INTRODUCTION**

The Court has before it a motion for sanctions filed by the plaintiff Lori Stevens. The Court held an evidentiary hearing on November 11-12, 2019, and directed counsel to file further briefing. That briefing has now been received and the motion is at issue. For the reasons set forth below, the Court will deny the motion but will allow full inquiry at trial into the issues raised here and will consider jury instructions discussed further below.

**LITIGATION BACKGROUND**

Plaintiff Stevens, a former BYU-I student, alleges that Robert Stokes, a former BYU-I professor, initiated an unwanted relationship with her while she was a student and Stokes was a professor at BYU-I. Stevens alleges that this relationship ultimately became sexually and emotionally abusive. She further asserts that she, along with

**Memorandum Decision & Order – page 1**

another student, Danielle Spencer, reported Stokes' inappropriate and abusive behavior to several BYU-I professors and officials, who failed to take any action. The relationship ended when Stokes died on July 1, 2016, from complications during heart surgery. Stevens originally sued BYU-I and the Stokes estate. She later settled her claims against the Stokes estate. The LDS Church intervened for "the limited purpose of protecting its claims of privilege. . . ." *See Order (Dkt. No. 89)*.

There are now four claims in this case against BYU-I:

1. Teacher-on-student hostile environment/sexual harassment actionable under Title IX of the Education Amendments Act;
2. Teacher-on-student quid pro quo sexual harassment;
3. Hostile learning environment in violation of the Rehabilitation Act and the Americans with Disabilities Act; and
4. Violation of the Idaho Human Rights Act.

## FACTUAL BACKGROUND

In her motion for sanctions, Stevens claims that BYU-I improperly influenced the testimony of a crucial witness, Danielle Spencer, who was a friend and confidant of Stevens. Stevens alleges that BYU-I's counsel manipulated Spencer into changing her initial testimony that would have favored Stevens to testimony that is now detrimental to her case. Stevens argues that as an unrepresented third-party witness, Spencer should have been able to testify about her interactions, provide relevant documents, and exit the litigation. Instead, Stevens asserts, BYU-I met with Spencer for hours to coach and influence her, educate her on privilege, and limit and shape her testimony. At this point the LDS Church stepped in to pay for legal counsel it selected to represent Spencer. Stevens asserts that BYU-I's counsel and the LDS Church-appointed counsel for Spencer

**Memorandum Decision & Order – page 2**

then consulted to ensure Spencer took actions and gave testimony favorable to BYU-I. She further asserts that BYU-I provided Spencer with additional deferments for her schooling beyond its stated policy, significant grade changes, and free counseling.

To address these arguments, the Court will begin by reviewing what the record reveals about Spencer's knowledge and conduct concerning the relationship between Stevens and Stokes. Stevens testified that during her relationship with Stokes, she told Spencer that Stokes was harassing her:

> I told her [Spencer] that he [Stokes] was calling me his wife, that he was loving me, that he was touching me, that he was kissing me . . . . He's coming to my house and he won't leave me alone. And I told her [Spencer]: I am trying and trying and trying to push him away and I can't do it. . . . I need help. That's what I told her. I need help to stop him.

*See Stevens' Deposition (Dkt. No. 170-6) at p. 217.* Alarmed by this, Spencer decided to confront Stokes but first sought counsel from therapist Lisa Fox. Fox's notes from her session with Spencer read in part as follows: "[Spencer] confided that her close friend recently told her that she had been having an emotional and physical relationship with one of their mutual instructors, who was married. [Spencer] stated she told her friend that things needed to end and friend agreed but stated she had tried before but without success. [Spencer] knows the instructor well and stated she felt inclined to talk to him personally but wanted to 'run this idea' by this therapist; [I] offered support and suggestions for managing the situation." *See Exhibit 1007.*

Spencer then confronted Stokes and wrote the following text to Stevens about that confrontation:

**Memorandum Decision & Order – page 3**

> Lori I love you and am trying to respect your agency. I do not want to be one more person in your life dictating your choices. I am trying to balance that respect with the obligation I feel as your friend to stand up for you and let you know when someone's behavior is out of line. I cannot sit by as someone tries to convince you something is ok that is clearly not. He is continuing to make a choice and expect you to deal with the consequences of it. I am honestly concerned about what I saw today. Intended or not, that was manipulation. I want so badly for you to be able to have someone you trust to go to, and I know he is a good person, but he is not in his right mind right now.
> . . .
> He literally thinks God wants him to cheat on his wife. I'm not sure how he can say that and be in a rational place.

*See Exhibit 1003.* Stevens filed this lawsuit on December 9, 2016. Several months later, in July of 2017, Spencer saw a newspaper article describing the lawsuit. *Testimony at Evidentiary Hearing November 12, 2019.* She was concerned that article's description of the lawsuit did not reflect the relationship between Strokes and Stevens as she understood it. *Id.* She read that BYU-I was represented by Wade Woodard, and she called Woodard. *Id.* Woodard asked her to read Stevens' complaint and then call him back. *Id.* After reading the complaint, Spencer testified that "it was apparent to me that she [Stevens] was being untruthful . . . and many things I felt were misleading based on the interactions I had had." *See Spencer Deposition (Dkt. No. 184-2)* at p. 20. Spencer then called Woodard to set up a meeting between the two.

On December 5, 2016, Spencer met with Woodard to discuss Stevens' lawsuit. Woodard asked her about any knowledge she had about Stevens' claims. Spencer and Woodard testified that Woodard did not attempt to coach or change Spencer's testimony. Spencer testified that by this point she had heard many different stories from Stevens and

no longer believed that Stokes was harassing and manipulating Stevens. *See Spencer Declaration (Dkt. No. 198) at ¶¶ 15-30.*

Shortly after that meeting, an attorney working for BYU-I – Mckinzie Cole – met with Spencer and coordinated the downloading of Spencer's text messages from her phone. Woodard then noticed Spencer's deposition for September 14, 2017, and Stevens' attorney DeAnn Casperson sent a subpoena to Spencer directing her to provide documents about a week before the deposition. *See Exhibit A (Dkt. No. 170-3).* Spencer emailed the subpoena to Woodard on August 31, 2017, *see Hearing Exhibit 1018,* to get his help because BYU-I had downloaded her emails and the production was just overwhelming to her. *Hearing Testimony November 12, 2019.*

Woodard met again with Spencer just prior to the deposition. In this meeting on September 13, 2017, present were Spencer, Woodard, BYU-I's in-house counsel Stephen Craig and the Risk Management Attorney for the LDS Church, Steven Hoskins. The meeting lasted about two hours. *See Spencer Declaration (Dkt. No. 198) at ¶ 38*

During that meeting, Woodard learned that Spencer had discussed this matter with two counselors – Dan Barnes and Lisa Fox. Woodard testified that he told her that those communications may be privileged, described in general the four privileges available under the law, and recommended that she get legal counsel. He testified – and Spencer confirmed – that it was Spencer who decided later (during the deposition) to claim the privilege and that Woodard never advised her that any particular communication was privileged or that she should claim a privilege. *See Hearing Testimony November 11-12, 2019.* Yet, when Casperson asked Spencer if BYU-I's counsel had advised her that her

**Memorandum Decision & Order – page 5**

discussion with Barnes was privileged – that is, whether a particular communication was privileged – Spencer answered "Yes." *Id.* Her answer was consistent with her notes from that meeting which state as follows: "Don't offer Barnes info (& if I do, only what I had shared w/Lori & only that)." *See Exhibit 1008.*

Spencer's first deposition was taken by Woodard on September 14, 2017. She was not yet represented by counsel and was questioned first by Woodard and then cross-examined by Casperson. Also present were BYU-I's in-house counsel Stephen Craig and the Risk Management Attorney for the LDS Church, Steven Hoskins.

As the deposition began, Casperson expected Spencer to confirm the gist of the emails – and Stevens' testimony – that Stokes was harassing Stevens. *See Casperson Declaration (Dkt. No. 170-2) at ¶ 8.* That is not, however, how Spencer testified. In answering questions from Woodard, Spencer testified that when she read Stevens' complaint in this case "it was apparent to me that she was being untruthful . . . and many things I felt were misleading based on the interactions I had had." *See Spencer Deposition (Dkt. No. 184-2) at p. 20.* Spencer related that Stevens had told her that "[s]he [Stevens] was grateful for Professor Stokes because when he would help her out with groceries, that he didn't expect anything in return. That in the past men who had come in and fed her family had expected things sexually from her, but with Professor Stokes that he didn't." *Id.* at p. 29. According to Spencer, the relationship was "portrayed as supportive" by Stevens. *Id.* at p. 36. Spencer denied that Stevens had ever told her that she was being harassed or sexually assaulted by Stokes. *Id.*

Spencer did testify that the relationship changed somewhat about a month before Stokes passed away. *Id.* at 36-37. Stevens told Spencer that the relationship with Stokes may be "inappropriate" because Stokes "said that he . . . loved her and that she [Stevens] realized that she did love him as well insinuating possibly something more." *Id.* at p. 39. But Spencer recalled that Stevens at that point never said they had sex, describing their physical interactions as "he gave me hugs." *Id.* at 38-39.

During her cross-examination of Spencer, Stevens' attorney DeAnne Casperson confronted Spencer with evidence such as her texts depicting Stokes as manipulating Stevens. Casperson also asked Spencer to describe what she told her therapists about Stevens. Spencer refused, claiming a privilege to protect that information, and stating: "I feel like you're trying to bully me into giving information, and I have said I do not want to share that unless I absolutely have to. So whatever legal action needs to happen for you to, you know, get what you need to get." *Id.* at p. 218.

Spencer testified in the evidentiary hearing that after that deposition, she felt intimidated by Casperson and felt she may need an attorney. She discussed this with Woodard and Hoskins who both recommended that she get counsel. Hoskins said he might be able to find counsel who would not charge Spencer a fee. Within a week, attorneys Jon Stenquist and Kelsie Kirkham had contacted Spencer and she had agreed to have them represent her. The LDS Church paid their fees that amounted to about $36,000. *See Hearing Testimony November 11, 2019.*

Spencer testified at her third deposition held on February 13, 2019, that she had no idea who was paying her legal fees. *See Spencer Deposition (Dkt. No. 184-16)* at p. 283.

**Memorandum Decision & Order – page 7**

But at the evidentiary hearing on November 11, 2019, Spencer was asked if she understood who paid those fees, and the gist of her response was that she understood it was either the LDS Church or BYU-I. *See Hearing Testimony November 11, 2019.*

In addition to the LDS Church paying for counsel for Spencer, BYU-I provided Spencer with grade increases in the Fall Semester of 2016 and Winter Semester 2017. BYUI changed one grade from a C to an A- and then an A, and the other from a D- to an A. *See Grade Transcript (Dkt. No. 165-3).* BYU-I also granted Spencer three deferments: first in January 2016; another on August 29, 2017 (the same date BYU-I sent notice of Spencer's deposition); and a third on January 23, 2018. *Id.* at pp. 6, 8-9.

At the evidentiary hearing, Grover Wray, a professor at BYU-I, testified that one grade change was due to his mistake and the other was due to his granting Spencer additional time to complete her assignments because she was going through a bout of depression. Wray testified that when he made these changes to Spencer's grades, he had no knowledge of Spencer's involvement in this lawsuit.

Stevens offered evidence that the three deferments granted to Spencer was unusual and against BYU-I policy. In addition, Spencer testified that she may have mentioned the stress she was undergoing due to the lawsuit in applying for one of the deferments.

**ANALYSIS**

The record in this case contains evidence that over time, Spencer changed her depiction of the Stokes/Stevens relationship. Spencer's texts, Fox's notes, and Stevens' testimony, all point to a conclusion that Spencer had been told by Stevens that Stokes was manipulating and harassing Stevens. But Spencer has denied that under oath and testified

**Memorandum Decision & Order – page 8**

instead that she was never told Stokes was harassing Stevens and in fact was ultimately told by Stevens, after Stokes' death, that the two had a "romantic and sexual relationship." *See Spencer Declaration, supra,* at ¶ 25. This conflict in the testimony creates a significant issue that cannot be resolved as a matter of law.

It is true that on this record, the change in Spencer's testimony appears to come after meeting with Woodard. But correlation is not necessarily causation. Spencer testified credibly, as discussed above, that her view of the relationship changed over time and that she ultimately concluded on her own that Stokes was not manipulating Stevens or harassing her. Woodard and Spencer both testified credibly that in their meetings prior to the first deposition in September of 2017, Woodard (and the other counsel present) did not influence Spencer's testimony or cause her to change her description of the relationship. Based on all of this, the Court cannot find counsel improperly influenced or manipulated Spencer's testimony during their meetings together.

But the Court cannot so easily resolve Stevens' claim that Spencer's testimony may have been influenced by benefits she received from BYU-I and the LDS Church. While Spencer may have had a legitimate reason to obtain counsel, the payment of the legal fees for that counsel by the LDS Church is what concerns the Court.

To begin this analysis, the Court finds Spencer had a legitimate reason to obtain counsel. Stevens argues that Spencer's expressed desire for counsel is not believable because she could have briefly testified and quickly exited this highly stressful litigation without counsel. While the parties argue over whether Casperson was "bullying" Spencer or prying into the substance of her therapy sessions at that first deposition where

**Memorandum Decision & Order – page 9**

Spencer was unrepresented, there is no doubt that Casperson and Spencer were antagonists – Spencer had changed her story to Stevens' detriment, and Casperson's probing cross examination was highlighting those changes to undercut Spencer's credibility. Casperson was inferring through her questions that Spencer was lying. Although Casperson's questions regarding Spencer's therapy were limited to Spencer's statements regarding Stevens, it would be reasonable for Spencer to conclude that Casperson was ultimately fishing for substantive therapy information to somehow tar Spencer's credibility. At any rate, Spencer's explanation that she felt she needed counsel is not inherently unbelievable as argued by Stevens.

But receiving the benefit of the payment of legal fees for that counsel is another matter altogether. And not only did Spencer received free legal counsel – worth $36,000 – paid by the LDS Church, she also received grade changes and an unusual number of deferments provided by BYU-I. The explanation by Professor Wray of his grade changes appears to render that "benefit" innocuous: Wray testified credibly that he was not aware of Spencer's involvement in the lawsuit when he made those changes.

However, the deferments and the legal fees were not so neatly explained. While BYU-I argues that there were good reasons behind these benefits that had nothing to do with the lawsuit, Spencer herself testified that she might have applied for one deferment based on her stress from this lawsuit. Moreover, the payment of legal fees for a non-employee unrelated third party is quite unusual in the Court's experience. Spencer was well aware of these benefits and knew where they came from. During the hearing, it was explained that the LDS Church has provided attorneys for non-employee unrelated third

Memorandum Decision & Order – page 10

parties in the past. However, this does little to quiet the Court's concern, since those instances arose, by and large, in circumstances like those presented here – where the Church stood to potentially benefit in litigation from the appointment of counsel for a third party witness.

While significant issues with the deferments and legal fees preclude any decision as a matter of law on Stevens' motion, these matters are directly relevant to Spencer's credibility. The Court will allow full inquiry by Stevens into these benefits at trial and, depending on the testimony, will consider giving a jury instruction stating that in considering the credibility of any witness, the jury may consider any benefits the jury finds were given in exchange for that testimony. The Court is aware that this will increase the length of trial and create a "trial-within-a-trial" but it is the minimum necessary to ensure a fair opportunity for Stevens to challenge Spencer's testimony.

## Conclusion

For the reasons set forth above, the Court will deny the motion for sanctions for discovery abuse but will allow full inquiry at trial into the issues raised here and will further consider jury instructions as discussed above.

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for sanctions for discovery abuse (docket no. 170) is DENIED without prejudice to the right of plaintiff to inquire fully at trial into the issues raised here and to request jury instructions as set forth in the Memorandum Decision.

**Memorandum Decision & Order – page 11**



DATED: December 3, 2019

_____
B. Lynn Winmill
U.S. District Court Judge