UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LORI STEVENS,<br><br>    Plaintiff,<br><br>    v.<br><br>BRIGHAM YOUNG UNIVERSITY - IDAHO, dba BYU-IDAHO,<br><br>    Defendant. | Case No. 4:16-cv-00530-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Plaintiff, Lori Stevens, brought this action against Defendant, Brigham Young University – Idaho (BYU-I) alleging teacher-on-student hostile environment/sexual harassment in violation of Title IX of the Education Amendments Act; teacher-on-student quid pro quo sexual harassment; violation of the Rehabilitation Act and Americans with Disabilities Act (Hostile Learning Environment); and violation of the Idaho Human Rights Act. These allegations arise out of an intimate sexual relationship that occurred between Stevens, a former student at BYU-I, and Stephen Stokes, a former professor for BYU-I, and the manner in which BYU-I handled the situation once it learned of the Stevens-Stokes

relationship.

Before the Court are Defendant's Motion for Summary Judgment (Dkt. 272), Defendant's Renewed Motion for Sanctions (Dkt. 278), and Plaintiff's Motion to Strike (Dkt. 282). For the reasons discussed below, the Court will grant in part and deny in part the Motion for Summary Judgment, deny the Renewed Motion for Sanctions, and grant the Motion to Strike.

## BACKGROUND[1]

Stevens has suffered a history of abusive relationships that has caused her to have mental health issues, including severe anxiety, agoraphobia, and PTSD. In April 2014, she was finally mentally and emotionally stable enough to go back to school to earn a degree. Her counselors encouraged her to attend BYU-I[2] because they thought it would be a safe environment that would be free from abusive relationships.

Prior to enrolling at BYU-I, Stevens met with the BYU-I disability office to arrange for accommodations for her disabilities. The disability office in turn sent

---

[1] Because this is before the Court on a motion for summary judgment, this statement of the factual background of the case is written to reflect that all evidence in the record is construed in a light most favorable to the non-moving party, who is also given the benefit of all reasonable inferences which can be drawn from that evidence.

[2] BYU-I is a private, four-year university affiliated with the Church of Jesus Christ of the Latter-Day Saints (LDS Church). *See https://www.byui.edu/* (last visited February 28, 2022).

letters to her professors regarding her needed accommodations.

In June 2014, Stevens met Stephen Stokes for the first time. Stokes was a faculty member in the Sociology and Social Work Department (the Department). When Stevens stated who she was, Stokes told Stevens that he had known her father, who was deceased. Stokes invited Stevens to his office after class and told Stevens that her father had inspired him to reach out to Stevens to say hello. This was the first of many times that Stokes credited Stevens' deceased father with bringing Stevens into Stokes life. Stokes, who was well aware of Stevens' disabilities, encouraged Stevens to change her major to social work, offered to be her advisor, and helped her fill out the transfer paperwork.

Stokes also began to integrate himself into Stevens' life. He mentored her in her academic program; he advised her about how to parent her children; he talked with her about her callings[3] and her finances; he assisted her financially; he came to her home; he advocated for her at BYU-I; he obtained medication for her; and he spent time with her children. At the beginning, Stevens saw Stokes as her

---

[3] The LDS Church website explains a "Calling" as follows: "[T]he Lord calls men and women to serve in the Church . . . through inspired invitations from His servants. These opportunities to serve are known as callings." *See* https://www.churchofjesuschrist.org/study/manual/general-handbook/30-callings-in-the-church?lang=eng (last visited February 28, 2022).

adviser and counselor, and as a father figure.

By the fall of 2014, Stokes had placed a picture of Stevens and her deceased father on his desk. He told Stevens, that Heavenly Father put Stokes into her life for a reason, and he began texting and calling Stevens on a frequent basis.

Stokes began to actively isolate Stevens from her support networks, including her church leaders and mental health counselors. Stevens stopped going to see her counselor and case manager, whom she had been seeing weekly, because Stokes told her he would act in their place. He told Stevens that he was the only one who could help her, he had been directed by God that he was the only one who could help her, and she could not trust anyone else.

Stokes also began to physically touch Stevens, starting with hugs, then progressing to "spinal touch therapy," and then to sexual touching, including putting his hand down Stevens' pants. When she jumped and started to cry, Stokes told her he wanted her to be comfortable with him touching her because masturbation would cure her anxiety. He told Stevens that she needed to start engaging in self-gratification to manage her anxiety, that he wanted to show her how to self-gratify, and placed his hands down her pants without permission and began rubbing her private area.

Stevens initially responded by telling Stokes that what he was doing was not

okay and trying to move away. She also questioned whether this "treatment" was legitimate. Stokes presented her with medical literature describing self-gratification as a legitimate medical treatment and asserted, based upon his church authority, that self-gratification was an acceptable practice for adults in the LDS Church.

Stokes' sexual contact with Stevens continued to increase from that point, and continued through June 30, 2016. Stokes would come over to Stevens' house uninvited; would take Stevens' clothes off; would engage in sexual touching with Stevens, including oral sex and masturbation; and would engage in sexual intercourse with Stevens. Stokes told Stevens that sexual intercourse was acceptable within church doctrine as long as he did not ejaculate inside of her. At one point, Stokes, who was already married to someone else, performed what he claimed was a "marriage ceremony" with Stevens. He told Stevens that God had consecrated their relationship and she was his wife.

Due to Stevens' history of abuse and disability, and Stokes' position of power at both BYU-I and in the LDS Church, Stevens believed what he told her. When Stevens objected to Stokes' actions, Stokes would provide examples from LDS Church scripture of other instances where someone engaged in otherwise sinful actions that God condoned. Stokes would tell Stevens that she just needed to

have more faith and she would receive the same revelation[4] as Stokes. Stokes also sent Stevens sexually oriented text messages to which Stevens objected.

Much of this sexual conduct between Stokes and Stevens occurred in Stokes' office on the BYU-I campus. Numerous other faculty members and staff in the Department frequently saw Stokes with Stevens.

Stokes' conduct exacerbated Stevens' mental health issues. Stevens frequently ended up in the hospital for treatment of her symptoms. She began avoiding campus in order to avoid Stokes. Despite this, Stokes would still show up at her house and her children's school activities and performances. Because Stokes considered Stevens to be his "wife," he referred to Stevens' children as "his" children. Stokes convinced Stevens that having sex with her was part of God's plan.

Stokes became increasingly involved in Stevens' life. He was constantly around her and was either texting her and asking her where she was, showing up

_____

[4] The LDS Church website explains "Revelation" as a "communication from God to His children. This guidance comes through various channels according to the needs and circumstances of individuals, families, and the Church as a whole. . . . Prophets are the only people who can receive revelation for the Church, but they are not the only people who can receive revelation. According to our faithfulness, we can receive revelation to help us with our specific personal needs, responsibilities, and questions and to help us strengthen our testimony." *See* https://www.churchofjesuschrist.org/study/manual/gospel-topics/revelation?lang=eng (last visited February 28, 2022).

where she went, or showing up at her house uninvited. He would masturbate her every time he got her alone. Stevens could not get away from him. She tried to end things with Stokes, but he would not allow it. She told him several times to leave her alone, and his response was, "Never."

Stevens' mental health deteriorated to the point that she felt she could not continue with things the way they were. She finally reached out to Danielle Spencer, who was, at the time, a friend of Stevens. She asked Spencer if they could talk. Spencer agreed, but explained that if Stevens told her anything that needed to be reported, she would report it.

Stevens talked with Spencer about some of the things that were going on between Stevens and Stokes—that Stokes was calling Stevens his "wife" and telling her that he loved her; that he was touching and kissing her; that he was coming to her house and refusing to leave her alone; and that he was telling her that God approved of the things that he was doing with her. Stevens also told Spencer that she (Stevens) was trying to push Stokes away and trying to get him to stop, but that she was unable to do so and that she needed help. Spencer had also observed interactions between Stevens and Stokes, including Stokes' physical contact with Stevens, such as brushing Stevens' hair out of her face, touching Stevens' shoulder, and having Stevens sit on his lap.

On June 3, 2016, after her conservation with Stevens, Spencer spoke with Lisa Fox, a counselor at BYU-I. Spencer explained that she wanted to get advice from Fox about how to handle an ethical issue about which she had recently become aware. Spencer confided to Fox that a close friend [Stevens] had recently told Spencer that she [Stevens] had been having an emotional and physical relationship with one of their mutual professors [Stokes], who was married. Spencer explained to Fox that she had told Stevens that things between Stevens and Stokes needed to end, and that Stevens had agreed but had also explained that she had tried to end the relationship before without success. Spencer told Fox that she (Spencer) knew Stokes well and that she felt inclined to talk to him personally but wanted to run it by Fox first to get her advice.

On the evening of June 3, 2016, Spencer confronted Stokes at his office. Spencer told Stokes that she knew there was something going on between him and Stevens. Stokes told Spencer that it was not for her to judge and that it was not the time for him to leave Stevens. He also told Spencer that God revealed to him that he was in the right, and that he loved Stevens. During the conversation, Stokes referred to Stevens as his wife.

That same evening, Spencer sent follow-up texts to Stevens, stating:

> Lori I love you and am trying to respect your agency. I do not want to be one more person in your life dictating your choices. I am trying to

balance that respect with the obligation I feel as your friend to stand
up for you and let you know when someone's behavior is out of line. I
cannot sit by as someone tries to convince you something is ok that is
clearly not. He is continuing to make a choice and expect you to deal
with the consequences of it. I am honestly concerned about what I saw
today. Intended or not, that was manipulation. I want so badly for you
to be able to have someone you trust to go to, and I know he is a good
person, but he is not in his right mind right now.

He literally thinks God wants him to cheat on his wife. I'm not sure
how he can say that and be in a rational place.

(Dkt. 283-11 at 3-4.)

Spencer also reported the Stokes-Stevens situation to Dan Barnes, a

professor and a counselor at BYU-I. On June 7, 2016, Spencer sent Barnes an

email stating that a student had disclosed a romantic relationship involving a

professor and requested that Barnes clarify Spencers' duty to report this

relationship. Spencer explained that she was willing to report if required to do so;

but, if she was not required to do so, and a different approach would help to

resolve the situation, she would prefer that approach. Later that day, Spencer was

able to discuss the situation with Barnes in person. Barnes told Spencer that if she

did not report the situation, he would. He also asked her to confirm that she would

report.

The next morning, on June 8, 2016, Stevens met with Paul Roberts, the head

of the Social Work Program, regarding Stokes' conduct. Spencer later joined this

meeting. Roberts found the report from Stevens and Spencer to be concerning and to indicate an inappropriate boundary issue that the administration needed to address. He believed the situation warranted further reporting and therefore elevated the issue to Nathan Meeker, the Chair of the Department and Stokes' and Roberts' supervisor.

Stevens, Spencer, and Roberts all met with Meeker to report the Stokes-Stevens situation. During this meeting, Spencer and Stevens reported that Stokes had been kissing, touching, hugging, and rubbing Stevens; that he had been going to Stevens' home; that Spencer saw Stokes get into Stevens' car with her and sit on Stevens' lap; and that Stokes had said he loved Stevens. Stevens begged for help in putting up boundaries with Stokes.[5] During this meeting, Spencer and Stevens also raised the issue of what constitutes covenant breaking.[6] Spencer further indicated

_____

[5] Spencer, Roberts, and Meeker deny that any type of sexual misconduct or other unwelcomed conduct was reported during this meeting and testified that Stevens denied any sexual conduct or a sexual relationship with Stokes. However, for purposes of summary judgment, the Court construes the facts in the light most favorable to Stevens, and does not weigh the evidence. The Court thus takes as true the version of the meeting put forward by Stevens.

[6] The LDS Church website explains: "A covenant is a sacred agreement between God and a person or group of people." *See* https://www.churchofjesuschrist.org/youth/topic/covenants-and-ordinances?lang=eng (last accessed February 28, 2022). "If a person violates a covenant, whether it be of baptism, ordination, marriage or anything else, the Spirit withdraws the stamp of approval, and the blessings will not be received." See https://www.churchofjesuschrist.org/study/manual/eternal-marriage-student-manual/covenants-and-ordinances?lang=eng (last accessed (Continued)

during the meeting that she thought more was going on between Stevens and Stokes than was being reported by Stevens.

That afternoon, after this meeting ended, Spencer emailed Barnes to let him know that she had reported the Stokes-Stevens situation to the Chair of the Department, and that the Chair was consulting with the Dean. Barnes responded, "Thanks for letting me know. You did the right and necessary thing by reporting this situation. The student is especially vulnerable and the situation is inappropriate at multiple levels." (Dkt. 283-17 at 2.)

Also after this meeting, Roberts and Meeker met with Stokes. Stokes admitted to Roberts and Meeker that he had been in Stevens' home and was having frequent contact with her. He also described his feelings toward her as "love."

Meeker then met with the Dean, Steve Dennis, to discuss the Stokes-Stevens situation. However, Meeker failed to inform Dennis of multiple details regarding the situation, including, among other things, the incident when Stokes sat on Stevens' lap in Stevens' car, and the fact that Stokes had been going to Stevens' home. Had Dennis been informed about these additional details, he would have

———————————————

February 28, 2022).

been concerned enough to elevate the report to HR or Title IX. Lacking these details, Dennis decided not to elevate the report to HR or Title IX.

Neither Roberts, Meeker, or Dennis, or anyone else at the Department or BYU-I, engaged in any further investigation regarding the Stokes-Stevens situation. The Department's only response was to send Stokes an email. The email was sent by Meeker and stated that Stokes needed to cease all non-academic interactions with Stevens, and that if Stokes made that change, there was no reason to elevate the concern above the Department level at that time.[7]

---

[7] The email stated:

Thank you for meeting with me the other day regarding the complaint voiced by a social work student who had concerns about an inappropriate relationship between you and another student in the program. While the intent behind your actions were benevolent, the emotional relationship that has developed over time crosses the boundary of what an appropriate student-teacher relationship should be at BYU-I. University policy states, "faculty members should exercise prudence in their use of all forms of communication with students, ... making certain there is an academic purpose to all interactions." Faculty are also encouraged to refer troubled students to the available resources on campus, "distressed or troubled students who are experiencing prolonged sadness, confusion, stress, disorientation, or anxiety should be directed to seek help through the Counseling Center, the Health Center, the Dean of Students Office, or an ecclesiastical leader" (Faculty Guide 3.5.1 & 3.5.6).

As a result of my discussions with you, the students involved, and the College Dean, I am requesting the following action to minimize risk to you, the student involved, and the University. Please cease all non-academic interactions with this student and make sure that any academic discussions with this student are limited and take place in a public setting. I encourage you to direct her towards the various campus and community services, and ecclesiastical help that is available

(Continued)

No one in the Department ever saw Stevens again after the June 8, 2016, meeting and report, nor did anyone in the Department take any action to confirm that Stokes was complying with the directive to have no further non-academic contact with Stevens. The Department also did not follow up with Stevens regarding resolution of the issue. And Stevens never returned to campus.

In response to Spencer taking action to report the Stokes-Stevens situation, Stokes threatened to harm Spencer's educational opportunities. He stated that he could "make one phone call, and she'll lose her internship." (Dkt. 272-16.) Stevens saw this threat as a way in which Stokes demonstrated his power. Stevens believed that by saying that he could do that to others, such as Spencer, he was also indicating he could do the same thing to her (Stevens). Thus, Stevens was concerned about what Stokes might do to interfere with her own ability to complete her degree if she took further action against him.

Stokes' sexual conduct with Stevens continued through the remainder of June 2016. On July 1, 2016, Stokes passed away due to complications that arose

---

to help her meet her needs. This change will insure[sic] that University policy is being followed, will minimize risk to you, and will provide the assistance that this student needs. If this change is made, I see no reason why this concern needs to be elevated above the college level at this time. Thank you Steve, for your openness throughout this process.

(Dkt. 272-20 at 2.)

during a medical procedure.

Spencer learned of Stokes' passing when it was announced while Spencer was in a classroom on campus. After she heard the announcement, she became very upset and angry, and eventually went to talk with Karrie Tingey, who was the Department's office manager. Spencer expressed that she was angry at Roberts because he had not believed her report regarding the Stokes-Stevens relationship and did not believe Spencer when she indicated that Stevens had changed her story about what was going on. Spencer also told Tingey that Stokes had been calling Stevens his wife; that Stokes had been telling Stevens that God approved of the relationship between Stevens and Stokes; that Stokes sat on Stevens' lap in Stevens' vehicle; that Stokes kept a picture of Stevens in his office; and that when Spencer confronted Stokes about the relationship, Stokes told Spencer that he loved Stevens. Tingey, in turn, reported this information to two other Department professors.

Barnes, a counselor with BYU-I, reached out to Stevens sometime after Stokes' passing and provided her with some limited counseling. Barnes' counseling notes state that Stevens "is still working on regaining her sense of self and moving forward. Time is really helping her to better recognize and confront her worries and concerns in the romantic relationship. She is starting to gain a little

sense of her vulnerability as well as a better sense of [Stokes'] responsibility to manage the boundaries as teacher and therapist. She has organized messages binders that have the messages that [Stokes] has sent to her. They reveal a clear pattern of manipulation although the exact intent is difficult to read." (Dkt. 285 at 3.) Barnes also reported Stokes' sexual relationship with Stevens to administrator Wynn Hill. The Stokes-Stevens relationship was then finally reported to HR.

Barnes also took it upon himself to advocate for Stevens at BYU-I—Stevens had failed both of her spring classes due to lack of attendance and was on academic suspension. It was clear that Stevens was going through a crisis and needed help. However, beyond this limited assistance from Barnes, Stevens was not provided with support from anyone at BYU-I to ensure that she could continue to attend school.

Stevens requested a Title IX investigation through her counselor. Yet, no Title IX investigation was initiated.

BYU-I also refused to allow Stevens to meet the Title IX Coordinator, Nick Rammell, in the presence of Stevens' attorney. Further, Rammell told Stevens that he encourages parties *to not report* issues of sexual misconduct to the Title IX office and to seek help outside of BYU-I because of BYU-I's failure to grant amnesty from the Honor Code.

Stevens' ecclesiastical endorsement[8] also expired during this time, and her LDS Church leaders refused to meet with her for an endorsement on the grounds that she had pending litigation against BYU-I. The LDS Church leaders told her that she had to instead obtain a waiver of the ecclesiastical endorsement requirement from BYU-I. However, BYU-I refused to waive that requirement and told her that she would need to be denied an ecclesiastical endorsement before she could be considered for a waiver. Thus, Stevens had to work through her legal counsel to arrange a meeting with her bishop[9] to obtain an ecclesiastical endorsement. Stevens eventually returned to BYU-I and completed her degree, graduating in December 2017 with her Bachelor of Science degree in Social Work.

## MOTION FOR SUMMARY JUDGMENT

In this action, Stevens brings claims against BYU-I for teacher-on-student hostile environment/sexual harassment in violation of Title IX of the Education

---

[8] The BYU-I website explains the ecclesiastical endorsement as follows: "Annually, each [LDS] student planning on continuing at Brigham Young University-Idaho beyond the winter semester will be required to obtain a continuing [ecclesiastical] endorsement from the bishop of the ward the student resided in during the winter semester before registering for any subsequent term or semester." *See* https://www2.byui.edu/catalog-archive/2002-2003/byui.edu/DeanOfSt/ecclesia.htm (last accessed February 28, 2022).

[9] The LDS Church website explains a "bishop" as follows: "A bishop is a man who has been ordained and set apart as the presiding high priest for a ward, or congregation. He has overall responsibility for ministering the temporal and spiritual affairs of the congregation." *See* https://www.churchofjesuschrist.org/study/manual/gospel-topics/bishop?lang=eng (last accessed February 28, 2022).

Amendments Act; teacher-on-student quid pro quo sexual harassment; violation of the Rehabilitation Act and Americans with Disabilities Act (Hostile Learning Environment); and violation of the Idaho Human Rights Act. BYU-I moves for summary judgment on all of Stevens' claims.

As discussed below, the Court finds that BYU-I is entitled to summary judgment on Stevens' claims under the ADA and the Rehabilitation Act, and those claims (Count Three of the Complaint) will be dismissed. However, the Court finds that there are genuine disputes of material fact that preclude summary judgment as to Stevens' other claims.

### A.    Summary Judgment Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In deciding whether there is a genuine dispute of material fact, the Court must view the facts in the light most favorable to the nonmoving party. *Id.* at 255; *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether

there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.") (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc)). The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

### B.      Title IX Claims

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Claims for violation of Title IX may be pursued under two different theories of liability—(1) as a claim that the defendant violated Title IX by failing to adequately respond to the plaintiff's assault (an individual claim); and (2) as a claim that the defendant maintained "a general policy of deliberate indifference to reports of sexual misconduct, which heightened the risk that [the plaintiff] would be assaulted" (a pre-assault claim). *Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1099 (9th Cir. 2020). The Court will examine each of these theories of liability in turn.

#### 1.   Individual Claim

To prevail on a Title IX individual claim, a plaintiff must establish five elements:

(1) "[T]he school ... exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]";

(2) "[T]he plaintiff ... suffered harassment that is so severe, pervasive, and objectively offensive that it can be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school";

(3) "[A] school official with authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf must have had 'actual knowledge' of the harassment";

(4) "[T]he school must have acted with 'deliberate indifference' to the harassment, such that the school's response to the harassment or lack thereof [was] clearly unreasonable in light of the known circumstances"; and

(5) "[T]he school's deliberate indifference ... subject[ed the plaintiff] to harassment."

*Brown v. State*, 23 F.4th 1173, 1179 (9th Cir. 2022) (quoting *Karasek*, 956 F.3d at 1105).

For purposes of summary judgment, BYU-I challenges only the third  and fourth elements—whether an "appropriate person" had actual notice; and whether BYU-I acted with deliberate indifference.

### a.  Appropriate person with actual knowledge.

BYU-I argues that Stevens has failed to put forward evidence demonstrating that an "appropriate person" under Title IX had "actual knowledge" of Stokes' sexual harassment of Stevens. The Court disagrees.

Under Title IX, an appropriate person is "an official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser v. Lago*

*Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) ("a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge . . . . and fails adequately to respond").

Here, the evidence, viewed in the light most favorable to Stevens, demonstrates that Stevens and Spencer reported the Stokes-Stevens relationship to numerous individuals employed by BYU-I, including Roberts and Meeker; and that this report included information that Stokes had been kissing, touching, hugging, and rubbing Stevens; that Stokes had been going to Stevens' home; that Stokes got into Stevens' car with her and sat on her lap; that Stokes had said he loved Stevens; and that Stevens begged for help in putting up boundaries with Stokes. Further, the evidence shows that Meeker is a supervisor of Stokes and had authority to take action to remedy Stokes' misconduct.[10] BYU-I does not dispute that Meeker is an "appropriate person" under Title IX.

Thus, viewed in the light most favorable to Stevens, the evidence shows that an "appropriate person" under Title IX received a report that inappropriate physical

---

[10] Stevens argues that others, such as Roberts and Barnes, are "appropriate persons" under Title IX. The Court need not reach that issue for purposes of summary judgment because it finds that Meeker was an appropriate person and that the evidence, viewed in the light most favorable to Stevens, demonstrates that Meeker had knowledge of inappropriate physical conduct between Stokes and Stevens.

conduct had been occurring between Stevens and Stokes, and that Stevens was

asking for help to stop the conduct. This is sufficient to create a genuine issue of

material fact as to whether an "appropriate person" had "actual knowledge" of the

alleged sexual harassment.

### b.   Deliberate Indifference

For Title IX liability to attach, a plaintiff must demonstrate that the

defendant acted with deliberate indifference to the reported harassment. *Gebser*,

524 U.S. at 290. Deliberate indifference occurs when the plaintiff proves the

school's response was "clearly unreasonable in light of the known circumstances."

*Oden v. N. Marianas Coll.*, 440 F. 3d 1085, 1089 (9th Cir. 2006). To avoid

liability, "the recipient must merely respond . . . in a manner that is not clearly

unreasonable." *Karasek*, 956 F.3d at 1105.

Here, the evidence, viewed in the light most favorable to Stevens,

demonstrates the following: After receiving a report of inappropriate physical

conduct between Stokes, a professor, and Stevens, a vulnerable student with

disabilities, Meeker did not elevate the report to Title IX or HR for further

investigation, or otherwise engage in further investigation. Instead, Meeker

elevated the issue to Dean Dennis, but failed to report to Dennis all of the physical

conduct that had been reported to Meeker by Stevens and Spencer. Further, the

only action taken in response to the reported inappropriate physical and emotional

relationship between Stokes and Stevens was an email Meeker sent to Stokes directing Stokes to cease all non-academic interactions with Stevens and informing Stokes that the issue would not be elevated if he did so. There is no evidence that, following this email, anyone at BYU-I followed up with Stevens, Stokes, or in any other manner, to confirm that Stokes was following the direction to cease all non-academic interactions with Stevens.

The evidence, viewed in the light most favorable to Stevens, raises at minimum a question of fact as to deliberate indifference. This evidence includes the failure of Meeker and/or Dennis to take adequate action to remedy the inappropriate relationship between Stokes and Stevens, such as by elevating the situation for investigation or acting reasonably to prevent future harassment. Accordingly, summary judgment on the Title IX individual claim will be denied.

### 2.  Title IX Pre-Assault Claim

To prevail on a Title IX pre-assault claim, Stevens must demonstrate

(1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived the plaintiff of access to the educational opportunities or benefits provided by the school.

*Karasek*, 956 F.3d at 1112.

"A school need not have had actual knowledge of a specific instance of

sexual misconduct or responded with deliberate indifference to that misconduct before damages liability may attach." *Id.* Thus, "where the official policy is one of deliberate indifference to a known overall risk of sexual harassment, notice of a particular harassment situation and an opportunity to cure it are not predicates for liability." *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 967 (9th Cir. 2010).

Here, viewing the evidence in the light most favorable to Stevens, the evidence demonstrates that BYU-I combined the Title IX office with the Honor Code office until approximately April 2016; that the two offices shared information and did not give amnesty from the Honor Code to those who reported sexual misconduct; and that this created a chilling effect for anyone to report sexual misconduct. (*See* Dkt. 272-23; Dkt. 272-45.)  This sharing of the same office for Title IX and Honor Code, and the sharing of information between Title IX and Honor Code, created confidentiality issues and the risk of a student being accused of Honor Code violations if the student were to report sexual misconduct.

The legitimacy and significance of these concerns is demonstrated in this case by, among other things, Spencer's hesitancy and failure to report her suspicion regarding Stevens and Stokes to the Title IX/Honor Code office, including that she did not want to report unless absolutely required to do so and

that she did not want to report because she did not want to be "interrogated." In addition, Barnes, a professor and counselor at BYU-I, admitted that the reputation of the Honor Code office was poor, and that the "[g]eneral sense is that sometimes individuals who report things to the Honor Code office can feel like they have committed a crime just by reporting an incident by the questions that they might be asked." (Dkt. 283-4 at 24.) Further, Nick Rammell, the Title IX Coordinator, told Stevens that he encourages parties to seek help elsewhere because of the failure of BYU-I to give amnesty from the Honor Code for reports of sexual misconduct.

In addition, there is evidence that BYU-I fails to adequately train its employees on Title IX; that BYU-I applies its policy inconsistently in sexual misconduct cases such that victims are disregarded and offenders are protected; that claims of sexual misconduct against faculty can be decided within a department rather than by the Title IX or HR office; and that there is a general policy of victim blaming, particularly where the complaint is against faculty. (Dkt. 272-45.)

This and other evidence in the record, viewed in the light most favorable to Stevens, demonstrates an official policy of deliberate indifference to a known overall risk of sexual harassment, including the risks that sexual misconduct will occur but not be reported and investigated, that those who perpetrate sexual

misconduct will be emboldened and victims will not report and not be protected.

BYU-I argues, however, that Stevens' pre-assault claim fails as a matter of law because the policies she relies upon are all facially neutral and none of the policies indicate that BYU-I intended to discriminate against women. For example, BYU-I points out that the Honor Code applies to both women and men, as does the lack of amnesty.

However, the vast majority of BYU-I faculty are male—at the time of the alleged misconduct at issue in this case, women made up only twenty-one percent of the full-time faculty at BYU-I, and all ten professors in the Department were male. In light of this gender disparity, and the differential treatment in sexual misconduct cases such that faculty offenders are protected and student victims are blamed, there is at minimum a question of fact as to whether BYU-I policies indicate an intent to discriminate against women.

Finally, BYU-I contends that Stevens has not submitted evidence demonstrating that its policies caused her abuse. The Court disagrees. The evidence, viewed in the light most favorable to Stevens, indicates that Spencer suspected that there was ongoing sexual abuse by Stokes but did not report it to Title IX because of the manner in which BYU-I treated such reports. In an apparent attempt to avoid going to the Title IX/Honor Code office, Spencer and

Stevens instead reported the abuse to the Department, and Stevens asked for help in stopping the abuse. The Department then "handled" the situation within the Department rather than elevating the report to HR and to Title IX, failed to further investigate, failed to take corrective action other than sending an email to Stokes, and failed to follow up to ensure that Stokes had stopped the abuse. The abuse of Stevens thus continued.

If the BYU-I policies were such that students were not hesitant to report sexual misconduct to Title IX, it is possible (perhaps even likely) that Stokes would not have been emboldened to take the actions he did toward Stevens,[11] and/or that Spencer or Stevens would have reported the situation to Title IX. Further, had BYU-I investigated after receiving the report, and taken appropriate action, Stevens may have been spared both the ongoing sexual abuse and the difficulty she ultimately encountered in completing her degree.

In sum, there are, at minimum, genuine issues of material fact that preclude summary judgment on Stevens' Title IX pre-assault claim.

---

[11] The evidence, viewed in the light most favorable to Stevens, indicates that the culture at BYU-I and in the Department emboldened Stokes such that he put a picture of Stevens on his office desk, and openly engaged in conduct such as touching Stevens and sitting on Stevens' lap where others could observe him doing so.

### 3.  Title IX Religious Exemption and the First Amendment

BYU-I argues that Stevens' pre-assault claim, which relates to BYU-I's Honor Code and Honor Code office, is barred both by Title IX's religious exemption and by the First Amendment's Free Exercise Clause. The Court disagrees.

Title IX provides that it does "not apply to an educational institution which is controlled by a religious organization if the application . . . would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). Similarly, the First Amendment Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Cons. Amend. 1.

Here, Stevens is not arguing that BYU-I cannot enforce its Honor Code or have an Honor Code office. Instead, Stevens is arguing that BYU-I acted with deliberate indifference by creating a system in which victims would not report sexual assault because the Honor Code and the Title IX were combined into one office and information was shared between Title IX and Honor Code offices. This created a chilling effect on employees and students making sexual assault reports to Title IX for fear that they would be accused of Honor Code violations.

Further, there is no evidence that combining the Title IX and Honor Code offices, and the sharing of information between the offices, was necessary to comply with a religious tenet; nor is there evidence that granting amnesty to those

reporting sexual misconduct to the Title IX office would violate a religious tenet.

Accordingly, the Court finds that Stevens' pre-assault claim is not barred by either

Title IX's religious exemption or by the First Amendment.

### C.  Rehabilitation Act Claim[12]

Stevens alleges that BYU-I violated § 504 of the Rehabilitation Act, 29

U.S.C. § 794(a), by subjecting her to a hostile educational environment. BYU-I

seeks dismissal of this claim as a matter of law on the ground that the claim is not

cognizable.

The Ninth Circuit has not recognized a § 504 hostile educational

environment claim. *See Breyer v. Pac. Univ.*, No. 20-35304, 2021 WL 3829966, at

*2 (9th Cir. Aug. 27, 2021) ("The district court declined to recognize a hostile

environment theory of disability discrimination under the [ADA and Rehabilitation

Act]. Indeed, we have not held that such a claim is cognizable. But even assuming,

without deciding, that such a claim is cognizable, it fails here. The record does not

demonstrate that the University's actions rise to the level of severe or pervasive

harassment."). Further, numerous district courts in the Ninth Circuit have declined

--------

[12] Stevens concedes that Title III of the Americans with Disabilities Act exempts religious organizations and entities controlled by religious organizations from the public accommodation requirements of Title III. Thus, Stevens' ADA claim will be dismissed

to recognize § 504 hostile educational environment claims. *See, e.g.,Wormuth v. Lammersville Union Sch. Dist*., 305 F. Supp. 3d 1108, 1127 n.5 (E.D. Cal. 2018) ("The court is unaware of any court within the Ninth Circuit recognizing such a [hostile education] claim under the ADA or § 504 and so declines to recognize such a claim here."); *Toma v. Univ. of Hawaii*, 304 F. Supp. 3d 956, 963 (D. Haw. 2018) ("Based on the lack of controlling authority recognizing such a claim in the Ninth Circuit, the Court declines to recognize a claim for hostile educational environment in this case."); *Garedakis v. Brentwood Union Sch. Dist*., 183 F. Supp. 3d 1032, 1046 (N.D. Cal. 2016) ("This court was unable to locate any decision by the Ninth Circuit or by any district court within the Ninth Circuit recognizing a claim of hostile educational environment under the ADA or § 504, against a school board, and this court declines to do so."); *aff'd in part and reversed in part*, 756 F. App'x 669, 671 (9th Cir. 2018) ("Assuming without deciding that the [hostile educational environment] theory is cognizable in our circuit, that claim fails because the plaintiffs have not shown the alleged abuse was 'by reason of' or 'solely by reason of' their disabilities."); *but see Duncan v. Eugene Sch. Dist. 4J*, No. 6:19-CV-00065-MK, 2021 WL 3145966, at *4 (D. Or. July 26, 2021) ( allowing § 504 hostile educational environment claim to proceed).

Based on the lack of Ninth Circuit or other controlling authority recognizing

a claim for § 504 hostile educational environment, the Court declines to recognize such a claim here and will accordingly dismiss Stevens' § 504 claim.

**D.    Idaho Human Rights Act Claim (IHRA)**

Stevens brings a claim under the IHRA for gender discrimination. BYU-I contends that Stevens' IHRA claim must be dismissed. For purposes of its motion for summary judgment, BYU-I does not challenge any of the elements of a IHRA cause of action. Instead, BYU-I relies solely on its contention that it cannot be held vicariously liable under the IHRA for Stokes' conduct. The Court disagrees and will thus deny summary judgment on this claim.

The IHRA makes it unlawful for an "educational institution" to "exclude, expel, limit, or otherwise discriminate against . . . an individual enrolled as a student in the terms, conditions, and privileges of the institution," because of, or on the basis of sex. I.C. § 67-5909(7). "Educational institution" is, in turn, defined by the IHRA as a "public or private institution," including a "college, . . .  or university, . . . and includes *an agent of an educational institution*." I.C. § 67-5902(10) (emphasis added).

In an unpublished disposition, the Ninth Circuit recognized that this emphasized language—which includes "an agent of an educational institution" within the definition of an educational institution—"provides for *respondeat superior* liability." *Johnson v. N. Idaho Coll*., 350 F. App'x 110, 112 (9th Cir.

2009) (citing *Gebser*, 524 U.S. at 284). Further, the Ninth Circuit explained that "the preamble to the IHRA expresses the policy that the IHRA parallels Title VII." *Id.* Title VII uses almost identical language as that set forth in the IHRA definition of an "educational institution," and that language has been interpreted under Title VII to permit *respondeat superior* liability. *Id.* Thus, BYU-I can be held liable for Stokes' conduct based on *respondeat superior* liability.

BYU-I also argues that there is no evidence that a tangible educational action occurred here and that it is thus shielded from liability for Stokes' conduct by the *Ellerth-Faragher* affirmative defense. Again, the Court disagrees.

"Under *Faragher/Ellerth*, when an employee has been subjected to an unlawful 'tangible employment action' by a supervisor, the employer may be held liable without more; [however,] when the employee has been unlawfully harassed, but there has been no 'tangible employment action,' the employer may avoid liability by proving the defense of 'reasonable care.' " *Holly D. v. California Inst. of Tech.*, 339 F.3d 1158, 1167 (9th Cir. 2003) (citing *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)). However, where a supervisor abuses his or her supervisorial authority and succeeds in coercing an employee to engage in sexual acts, "the abuse of supervisorial authority results in a 'tangible employment action' that causes

significant injury to the employee involved." Under these circumstances, the *Faragher/Ellerth* defense is not available. *Holly D*, 339 F.3d at 1167.

Here, Stevens claims that her submission to Stokes' sexual advances were based on his manipulation and distortion of Godly revelation, and her perception of his power and authority due to his positions in BYU-I and the LDS Church. Taken as true, this abusive manipulation and resulting submission to the sexual advances constitute "tangible educational action" that caused significant injury to Stevens. Thus, the *Faragher/Ellerth* defense is not available to BYU-I. *See Holly D*, 339 F.3d at 1167.

## MOTION TO STRIKE

Stevens moves to strike the declaration of Brock Pence, which has been submitted by BYU-I in support of its renewed motion for sanctions for spoliation.[13] Stevens argues that BYU-I is attempting to use Pence as an expert witness even though he was not previously disclosed as an expert or otherwise. BYU-I responds that it is not seeking to use Pence as an expert but is instead submitting the

---

[13] The spoliation, which has been discussed extensively by the Court previously (*see, e.g.*, Dkt. 233), relates in relevant part to an incident in which Stevens' cell phone was factory reset at an AT&T store. Stevens has stated that this reset was unintentional—that she took her phone to the AT&T store after her phone froze; that she explicitly told the AT&T employee that she could not lose the data on the phone; but that the employee performed a factory reset on the phone without Steven's knowledge or consent, and thereby deleted all data on the phone, despite Steven's instruction to the employee that she needed the data.

declaration as lay opinion testimony. Because the Court finds the Pence declaration to constitute improper lay opinion testimony, the Court will grant Stevens' motion to strike the declaration.

Under Federal Rule of Evidence 701, the opinion of a witness that is not testifying as an expert may be admitted if the opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

The requirement of Rule 701(a) that a lay opinion be rationally based on the witness's "perception," "is the familiar requirement of first-hand knowledge or observation." Fed. R. Evid. 701, Advisory Committee's Note; *see United States v. Lopez*, 762 F.3d 852, 864 (9th Cir. 2014) ("Rule 701(a) contains a personal knowledge requirement. . . . [W]e have held that the personal knowledge requirement under Rule 602 is the same as that under Rule 701(a). . . . In presenting lay opinions, the personal knowledge requirement may be met if the witness can demonstrate firsthand knowledge or observation.").

Here, the Pence declaration discusses his previous experience as a manager of *Verizon stores*, including the training of employees; the procedures employees were to use in dealing with customers with phone issues that may require a factory

reset; and steps employees were to take so "no mistake could be made as to the factory resetting of a customer's phone without their knowledge or consent." (Dkt. 278-2.)

As to the situation where Stevens' phone was factory reset at an *AT&T store*, Pence states in the declaration that he reviewed some of Steven's discovery responses, as well as two of Stevens' declarations. Pence then goes on to opine what he believes happened.

Lacking from the Pence declaration is any indication that Pence has personal, first-hand knowledge of what occurred at the AT&T store when the factory reset of the cell phone occurred. Thus, there is no indication that the opinions expressed by Pence in the declaration are based on his own perception as required under Rule 701(a). The declaration is therefore inadmissible. *See* Fed. R. Evid. 701(a); *Lopez*, 762 F.3d at 864; *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 225 (3d Cir. 2008) ("First, a lay opinion must be rationally based on the witness's perception and 'firsthand knowledge of the factual predicates that form the basis for the opinion.' ") (citations omitted); *United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007) ("Rule 701(a) requires that lay opinion

testimony be both (a) based on the witness's first-hand perceptions and (b) rationally derived from those first-hand perceptions."); *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002) ("[A] lay opinion must be rationally based on the perception of the witness. This requirement is the familiar requirement of first-hand knowledge or observation.").

Nonetheless, BYU-I argues that because Pence's opinion is based on his industry experience and his review of written records disclosed in this case, it is based on his "perception" and is thus admissible. The Court disagrees.

First, the out-of-circuit authority relied on by BYU-I is not only not binding on this Court but is also inapposite. For example, in *United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011), a law enforcement agent, had been investigating a case for five years, and had "read thousands of wiretap summaries plus hundreds of verbatim transcripts, as well as faxes, publications, and speeches," and "listened to the intercepted calls in English and Arabic." The Eleventh Circuit found that, although the agent did not "personally observe or participate in the defendants' conversations and based his testimony largely on documents admitted into evidence," the agent had the requisite first-hand knowledge to testify regarding the "meanings of code words that he learned through his examination of voluminous documents during a five-year investigation." *Id.* at 1103. The agent's "familiarity

with the investigation allowed him to perceive the meaning of coded language that the jury could not have readily discerned."

In *United States v. STABL*, Inc., 800 F.3d 476, 486 (8th Cir. 2015), the district court had admitted as lay witness opinion the testimony of an EPA compliance officer on various topics related to EPA's investigation of the defendant and the violations at issue in the case. The plaintiff challenged the admission of that testimony, arguing that the testimony was expert testimony rather than lay testimony, and should have been excluded because the defendant had failed to disclose the officer as an expert. Thus, the issue before the Eighth Circuit was not whether the officer's testimony complied with the first-hand knowledge requirement of Rule 701,[14] but instead whether the testimony was expert witness testimony or lay testimony. The Eighth Circuit found the testimony was "properly viewed as primarily related to [the officer's] industry experience as an EPA compliance officer rather than expert knowledge" and thus found the testimony properly admitted under Rule 701 as lay testimony.

Similarly, in *United States v. Leo*, 941 F.2d 181, 193 (3d Cir. 1991), a GE finance executive testified at trial regarding "the conclusions he formed while

---

[14] However, the personal first-hand knowledge requirement was clearly met in that case based on the EPA officer's involvement in the investigation.

investigating General Electric's purchasing department files." The Third Circuit found that the executive's opinion testimony satisfied Rule 701(a)'s requirement that lay opinion testimony be "rationally based on the perception of the witness." *Id.*

Here, in contrast, we do not have a law enforcement or other witness who has gained their personal "perception" or first-hand knowledge of the underlying facts through their involvement in an investigation or other similar activities. Instead, we have a witness—Pence—whose sole source of knowledge regarding the underlying facts is the review of discovery responses and declarations produced in this case. The review of discovery and declarations does not provide the personal perception and first-hand knowledge required under Rules 701(a) and 602. *See, e.g., United States v. Mock*, 523 F.3d 1299, 1303 (11th Cir. 2008) (lay opinion testimony properly excluded where witness's testimony was not based on first-hand knowledge of underlying facts); *TLT-Babcock, Inc. v. Emerson Elec. Co.*, 33 F.3d 397, 400 (4th Cir. 1994) (lay opinion testimony properly excluded where witness's testimony was based upon reports he received from his staff and could not have been based on his own perceptions); *cf. United States v. Yannotti*, 541 F.3d 112, 125-26 (2d Cir. 2008) (witness's lay opinion testimony regarding loansharking was rationally based on the witness's "own perception because it derived from his direct participation in the

loansharking activities of the charged enterprise, not on participation in the loansharking activities of some unrelated criminal scheme").

In sum, the Pence declaration fails to establish it is based on Pence's personal perception and first-hand knowledge of the underlying facts. The declaration is therefore inadmissible as lay opinion testimony.[15]

## RENEWED MOTION FOR SANCTIONS

BYU-I renews its motion for sanctions based on spoliation by Stevens of evidence when she selectively deleted text messages on her phone and when the AT&T factory reset of her phone deleted all remaining texts on the phone.

The Court denied BYU-I's previous spoliation motion without prejudice to the right of BYU-I to raise the motion again at trial. (Dkt. 233.) BYU-I has now renewed its motion for sanctions, not at trial, but instead in another pre-trial motion.

In support of its renewed motion, BYU-I relies on (1) the Pence declaration, and (2) the deposition and files of DeAnne Casperson, counsel for Stevens. As discussed above, the Pence declaration is improper lay opinion testimony and will

---

[15] Stevens also argues that the declaration is inadmissible because it is not relevant. Because the Court finds the declaration to be improper lay opinion testimony, the Court does not reach the issue of relevance.

accordingly be stricken. This leaves the Casperson deposition and file as support for BYU-I's renewed motion.

BYU-I contends that Casperson's deposition testimony and file confirms that Casperson did nothing to preserve the texts and their metadata until many months after the data was irretrievably destroyed. As examples, BYU-I points out that Casperson never took custody of Stevens' phone or computer; never instructed Stevens to stop using her phone even though it had frozen in the past; never switched out the phone's SIM card; never had Stevens download anything other than "manipulated" screen shots; never put in place a safeguard to protect the phone's or computer's contents; and never downloaded the contents of Stevens' computer or tried to download the contents of Stevens' phone until November 2017, more than a year after Casperson was retained and eight to nine months after the AT&T store factory reset occurred. Finally, BYU-I argues that the destruction and manipulation of the text messages by Stevens was intentional and was for the purpose of depriving BYU-I of evidence and allowing Stevens to craft a misleading narrative.

The Court does not find the new evidence sufficient to warrant reconsideration of the Court's previous spoliation ruling. The Court recognizes that the Casperson deposition and file provides additional details regarding the factory

reset, the steps taken or not taken by counsel to preserve evidence, and why certain actions were or were not taken. However, none of this new information conclusively demonstrates intent or bad faith on the part of counsel or Stevens in deleting the text messages, or the timing of when the duty to preserve attached in relation to the text deletions. These are questions that must be decided by the fact finder at trial. Accordingly, the renewed motion for sanctions for spoliation will be denied without prejudice to the right of BYU-I to raise the motion during trial.

## ORDER

**IT IS ORDERED that:**

1.  Defendant's Motion for Summary Judgment (Dkt. 272) is GRANTED in part and DENIED in part as follows:

    a.  The motion is GRANTED as to Plaintiff's claims under the Americans with Disabilities Act and the Rehabilitation Act (Count Three).

    b.  The motion is otherwise DENIED.

2.  Defendant's Renewed Motion for Sanctions (Dkt. 278) is DENIED without prejudice to the right of BYU-I to raise the motion during trial, as discussed above and in the Court's December 3, 2019, Memorandum Decision and Order (Dkt. 233).

3.  Plaintiff's Motion to Strike (Dkt. 282) is GRANTED. The Declaration

of Brock Pence (Dkt. 278-2) is ordered STRICKEN.

DATED: March 2, 2022

B. Lynn Winmill
U.S. District Court Judge